# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No.  25-cv-1683

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND REQUEST FOR AN EXPEDITED HEARING

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65.1, Plaintiffs National Association of the Deaf, Derrick Ford, and Matthew Bonn, by and through their attorneys, respectfully move for a preliminary injunction requiring Defendants Donald J. Trump, in his official capacity as President of the United States, Executive Office of the President, White House Office, Office of the Vice President, Susan Wiles, in her official capacity as White House Chief of Staff, and Karoline Leavitt, in her official capacity as Press Secretary, to immediately resume providing qualified American Sign Language ("ASL") interpreters, including Certified Deaf Interpreters ("CDIs"), at all White House press briefings conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary.

As explained in the accompanying Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, a preliminary injunction is necessary to ensure that Plaintiffs have real-time, meaningful access to the White House's press briefings. Absent a preliminary injunction requiring Defendants to immediately resume providing qualified ASL interpreters at such briefings, Plaintiffs will suffer irreparable harm because they are being denied timely, meaningful

1

access to the White House's public pronouncements on, and discussions of, a wide-range of issues of national and international importance.  The balance of equities and public interest also favor a preliminary injunction.

Pursuant to Local 65.1(d), Plaintiffs respectfully request that the Court set a hearing on this motion no later than June 18, 2025, which is 21 days after its filing.  *See* Local Rule 65.1(d).

Dated: May 28, 2025

/s/ *Ian S. Hoffman*
Ian S. Hoffman (D.C. Bar No. 983419)
Alex E. Sirio (D.C. Bar No. 1724703)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
ian.hoffman@arnoldporter.com
alex.sirio@arnoldporter.com

Caitlyn Lewis Kellerman**
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-7751
caitlyn.kellerman@arnoldporter.com


/s/ *Brittany Shrader*
Brittany Shrader**
Drake W. Darrah**
NAD Law and Advocacy Center
86 30 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791
brittany.shrader@nad.org

**pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No.  25-cv-1683 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................4

    A.    Deafness and American Sign Language ................................................4

    B.    White House Press Briefings ................................................................5

    C.    NAD's Past Effort to Ensure Meaningful Access to White House Press Briefings 6

    D.    The White House Successfully Implements a Policy to Ensure ASL Interpreters for All Press Briefings ...............................................................8

    E.    The White House Stops Providing ASL Interpretation .........................11

ARGUMENT ......................................................................................................................12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................13

    A.    Plaintiffs Are Likely to Succeed on Their Rehabilitation Act Claim ..................13

        1.    The Rehabilitation Act Provides a Private Right of Action......................14

        2.    Plaintiffs Have Proven a Violation of the Rehabilitation Act..................16

    B.    Alternatively, Plaintiffs Are Likely to Succeed on Their Claim for Mandamus ...21

    C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim ....................22

II.    PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED......................................................24

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PLAINTIFFS...............................................................................28

CONCLUSION...................................................................................................................29

REQUEST FOR EXPEDITED HEARING.................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Choate,*
469 U.S. 287 (1985)...................................................................................................7, 14

*Am. Bar Ass'n v. U.S. Dep't of Just.,*
2025 WL 1388891 (D.D.C. May 14, 2025).........................................................26

*Am. C.L. Union Found. v. Wash. Metro. Area Transit Auth.,*
303 F. Supp. 3d 11 (D.D.C. 2018)......................................................................23

*Am. Council of Blind v. Astrue,*
2008 WL 1858928 (N.D. Cal. Apr. 23, 2008) ....................................................14

*Am. Council of Blind v. Paulson,*
463 F. Supp. 2d 51 (D.D.C. 2006)......................................................................15

*Am. Council of Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008)....................................................................*passim*

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018)............................................................................25

*Armstrong v. D.C. Pub. Libr.,*
154 F. Supp. 2d 67 (D.D.C. 2001)................................................................22, 23

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015)............................................................................................16

*Ateba v. Jean-Pierre,*
706 F. Supp. 3d 63 (D.D.C. 2023)......................................................................24

*Bartell v. Grifols Shared Servs. NA, Inc.,*
618 F. Supp. 3d 275 (M.D.N.C. 2022) ...............................................................25

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
980 F. Supp. 2d 588 (S.D.N.Y. 2013).................................................................18

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979)............................................................................................15

*Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419, Bhd. of Painters
    & Allied Trades, AFL-CIO v. Brown,*
    656 F.2d 564 (10th Cir. 1981) ............................................................................21

*Changji Esquel Textile Co. v. Raimondo,*
    40 F.4th 716 (D.C. Cir. 2022) ............................................................................13

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.,*
    411 F. Supp. 3d 5 (D.D.C. 2019) .......................................................................26

*Davis v. Pension Ben. Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ..........................................................................13

*Doe v. Dist. of Columbia,*
    796 F. Supp. 559 (D.D.C. 1992) ........................................................................15

*E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.,*
    821 F.2d 1085 (5th Cir. 1987) ............................................................................25

*Elec. Priv. Info. Ctr. v. Dep't of Just.,*
    416 F. Supp. 2d 30 (D.D.C. 2006) ......................................................................26

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
    266 F. Supp. 3d 297 (D.D.C. 2017) ....................................................................26

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ..............................................................................21

*Greater L.A. Council on Deafness, Inc. v. Baldrige,*
    827 F.2d 1353 (9th Cir. 1987) ............................................................................21

*Gresham v. Windrush Partners, Ltd.,*
    730 F.2d 1417 (11th Cir. 1984) ..........................................................................25

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003) ...............................................................................21

*Hernandez v. Enfield Bd. of Educ.,*
    2024 WL 3011177 (D. Conn. June 14, 2024) .....................................................25

*Hobby Lobby Stores, Inc. v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) ..........................................................................25

*In re Aiken Cty.,*
    725 F.3d 255 (D.C. Cir. 2013) ............................................................................21

*J.L. v. Soc. Sec. Admin.,*
    971 F.2d 260 (9th Cir. 1992) ..............................................................................14

*Jud. Watch, Inc. v. U.S. Dep't of Com.*,
    736 F. Supp. 2d 24 (D.D.C. 2010) ...................................................................21

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 21 (D.D.C. 2017) ...................................................................24

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ........................................................................................22

*Lane v. Pena*,
    518 U.S. 187 (1996) ..................................................................................14, 15

*Lane v. Pena*,
    867 F. Supp. 1050 (D.D.C. 1994) ...................................................................15

*Martinez v. Cuomo*,
    459 F. Supp. 3d 517 (S.D.N.Y. 2020) ...................................................... *passim*

*Mathis v. U.S. Parole Comm'n*,
    749 F. Supp. 3d 8 (D.D.C. 2024) ...............................................................15, 16

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013) ........................................................................................16

*McRaniels v. U.S. Dep't of Veterans Affs.*,
    2017 WL 2259622 (W.D. Wis. May 19, 2017) ...............................................14

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ......................................................................25

*Nat'l Ass'n of the Deaf v. Trump*,
    486 F. Supp. 3d 45 (D.D.C. 2020) .......................................................... *passim*

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an
    Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*,
    2024 WL 3443596 (D.D.C. July 15, 2024) .....................................................13

*Payne Enters., Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ........................................................................26

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    2025 WL 1276857 (D.D.C. May 2, 2025) .......................................................26

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ..........................................................................................23

*Pierce v. Dist. of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) ................................................................17

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ................................................................................................ 16

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................................ 25

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .................................................................................................. 25

*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ................................................................................ 24

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
    251 F.3d 814 (9th Cir. 2001) .................................................................................. 24

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ............................................................................ 12, 25

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ............................................................................................ 3, 22

*Traynor v. Turnage*,
    485 U.S. 535 (1988) ................................................................................................ 13

*United Gov't Sec. Officers of Am., Local 52 v. Chertoff*,
    587 F. Supp. 2d 209 (D.D.C. 2008) ....................................................................... 22

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ................................................................................................ 23

*Wash. Post v. Dep't of Homeland Sec.*,
    459 F. Supp. 2d 61 (D.D.C. 2006) .................................................................... 26, 27

## **Statutes**

28 U.S.C. § 1361 ............................................................................................................ 21

29 U.S.C. § 701(b)(1) .................................................................................................... 14

29 U.S.C. § 705(9) ......................................................................................................... 16

29 U.S.C. § 705(21)(A)(iii) ........................................................................................... 16

29 U.S.C. § 794 .............................................................................................................. 17

29 U.S.C. § 794(a) ...................................................................................................... 3, 13

## Regulations

3 C.F.R. Part 102......................................................................................................3

3 C.F.R. § 102.103...........................................................................................14, 17

3 C.F.R. § 102.160(a).......................................................................................14, 22

## Other Authorities

53 Fed. Reg. 25872 (July 8, 1988)...........................................................................18

7 Op. O.L.C. 110 (1983)...........................................................................................18

The Daily Moth, *Interview with Former White House CDI Elie Stecker*,
    https://www.dailymoth.com/blog/interview-with-former-white-house-cdi-
    elsie-stecker...................................................................................................10

Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Community's
    Obligation to Comply With the A.D.A.*, 8 J.L. & Health 155, 160 (1994)..............19

Lauren Oberheim, *Selective Hearing: Communication Barriers in the Court
    System for Deaf and Hardof-Hearing Victims of Rape or Sexual Assault*, 25
    Wm. & Mary J. Race, Gender & Soc. Just. 163 (2018)..........................................19

Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness,
    Language, and Due Process*, 844 Wis. L. Rev. 843 (2003) ...................................19

National Deaf Center on Postsecondary Outcomes, *How many deaf people live in
    the United States?* https://nationaldeafcenter.org/faq/how-many-deaf-people-
    live-in-the-united-states/ ..................................................................................4

Registry of Interpreters for the Deaf, Inc., *Certified Deaf Interpreter Certification
    (CDI)*, https://rid.org/certification/available-certifications/...................................8

Registry of Interpreters for the Deaf, Inc., *RID Position Statement: CDIs at Press
    Conferences*, https://rid.org/rid-position-statement-cdis-at-press-conferences/ ......11

**INTRODUCTION**

Deaf Americans are entitled to know what the President and other White House officials are saying to the public in real time. The law thus requires the White House to make its public press briefings accessible to deaf Americans, including those who communicate via American Sign Language ("ASL"). ASL is the primary and preferred language for hundreds of thousands of deaf persons in the United States.[1] It is a complete and complex language distinct from English, with its own vocabulary and rules for grammar and syntax. It is not simply English in hand signals. Many deaf individuals cannot read and do not understand written English. As such, the oft-cited substitute for ASL interpretation—closed captions—is entirely ineffective for a huge portion of the deaf community.

For four years, beginning in January 2021, the White House satisfied its accessibility obligations by providing ASL interpreters for all public briefings, press conferences, and related events by the President, the Vice President, and the White House Press Secretary. The ASL interpreters appeared on all of the White House's official communication channels, including the White House website, YouTube, Facebook, and Twitter/X. This ensured that deaf Americans who rely on ASL to communicate had meaningful access to the White House's briefings. Deaf Americans could understand and digest what the President and other White House officials were saying, thereby better enabling their participation in American life. The burden of providing such access to the White House was minimal.

However, in January 2025, the White House inexplicably stopped providing ASL interpreters for any of its public press briefings or similar events. Consequently, Defendants are

---

[1] Plaintiffs use the term "deaf" to refer to individuals with hearing levels or hearing loss that qualify as disabilities under the Rehabilitation Act. The phrase "deaf" includes Deaf, DeafBlind, DeafDisabled, Hard of Hearing, and Late Deafened individuals.

now denying hundreds of thousands of deaf Americans meaningful access to the White House's real-time communications on various issues of national and international import. And Defendants are doing so notwithstanding the fast pace at which the White House is announcing globally consequential shifts in economic and foreign policy, sweeping changes to federal agencies, and broad cuts to U.S. government spending.

The White House's refusal to provide qualified ASL interpreters during public briefings is against the law. Federal law unequivocally prohibits discrimination against individuals with disabilities and requires them to have meaningful access to the federal government's programs and services, including the White House's press briefings. Indeed, in 2020, the National Association of the Deaf ("NAD") and several deaf individuals were forced to bring a similar lawsuit in this Court to compel the White House to provide ASL interpreters during press conferences related to the COVID-19 pandemic. On NAD's motion for a preliminary injunction, Judge Boasberg found it likely that the Rehabilitation Act required the White House to provide ASL interpreters during those briefings, and ordered the White House to do so. *See Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 57-58, 60-61 (D.D.C. 2020) ("*NAD*"). Less than five years later, however, deaf individuals are essentially back where they started—that is, without real-time, meaningful access to the White House's public pronouncements on matters of national interest. Without such access, Plaintiffs are denied an equal opportunity to be included and integrated into society.

Plaintiffs seek preliminary injunctive relief to compel Defendants to resume providing qualified ASL interpreters at all White House press briefings and related events—just as the White House had been doing for the last four years without issue. Plaintiffs seek this preliminary relief on three counts: violation of the Rehabilitation Act, violation of the First Amendment, and

mandamus relief, with the latter two being in alternative to the first.  The Court should grant the motion for preliminary injunction for three reasons:

*First*, Plaintiffs are likely to succeed on the merits of their claims.  As this Court recognized when confronting the same issue in 2020, the Rehabilitation Act requires in-frame, qualified ASL interpreters to provide deaf people with meaningful access to the White House's public briefings.[2] *See NAD*, 486 F. Supp. 3d at 57-58, 60-61.  The Rehabilitation Act applies to the Executive Office of the President ("EOP"), White House Office, and Office of the Vice President.  *See* 29 U.S.C. § 794(a); 3 C.F.R. Part 102; *see also NAD*, 486 F. Supp. 3d at 52.  Plaintiffs are likely to succeed on their claims that these agencies have violated the Rehabilitation Act and the First Amendment, or, in the alternative, that they are entitled to relief through a writ of mandamus.

*Second*, Plaintiffs are likely to suffer irreparable harm absent a preliminary injunction.  Defendants' refusal to provide a qualified ASL interpreter is an ongoing violation of Plaintiffs' rights under the Rehabilitation Act, including their right to "fully participate in society."  *See Am. Council of Blind v. Paulson*, 525 F.3d 1256, 1259 (D.C. Cir. 2008).  Defendants' conduct also deprives Plaintiffs of their First Amendment "right to receive information and ideas" from the White House, *see Stanley v. Georgia*, 394 U.S. 557, 564 (1969), particularly when the rest of the country has unencumbered, real-time access to the same information and ideas.  Denying Plaintiffs and hundreds of thousands of other deaf people timely access to information that is highly relevant

---

[2] "In-frame" ASL means simultaneous sign language interpreting where the sign language interpreter is visible on the screen beside the President, Vice President, or other speaker.  This may be accomplished by placing the interpreter physically near the speaker, or by superimposing a live video feed of the interpreter into a frame that appears alongside the speaker, with the frame sized appropriately to allow deaf viewers to see and understand the interpretation.  Under either approach, the in-frame, on screen interpreter would be visible on televised broadcast and on streamed mobile devices.

to ongoing matters of public discussion and debate violates Plaintiffs' statutory and constitutional rights and thus establishes irreparable injury.

*Third*, the balance of hardships and the public interest decisively favor a preliminary injunction.  There would be no hardship on Defendants to provide ASL interpretation during White House briefings—Defendants have done just that for the past four years.  By contrast, Plaintiffs' inability to access information from the White House deprives them daily of their ability to fully participate in American society.  It is also manifestly in the public's interest that *all* members of the American public—including deaf Americans—have real-time access to information from the White House.  The Court should award Plaintiffs preliminary injunctive relief.

## BACKGROUND

### A.    Deafness and American Sign Language

More than 48 million deaf persons live in the United States.[3]  For many of these individuals—at least several hundred thousand—ASL is their primary language, and English is, at best, a second language.  *See* Decl. of Kelby N. Brick ("Brick Decl.")  ¶ 3.  Many deaf persons know virtually no English.  *Id.*

ASL is a complete and complex language distinct from English, with its own vocabulary and rules for grammar and syntax—it is not simply English on the hands.  *See* Decl. of Dr. Judy Shepard-Kegl and Dr. Amy June Rowley ("Shepard-Kegl/Rowley Decl.") ¶ 29.  These languages differ not only in the modalities in which they are expressed (auditory versus visual) but also in the way words are formed, sentences are arranged, and questions are signaled.  *Id.* ¶ 27.

---

[3] National Deaf Center on Postsecondary Outcomes, *How many deaf people live in the United States?*  https://nationaldeafcenter.org/faq/how-many-deaf-people-live-in-the-united-states/  (last visited May 27, 2025).

Additionally, for example, facial expressions play a significant grammatical role in ASL while in English facial expressions have only an affective role in communication.  *Id.* ¶ 29.

ASL has no widely used or standardized written component.  *Id.* ¶ 32.  For several reasons, including early language deprivation, many deaf people have a very limited ability to read and write in English.  Brick Decl. ¶ 3; Shepard-Kegl/Rowley Decl. ¶ 32. Indeed, studies have shown that the median reading level for deaf adults is around grade four.  Shepard-Kegl/Rowley Decl. ¶ 33.  Many deaf Americans therefore cannot communicate via written English.  *Id*. ¶¶ 31-39. Even those individuals who have partially mastered English must rely on their knowledge of ASL to understand English sentences, which can often lead to consequential misunderstandings of written information.  *Id.* ¶ 38.

Written English is not an effective means of communication for the many thousands of deaf individuals who have limited English capabilities, particularly for complex and important topics.  Brick Decl. ¶ 4.  Providing captioning or any written English text to deaf individuals is not a reasonable accommodation that provides meaningful communication access.  *Id.* ¶ 5.

Many deaf Americans who use ASL require qualified ASL interpreters to communicate with persons who can only communicate in a spoken language such as English.   Shepard-Kegl/Rowley Decl. ¶ 39. The most effective interpretations are those provided by native ASL signers, such as Certified Deaf Interpreters ("CDIs") (discussed below).  Such fluent and accurate interpretations are critical for deaf Americans especially in times of great and frequent change.  *Id*. ¶¶ 42-46.

### B.    White House Press Briefings

The White House, particularly the White House Press Office and Press Secretary, is responsible for the public communications of the Administration.  Compl. ¶ 25.  The President and the White House communicate with the public in various formats.  *Id.* ¶ 26.  Press briefings

conducted at the White House are among the most common formats. The Press Office generally convenes press briefings by notifying the reporters and networks covering the White House that a press briefing will occur. *Id.* During such briefings, the President, Vice President, Press Secretary, and other officials typically deliver remarks to members of the White House Press Corps. *Id.* Following those remarks, members of the Press Corps are often given an opportunity to ask questions on virtually any topic of interest. *Id.*

The Press Office permits members of the media and media outlets to attend and film the press briefings using television network video cameras. *Id.* ¶ 28. The footage is pooled and shared among various networks. *Id.* Many of the nation's major news networks broadcast the White House briefings to a live national audience. *Id.* The White House Communications Agency also films and broadcasts White House press briefings using its own video cameras and delivery apparatus. *Id.* ¶ 29. The White House's broadcasts regularly appear on the White House's official communication channels, including YouTube, Facebook, and Twitter/X. *Id.*

### C.    NAD's Past Effort to Ensure Meaningful Access to White House Press Briefings

In March 2020, the White House began holding regular, televised briefings regarding the COVID-19 outbreak. Even though governors, mayors, and other elected officials across the country were providing ASL interpreters for their COVID-19 briefings, the White House refused to do so. Consequently, hundreds of thousands of deaf Americans were unable to receive this important information on health safety due to the lack of ASL interpreters.

In August 2020, NAD and five individual plaintiffs sued President Trump, the EOP, the White House Office, the Office of the Vice President, and then-Press Secretary Kayleigh McEnany on the grounds that the administration's failure to provide ASL interpreters at these critical briefings violated the Rehabilitation Act of 1973 and the First Amendment. *See NAD*, 486 F. Supp.

3d at 48.  Among other things, the plaintiffs argued that the White House's failure to "provide in-frame ASL interpretation during its video broadcasts" rendered the plaintiffs without "access [to] the critical, potentially life-saving information that the nation's leaders and public-health officials share during the briefings," such as "updates on the impact of the pandemic on the economy and on vaccine development" and "information on how to protect themselves and their families."  *Id.* at 49 (internal quotation marks omitted).  The plaintiffs further argued that "the closed captioning that Defendants and the networks provide is an insufficient remedial measure."  *Id.*  For these and other reasons, plaintiffs sought a preliminary injunction requiring the White House to provide ASL interpreters at all COVID-19-related briefings.  *Id.* at 50.

Plaintiffs' request for a preliminary injunction was granted.  *Id.* at 61.  In a thorough and persuasive opinion, the Court agreed that the plaintiffs were likely to succeed on the merits of their claim that the White House's failure to provide ASL interpreters during its briefings on COVID-19 violated Section 504 of the Rehabilitation Act.  *Id.* at 57-58.  In so holding, the Court explained that, by failing to provide ASL interpreters, the White House denied deaf individuals "'meaningful access' to the federal government's programs or activities."  *Id.* at 57 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).  The Court likewise found that there was "little [room for] debate" that the plaintiffs would be irreparably harmed absent injunctive relief.  *Id.* at 58-59. Finally, the Court held that the "balance of equities" and "public interest" strongly favored the plaintiffs, given "that it is in the public interest for the[] [plaintiffs] to receive up-to-date information during the pandemic."  *Id.* at 59.

For these reasons, the Court ordered the White House to "include a qualified ASL interpreter in the [video] feed for all White House coronavirus briefings" going forward.  Order, *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Sept. 23, 2020), ECF No. 22.  The

order required the White House to display the ASL interpreter "either by including in the frame a qualified ASL interpreter located physically near the speaker, or by including in the frame a separate video feed of a qualified ASL interpreter being filmed in a remote location using a picture-in-picture (PIP) format." *Id.* The Court's order went into effect on October 1, 2020. *Id.* Thereafter, the White House began providing an ASL interpreter, in-frame, for all its COVID-19-related briefings.

### D. The White House Successfully Implements a Policy to Ensure ASL Interpreters for All Press Briefings

In early 2021, the White House began providing ASL interpreters for *all* press briefings—not limited to those addressing COVID-19—conducted by President Joseph Biden, Vice President Kamala Harris, the White House Press Secretary, and other key members of the administration. Compl. ¶ 37. The ASL interpreters were visible on the White House's official communication channels, including WH.gov/live, Facebook, Twitter/X, and YouTube. *Id.* The White House also used a team of hearing interpreters and Certified Deaf Interpreters ("CDIs") to interpret the briefings.[4] *Id.*

The White House provided the ASL interpreters via picture-in-picture technology, meaning the video feed of the interpreter was superimposed next to the video of the speaker. *Id.* ¶ 39. This allowed the ASL interpreters to be physically located in a different location from the speaker at the press briefing. *Id.* The White House typically filmed the ASL interpreters (who was typically a CDI) while located in the White House or Eisenhower Executive Office Building

---

[4] CDIs are a type of qualified ASL interpreter. They are individuals who are deaf or hard of hearing and who have demonstrated knowledge and understanding of interpreting, deafness, the Deaf community, and Deaf culture. They have native or near-native fluency in ASL, and they undergo countless hours of specialized training. Registry of Interpreters for the Deaf, Inc., *Certified Deaf Interpreter Certification (CDI)*, https://rid.org/certification/available-certifications/ (last visited May 27, 2025).

and provided the interpreters with a live video and/or audio feed of the person speaking at the press briefing. *Id.* At other times, the ASL interpreters interpreted via Zoom. *Id.* The White House would then combine the video feed of the ASL interpreter with the video feed of the speaker at the press briefing via picture-in-picture technology, as follows:



The White House's efforts were groundbreaking: For the first time in history, deaf Americans who communicate via ASL had meaningful access to all White House briefings in real time.

On April 26, 2021, the White House memorialized these efforts in an official policy memorandum entitled "Communication Services for People Who Are Deaf or Hard of Hearing at Presidential Briefings" (the "Policy"). *See* Ex. B to Brick Decl. The Policy reiterated the Biden administration's commitment to ensuring "accessibility for all Americans, including by ensuring effective communication at Presidential briefings with people who are Deaf or Hard of Hearing." *Id.* at 1. To achieve this, the Policy provided that "a qualified [ASL] interpreter" would be included at all "[b]riefings conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary" as broadcast by the White House Communications Agency. *Id.* The Policy dictated that when the White House used picture-in-picture technology, it would

9

"[i]nclude the video feed of the qualified ASL interpreter in the White House feed that is aired or uploaded on WH.gov; and [e]nsure that the video feed of the qualified ASL interpreter is also included in the video uploaded to the White House's social media pages." *Id.* at 2. The Policy also stated that the White House would "[p]rovide the video feed of the qualified ASL interpreter to television networks or the networks' pool feed for use in their live broadcasts." *Id.*

From 2021 to 2024, all individual plaintiffs could—and did—access White House briefings through in-frame ASL interpretation provided by the White House. Decl. of Derrick Ford ("Ford Decl.") ¶ 4; Decl. of Matthew Bonn ("Bonn Decl.") ¶ 4.

The White House successfully implemented the Policy for the remainder of President Biden's four-year term. An ASL interpreter thus appeared in hundreds (if not thousands) of hours of footage of White House press briefings, providing the deaf community with unprecedented and sustained access to the White House's public communications.

Before President Biden's term ended, White House officials developed guidelines and best practices for providing ASL interpretation. As explained by Elsie Stecker, a CDI who served as a politically appointed interpreter in the White House:

> [W]e've already developed guidelines and an internal structure for interpreting services, including how to make a request from vendors, along with specifications from them. We also developed an internal policy for ASL interpreting, along with best practices for large events where a CDI should be provided. We also developed best practices for press briefings and what we should expect from contractors and how we can support them. The guidelines are complete and it's "gold." The packet of information has been available since August and it includes everything needed to make [the White House's] events accessible for everyone.[5]

---

[5] The Daily Moth, *Interview with Former White House CDI Elie Stecker*, https://www.dailymoth.com/blog/interview-with-former-white-house-cdi-elsie-stecker (last visited May 27, 2025).

The guidelines and best practices were consistent with positions articulated by leading organizations. The Registry of Interpreters for the Deaf, for example, emphasizes the importance of providing CDIs for press conferences. Compl. ¶ 46. Because CDIs are specialists who are able meet the diverse linguistic needs of a broader array of the Deaf community, they are best able to convey critical information efficiently to deaf individuals.[6] *Id.*

### E.    The White House Stops Providing ASL Interpretation

President Trump was sworn in for a second term on January 20, 2025. Since that time, the White House has completely stopped providing ASL interpreters for White House press briefings. Press Secretary Leavitt has delivered at least twenty-six press conferences to members of the media. President Trump has held numerous live events—with the press—to announce new executive orders, address the American public alongside foreign heads of state, and reveal major shifts in domestic and international policy. *Id.* ¶ 48. Indeed, President Trump has signed over 150 executive orders since taking office in January and has taken actions that dramatically impact the American people. These actions include shuttering Diversity, Equity, and Inclusion ("DEI") offices within the federal government (many of which were responsible for the provision of workplace accommodations that directly impact deaf federal employees), reducing the federal workforce, and potentially eliminating various federal agencies.

On March 4, 2025, President Trump delivered a nationally televised address before a joint session of Congress. *Id.* ¶ 49. This event was broadcast on major television networks and streamed on the White House YouTube channel. *Id.* No ASL interpreters were provided for this high-profile event. *Id.*

---

[6] Registry of Interpreters for the Deaf, Inc., *RID Position Statement: CDIs at Press Conferences*, https://rid.org/rid-position-statement-cdis-at-press-conferences/ (last visited May 27, 2025).

The White House has not provided an ASL interpreter for any of the aforementioned public briefings or events like them.  As a result, NAD sent a letter to Defendant Susan Wiles on January 31, 2025, requesting that the White House fulfill its obligation to accessibility by restoring ASL interpretation for all press briefings, press conferences, and related events.  *See* Ex. A to Brick Decl.  Having received no response, NAD sent a follow-up letter on April 12, 2025, reiterating its request.  *See* Ex. C to Brick Decl.  As of the date of this filing, the White House has not provided any response to these requests, nor has the White House resumed providing ASL interpreters for its press briefings.  Compl. ¶¶ 57-58.

It is now plainly apparent that the White House is not complying with the Policy announced and followed by the prior administration.  It is also clear the White House is not following any of the guidelines or best practices developed by previous White House officials.

Following many of the White House's press briefings and related events, the White House has posted footage of those briefings to its official communications channels, such as its official channel on YouTube.  *Id.* ¶ 51.  The posted videos do not contain any ASL interpreters.  *Id.*  To be sure, some of the posted videos do contain English closed captions (though it appears that the closed captions are auto generated by YouTube).  *Id.* ¶ 52.  However, English closed captioning is not accessible to many deaf individuals regardless of their ability to read English, and it is especially inaccessible to the many thousands of deaf persons fluent only in ASL.  *Id.*

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must show (1) "a likelihood of success on the merits"; (2) that they "will likely suffer irreparable harm before the district court can resolve the merits of the case"; (3) that the "the balance of equities favors preliminary relief"; and (4) that "an injunction is in the public interest."  *See Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022).

12

Courts in this Circuit apply these factors on a "sliding scale," and thus "an unusually strong showing on one of the factors" may compensate for a lesser showing on another. *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (citation omitted); *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (noting potential tension in caselaw but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, 2024 WL 3443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent). Here, all four factors decisively favor a preliminary injunction.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Are Likely to Succeed on Their Rehabilitation Act Claim

Congress enacted the Rehabilitation Act "to ensure that members of the disabled community could live independently and fully participate in society." *Am. Council of the Blind*, 525 F.3d at 1259. To that end, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), makes it unlawful for federal agencies, including the EOP, White House Office, and Office of the Vice President, to discriminate on the basis of disability in their programs or activities. Section 504 states that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any . . . program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a). The purpose of Section 504 "is to assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals." *Traynor v. Turnage*, 485 U.S. 535, 548 (1988); *see also Am. Council of the Blind*, 525 F.3d at 1260 (stated purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment,

economic self-sufficiency, independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity" (quoting 29 U.S.C. § 701(b)(1))).  Section 504 thus requires that persons be "provided with meaningful access" to the benefit at issue through reasonable accommodation.  *Alexander*, 469 U.S. at 301.

The EOP's regulations implementing the Rehabilitation Act provide that agencies within the EOP—including the White House Office and Office of the Vice President—"shall take appropriate steps to ensure effective communication with . . . members of the public."  3 C.F.R. § 102.160(a).  The agencies "shall furnish appropriate auxiliary aids where necessary to afford a [handicapped person] an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency [*i.e.*, the White House Office]."  *Id.* § 102.160(a)(1).  These regulations additionally mandate that "[i]n determining what type of auxiliary aid is necessary, the agency shall give primary consideration to the requests of the [handicapped person]."  *Id.* § 102.160(a)(1)(i).  Auxiliary aids include, but are not limited to, qualified interpreters for deaf people.  *Id.* § 102.103.

### 1.    The Rehabilitation Act Provides a Private Right of Action

The Rehabilitation Act provides a private right of action to victims of disability discrimination.  *See NAD*, 486 F. Supp. 3d at 53-57; *see also J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992) (finding that plaintiffs can be entitled to equitable relief to remedy Executive agency's section 504 violations), *disapproved of on other grounds by Lane v. Pena*, 518 U.S. 187 (1996); *McRaniels v. U.S. Dep't of Veterans Affs.*, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017) (finding private right of action); *Am. Council of Blind v. Astrue*, 2008 WL 1858928, at *7 (N.D. Cal. Apr. 23, 2008) (same).  As this Court previously explained, "the language of [S]ection 504, which guarantees that 'no otherwise qualified individual with a disability in the

14

United States shall be subjected to discrimination under any program or activity conducted by any Executive agency,'" is the type of language the Supreme Court "has consistently found" to create a privately-enforceable right. *NAD*, 486 F. Supp. 3d at 53 (cleaned up). That same phrasing is likewise "the most accurate indicator" of Congress's intent to create a private cause of action. *Id.* at 54 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979)). Moreover, the "history" and "structure of the Rehabilitation Act" reinforce the conclusion "that Congress intended to create a private cause of action" to enforce Section 504's protections. *Id.*

For these reasons, "many courts across the country" and within this District have held that "private parties can rely on [Section 504 to] bring[] suits against Executive agencies for injunctive and declaratory relief." *Id.* at 55 (collecting cases); *see also Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51, 57-58 (D.D.C. 2006) (recognizing private right of action against government in holding that sovereign immunity does not bar private-plaintiff claims under section 504 against Executive agency for injunctive relief); *Lane v. Pena*, 867 F. Supp. 1050, 1053 (D.D.C. 1994) (granting injunction against Executive agency for violation of section 504 and noting that "[i]t is well-established that injunctive and declaratory relief are available under the Rehabilitation Act" (quoting *Doe v. Dist. of Columbia*, 796 F. Supp. 559, 573 (D.D.C. 1992))), *vacated in part on other grounds by Lane*, 518 U.S. at 190–91. Indeed, *the Government itself* has previously argued in court that "Section 504 implies a private right of action to sue for injunctive relief in federal court for violations of that section that is not dependent on administrative exhaustion." *NAD*, 486 F. Supp. 3d at 55 (quoting government brief from 2015).

Nevertheless, to the extent the Court disagrees with this significant weight of authority and finds no private right of action, the Court still possesses "inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp.

3d 8, 22 (D.D.C. 2024); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27

(2015) (explaining that "federal courts may in some circumstances grant injunctive relief" to enjoin

"violations of federal law by federal officials").  As Judge McFadden explained in *Mathis*, the

"default" rule is that "federal courts have 'jurisdiction in equity'" and that "the 'full scope of [this]

jurisdiction is to be recognized and applied,' absent only 'the clearest command' otherwise in a

statute."  749 F. Supp. 3d at 23 (first quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398

(1946), and then quoting *McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013)).  The Rehabilitation

Act "does not explicitly displace the Court's equity jurisdiction," and, if the Court concludes that

Section 504 does not create an implied right of action, then the Rehabilitation Act also does not

impliedly displace the Court's inherent equitable authority either.  *Id.* at 23-24, 26 (granting

preliminary injunction after holding that the Rehabilitation Act does not explicitly or implicitly

preempt federal courts' equity jurisdiction and therefore finding that "the full scope of this Court's

jurisdiction in equity" enabled the plaintiffs to obtain the remedy they sought under Section 504

(internal quotation marks omitted)).  The Court would thus have full "equitable power to enjoin

the Government from violating" Section 504.  *Id.* at 22.

### 2.    Plaintiffs Have Proven a Violation of the Rehabilitation Act

To prove a violation of Section 504, plaintiffs must show that "[1] they are disabled within

the meaning of the Rehabilitation Act [and] are otherwise qualified, [2] they were excluded from,

denied the benefit of, or subject to discrimination under a program or activity, and [3] the program

or activity is carried out by a federal executive agency or with federal funds."  *Am. Council of

Blind*, 525 F.3d at 1266.  Here, Plaintiffs have demonstrated each of these elements.

*First*, because Plaintiffs are deaf, they are individuals with disabilities.  *See* 29 U.S.C.

§ 705(9); *id.* § 705(21)(A)(iii).  Plaintiffs are also qualified individuals with disabilities under EOP

regulations, which define the term qualified individual with a disability as an individual with a disability who "meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity."  3 C.F.R. § 102.103.  NAD's members and each of the individual Plaintiffs are individuals with disabilities who, with the reasonable accommodation of a qualified ASL interpreter, could more meaningfully participate in and benefit from White House public briefings.  *See Martinez v. Cuomo*, 459 F. Supp. 3d 517, 523 (S.D.N.Y. 2020) (noting that there was "no dispute" that deaf plaintiffs were "qualified individuals with a disability"); *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250, 255, 267 (D.D.C. 2015) (deaf inmate requesting ASL interpreter was qualified individual with a disability under Rehabilitation Act); *Am. Council of the Blind*, 525 F.3d at 1268 (explaining that "deaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance"); *NAD*, 486 F. Supp. 3d at 57-58 (same).

*Second*, the White House's press briefings are programs or activities conducted by the EOP, White House Office, and Office of the Vice President, which are "Executive agencies" under the Rehabilitation Act.  *See NAD*, 486 F. Supp. 3d at 52.  Indeed, the EOP considers itself—as well as the White House Office and Office of the Vice President—to be Executive agencies, as evidenced by its own rulemaking.  The Rehabilitation Act provides that the "head of each such [Executive] agency shall promulgate such regulations as may be necessary to carry out" the statute. 29 U.S.C. § 794.  The EOP has issued such regulations and has defined "agency" therein as "the following entities in the Executive Office of the President: the White House Office, the Office of the Vice President . . . and any committee, board, commission, or similar group established in the Executive Office of the President."  3 C.F.R. § 102.103.  Further, the EOP's regulations state that "a federally conducted program or activity is, in simple terms, anything a Federal agency does."

17

53 Fed. Reg. 25872, 25873 (July 8, 1988).  Accordingly, the White House's press briefings are "programs or activities" under the Rehabilitation Act.  *See NAD*, 486 F. Supp. 3d at 52, 57-58; *see also Martinez*, 459 F. Supp. 3d at 523-26 (applying Rehabilitation Act's prohibition on discrimination in programs and activities to New York governor's briefings); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 640 (S.D.N.Y. 2013) (noting that there was "no dispute" that New York City's emergency preparedness program, which included city press conferences, was a "program" or "activity" within the meaning of the Rehabilitation Act).

That the EOP, White House Office, and Office of the Vice President are "Executive agencies" under the Rehabilitation Act is also confirmed by a memorandum of the Office of Legal Counsel authored by Ted Olson shortly after the 1978 amendments to the Rehabilitation Act.  That memorandum concludes: "It is clear from the legislative history of the 1978 Amendments [to the Rehabilitation Act] that Congress intended the amended [§] 504 to have *the broadest possible coverage within the Executive Branch*."  *See* 7 Op. O.L.C. 110, 110, 114 (1983) (emphasis added). Thus, "the legislative history . . . makes clear that Congress intended [§] 504 to apply . . . to all 'agencies and instrumentalities' in 'the Executive Branch' of government."  *Id.* at 114.  "Those 'agencies and instrumentalities' were understood by Congress to include independent regulatory agencies performing functions constitutionally committed to the Executive Branch, as well as entities more closely subject to the President's day-to-day supervisory authority."  *Id.*

*Third*, Defendants' failure to provide in-frame, qualified ASL interpreters during White House briefings has excluded Plaintiffs from, denied Plaintiffs the benefit of, and subjected Plaintiffs to discrimination under a program or activity conducted by the EOP and agencies within the EOP.  Plaintiffs require an ASL interpreter to effectively understand and participate in public White House briefings because they are deaf.  Without this auxiliary aid, Plaintiffs are not

receiving effective communication and, therefore, cannot access the briefings because they cannot understand the critical information covered.  As discussed above, ASL is the primary and preferred language of many of the NAD's members and the individual Plaintiffs.  Brick Decl. ¶¶ 3-4; Shepard-Kegl/Rowley Decl. ¶¶ 32, 39.  The individual Plaintiffs rely on ASL as their primary language to understand fast-paced, complex information.  *See* Ford Decl. ¶ 2; Bonn Decl. ¶ 2.

Other auxiliary aids, such as closed captioning, are not effective for Plaintiffs.  Multiple courts have recognized that although closed captioning may accommodate deaf Americans "who are fully literate in English," such captions are not an adequate accommodation for the many deaf Americans "who cannot read English."  *See Martinez*, 459 F. Supp. 3d at 525; *NAD*, 486 F. Supp. 3d at 58 (finding same).  Indeed, studies have shown that the median reading level for deaf adults is around grade four.  *See* Shepard-Kegl/Rowley Decl. ¶ 33.[7]  Many thousands of deaf Americans thus cannot communicate via written English, and thus cannot understand English closed-captioning.  *Id*. ¶ 39; *see also* Brick Decl. ¶ 5.  Further, closed captions are frequently riddled with errors, *see* Brick Decl. ¶ 6, and important communicative aspects like tone cannot be conveyed through closed captions, *id.*  The Plaintiffs, in this case, make that point clear.  Mr. Ford and Mr. Bonn have difficulty reading and understanding English closed captioning.  *See* Ford Decl. ¶ 3;

---

[7] *See also, e.g.*, Lauren Oberheim, *Selective Hearing: Communication Barriers in the Court System for Deaf and Hardof-Hearing Victims of Rape or Sexual Assault*, 25 Wm. & Mary J. Race, Gender & Soc. Just. 163, 170 (2018) ("Only ten percent of deaf eighteen-year-olds achieve a tenth-grade reading level. Thirty percent of deaf students exit the school system 'functionally illiterate.'" (citations omitted)); Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 844 Wis. L. Rev. 843, 857 (2003) ("Among the prelingually deaf and severely hard-of-hearing, the median reading level for seventeen- and eighteen-year-olds is grade four. . . . [M]any deaf people do not understand the words we are using, even if the words are put into a visible form by writing or finger-spelling."); Jo Anne Simon, *The Use of Interpreters for the Deaf and the Legal Community's Obligation to Comply With the A.D.A.*, 8 J.L. & Health 155, 160 (1994) (average prelingually deaf adult reads at a fourth grade level).

Bonn Decl. ¶ 3.  The Plaintiffs' difficulties only increase when the subject matter is complex, which is typical in White Houe press briefings.  *See* Ford Decl. ¶ 3; Bonn Decl. ¶ 3.

Based on these facts, this Court previously held that NAD and other deaf plaintiffs had established that the White House's briefings were not accessible without an in-frame, qualified ASL interpreter and had therefore demonstrated a likelihood of success on the merits.  *NAD*, 486 F. Supp. 3d at 57-58.  In so holding, the Court rejected the White House's argument that "[c]losed captioning and transcripts" constituted a "reasonable" alternative accommodation.  *Id.* at 58.  The Court explained that, while such an accommodation might suffice "under some circumstances," it "simply do[es] not provide 'meaningful access in the circumstances [presented] here.'"  *Id.* (quoting *Martinez*, 459 F. Supp. 3d at 525); *see also Am. Council of the Blind*, 525 F.3d at 1267 (explaining that where "plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit").

The court in *Martinez* concluded the same.  459 F. Supp. 3d at 525-26.  There, like here, four deaf individuals and a civil rights organization sued New York Governor Andrew Cuomo on the ground that his failure to provide in-frame, qualified ASL interpretation during his daily press briefings violated Section 504.  The governor argued that existing accommodations, such as closed captioning, ensured meaningful access, but the court "disagree[d]."  *Id.* at 523-24.  The court explained that such accommodations "while perhaps accommodating deaf New Yorkers who are fully literate in English, do not accommodate Plaintiffs and other similar deaf New Yorkers who cannot read English."  *Id.* at 525.  "[W]ithout in-frame ASL interpretation, Plaintiffs are, 'as a practical matter, unable to access benefits to which they are legally entitled.'"  *Id.* (alterations

omitted) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003)). The same analysis applies here.

### B.    Alternatively, Plaintiffs Are Likely to Succeed on Their Claim for Mandamus

In addition to their claim under the Rehabilitation Act, Plaintiffs also seek relief in the form of a writ of mandamus. Even if the Rehabilitation Act could not provide Plaintiffs with adequate remedies—it does—Plaintiffs are likely to succeed on their claim for mandamus relief.

District courts "have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. A plaintiff establishes mandamus relief where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Fornaro v. James,* 416 F.3d 63, 69 (D.C. Cir. 2005) (citation omitted).

Courts have held that mandamus relief is appropriate when a government agency or official has violated a clear statutory command or the agency's regulations. *See, e.g.*, *In re Aiken Cty.*, 725 F.3d 255, 266 (D.C. Cir. 2013) (granting mandamus relief where agency was "defying a law enacted by Congress . . . without any legal basis"); *Greater L.A. Council on Deafness, Inc. v. Baldrige*, 827 F.2d 1353, 1362 (9th Cir. 1987) (holding that mandamus was available to compel Department of Commerce to act based on clear Department regulations implementing Section 504 of the Rehabilitation Act); *Carpet, Linoleum & Resilient Tile Layers, Local Union No. 419, Bhd. of Painters & Allied Trades, AFL-CIO v. Brown*, 656 F.2d 564, 568 (10th Cir. 1981) (holding that mandamus relief was appropriate where plaintiffs demonstrated a "complete failure of federal officials to comply with mandatory statutory and regulatory directives"); *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (holding that plaintiffs could bring claim for

21

alleged violations of clear mandatory duties under the Federal Advisory Committee Act); *United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 217, 221 (D.D.C. 2008) (holding mandamus relief appropriate where plaintiff relied on "regulations that clearly dictate the actions that must be taken").

Here Plaintiffs have a "clear right to relief":  the Rehabilitation Act and EOP's own implementing regulations provide Plaintiffs with a clear right not to be discriminated against under any program or activity conducted by any executive agency, which requires a right to meaningful access to information conveyed at the White House's public briefings.  *See NAD*, 486 F. Supp. 3d at 57-58; *Martinez*, 459 F. Supp. 3d at 522-26.  Defendants' "duty to act" is equally clear—the Rehabilitation Act and the EOP's regulations require that the Defendant agencies "take appropriate steps to ensure effective communication with . . . members of the public" and "furnish appropriate auxiliary aids"—including ASL interpreters—"where necessary to afford an individual with [disabilities] an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency."  3 C.F.R. § 102.160(a), (a)(1).  Thus, to the extent the Court concludes that the Rehabilitation Act does not provide adequate remedies to Plaintiffs—or does not provide a private right of action—relief would be available under the doctrine of mandamus.

## C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim

Plaintiffs are also likely to succeed on the merits of their First Amendment claim.  It is well-established that the First Amendment "protects the right to receive information and ideas." *Stanley*, 394 U.S. at 564; *see also Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences . . . ." (citation omitted)); *Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 75 (D.D.C. 2001) (acknowledging the "long-standing precedent supporting plaintiff's First Amendment right to receive information and ideas").  Where one enjoys a right to speak, others hold a "reciprocal

right to receive" that speech, which "may be asserted" in court. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976).

For four years, the White House provided ASL interpreters for its public briefings. Defendants' decision to stop providing such interpreters directly infringes upon deaf Americans' ability to receive information and ideas from the White House—information and ideas to which the rest of the country has unencumbered, real-time access. It also impinges on Plaintiffs' First Amendment right to "petition the Government for a redress of grievances" because, as a result of Defendants' conduct, Plaintiffs are precluded from knowing what to petition the government for.

Because the White House has chosen to make the video feed of its press briefings available to the public, Defendants must show that eliminating ASL interpreters is "narrowly tailored to serve a significant governmental interest." *See Armstrong*, 154 F. Supp. 2d at 75-76 (explaining that intermediate scrutiny applies to restrictions in a "designated public forum") (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). They cannot do so. Eliminating *all* ASL interpreters for *all* press briefings is not a narrowly tailored approach and denying hundreds of thousands of Americans access to the White House's real-time statements does not serve a significant government interest. And even if the Court were to determine that Defendants' restrictions need only be "reasonable," *see Am. C.L. Union Found. v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 17 (D.D.C. 2018) (explaining that restrictions in a limited or nonpublic forum must be "viewpoint neutral and reasonable in light of the forum's purposes"), Defendants cannot make the required showing. Again, for four years the White House has provided ASL interpreters at all of its press briefings without issue, and Defendants' arbitrary elimination of those interpreters cannot be reasonable.

In analogous circumstances, courts have found that arbitrary restrictions on journalists' access to White House press briefings can violate the First Amendment. *See, e.g.*, *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977) (explaining that "the public at large have an interest protected by the [F]irst [A]mendment in assuring . . . that individual newsmen not be arbitrarily excluded from sources of information" and agreeing that "arbitrary or content-based criteria for press pass issuance are prohibited under the [F]irst [A]mendment"); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 75 (D.D.C. 2023) (explaining that *Sherrill* "support[s] a First Amendment claim at least when a journalist is *excluded* from the [White House] Press Area for arbitrary reasons"), *aff'd sub nom. Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025). Here, Defendants are similarly excluding Plaintiffs from public White House press briefings without adequate justifications, which likewise violates Plaintiffs' First Amendment rights.

For all of these reasons, Plaintiffs are likely to succeed on the merits of at least one of their claims seeking an order compelling Defendants to provide qualified ASL interpreters at all public briefings.[8]

## II. PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED

Absent a preliminary injunction requiring ASL interpretation, Plaintiffs are likely to continue suffering irreparable harm. Where, as here, "a defendant has violated a civil rights statute," courts "presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814,

---

[8] Plaintiffs are also likely to succeed on their Fifth Amendment Equal Protection claim, as well as their claim for non-statutory review. *See* Compl. ¶¶ 82-90, 96-98. However, Plaintiffs' likelihood of success on their other claims means that the Court need not reach this issue. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) ("Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." (citation omitted)).

827 (9th Cir. 2001); *see also Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes."); *E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1090 (5th Cir. 1987) ("[W]hen a civil rights statute is violated, irreparable injury should be presumed from the very fact that the statute has been violated." (internal quotation marks omitted)); *cf. Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (likely violation of the Religious Freedom Restoration Act establishes irreparable harm), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Courts apply this presumption in part because, "[i]n cases where a plaintiff's civil rights have been violated," it is often difficult to "quantify[] the harm done to the plaintiff." *Hernandez v. Enfield Bd. of Educ.*, 2024 WL 3011177, at *3 (D. Conn. June 14, 2024). The Rehabilitation Act is a civil rights statute, and, as shown above, Defendants are engaged in an ongoing violation of the Plaintiffs' rights under that statute. Accordingly, the Court may presume irreparable injury to the Plaintiffs. *See Bartell v. Grifols Shared Servs. NA, Inc.*, 618 F. Supp. 3d 275, 289-90 (M.D.N.C. 2022) (recognizing violation of Americans with Disabilities Act created a presumption of irreparable injury).

This conclusion is buttressed by the fact that Plaintiffs are likely to succeed on the merits of their First Amendment claim. The D.C. Circuit has long made clear that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Singh*, 56 F.4th at 109 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (same); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same); *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same). Recent decisions by judges in this district reaffirm and underscore that principle. *E.g.*,

*Am. Bar Ass'n v. U.S. Dep't of Just.*, 2025 WL 1388891, at *8 (D.D.C. May 14, 2025) (finding irreparable harm because plaintiff had "establish[ed] a likelihood of success on the merits of its First Amendment claims"); *Perkins Coie LLP v. U.S. Dep't of Just.*, 2025 WL 1276857, at *47 (D.D.C. May 2, 2025) (finding irreparable harm where plaintiff established violations of First, Fifth, and Sixth Amendment rights). Because Plaintiffs suffer the loss of their First Amendment freedom to access the information and ideas shared by the White House with each press conference, the Court may also find irreparable injury on this basis.

Further, courts in this circuit have repeatedly held that "the non-disclosure of information to which a plaintiff is entitled, under certain circumstances itself constitutes an irreparable harm; specifically, where the information is highly relevant to an ongoing and highly public matter." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C. 2017); *see also Elec. Priv. Info. Ctr. v. Dep't of Just.*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) (finding irreparable harm where plaintiff would "be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program"). Deaf Americans are entitled to know what the President and other leading federal officials are saying in real time. The President and these officials regularly speak about "ongoing and highly public matter[s]," including matters of national and international importance, which are frequently topics of vigorous national debate. In such circumstances, "stale" information is "of little value" and thus an inadequate remedy to ensure and enable meaningful participation. *See Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019) (finding irreparable harm where plaintiff sought information relating to "ongoing proceedings of national importance"); *Wash. Post v. Dep't of*

*Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) (finding plaintiff would be irreparably harmed by delayed disclosure of information where information sought related to a "time-sensitive" "matter of current national debate"). Similarly, forcing Plaintiffs to rely on delayed and potentially outdated information irreparably denies them the ability to "fully participate in society," thus directly undermining the very purpose of the Rehabilitation Act. *Cf. Am. Council of the Blind*, 525 F.3d at 1259.

The individual Plaintiffs exemplify the irreparable harm deaf Americans will continue to suffer absent preliminary injunctive relief. Mr. Ford wants to engage with the White House's statements on executive orders; DEI issues; Social Security; Medicare; the economy; and the many issues that deeply impact Americans' daily lives. *See* Ford Decl. ¶ 6. He already fears that he is missing out on critical information from the White House on these topics, *see id.*, and that fear will only intensify if months and years pass before the White House provides qualified ASL interpreters at press briefings. Likewise, Mr. Bonn desires to understand what the President and other White House officials have to say about the economy, changes in Medicare and Medicaid, and executive orders on gender issues. *See* Bonn Decl. ¶ 6.

Unless this Court compels the White House to provide ASL interpreters, Mr. Ford, Mr. Bonn, and the many thousands of other deaf Americans who rely on ASL interpretation will be barred from accessing and receiving this important information from the White House and meaningfully engaging with the administration's discussion of these topics. That will remain true at least until this case is litigated through final judgment—a process that could take years. In the interim, these persons will be irreparably deprived of enormous amounts of information from the nation's leaders on matters of significant public import and, consequently, will be irremediably denied their right to fully participate in society.

### III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PLAINTIFFS

The balance of equities also decisively favors a preliminary injunction.  Retaining qualified and effective sign language interpreters is relatively inexpensive and administratively feasible.  In the prior litigation brought by NAD, even the government did not claim "that providing an ASL interpreter to guarantee . . . access would be too burdensome."  *NAD*, 486 F. Supp. 3d at 59; *Martinez*, 459 F. Supp. 3d at 527 (emphasizing that Governor did "not argue that implementing an in-frame ASL interpreter would be burdensome").  Indeed, the White House provided ASL interpretation (including with CDIs) of its public briefings for the last four years, demonstrating that Defendants would suffer no undue hardship if compelled to do the same now.  Plaintiffs, in contrast, would continue to suffer hardship due to their inability to access White House briefings.  *See* Ford Decl. ¶¶ 3, 5-7; Bonn Decl. ¶¶ 3, 5-7.

Finally, the public interest strongly favors a preliminary injunction.  It is in the public's interest that all members of the public have access to up-to-date information from government officials.  That is especially true in an environment like the present one, where the flow of information from top officials is nearly constant and government leaders are frequently announcing new policies that affect broad swaths of the population.  *Cf. NAD*, 486 F. Supp. 3d at 59 (holding that "it is in the public interest for [deaf individuals] to receive up-to-date information during the pandemic, . . . particularly given the rapidly evolving science on the nature of the virus's spread").  Without access to information through an ASL interpreter, an entire segment of the population will lack first-hand, contemporaneous access to vital information.  Nor would there be any "disservice to the public by providing Plaintiffs' proposed accommodation."  *Martinez*, 459 F. Supp. 3d at 527.  To the contrary, it is manifestly in the public interest to ensure that *all*

Americans, including deaf Americans, have timely and meaningful access to the White House's communications on all issues affecting the country.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and issue a preliminary injunction requiring Defendants to immediately resume providing qualified ASL interpreters, including CDIs, at all White House press briefings conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary.

## REQUEST FOR EXPEDITED HEARING

Pursuant to Local Rule 65.1(d), Plaintiffs respectfully request that the Court set a hearing on this motion no later than June 18, 2025, which is 21 days after its filing.

Dated: May 28, 2025

/s/ *Ian S. Hoffman*

Ian S. Hoffman (D.C. Bar No. 983419)
Alex E. Sirio (D.C. Bar No. 1724703)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
ian.hoffman@arnoldporter.com
alex.sirio@arnoldporter.com


Caitlyn Lewis Kellerman**
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-7751
caitlyn.kellerman@arnoldporter.com


/s/ *Brittany Shrader*

Brittany Shrader**
Drake W. Darrah**
NAD Law and Advocacy Center
86 30 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791
brittany.shrader@nad.org

***pro hac vice motion forthcoming*

*Counsel for Plaintiffs*