**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-cv-1683 (AHA) |

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

I.    Statutory and Regulatory Background ............................................................ 3

II.   Factual Background ....................................................................................... 6

ARGUMENT ....................................................................................................... 8

I.    Plaintiffs Have Not Established That They Will Be Irreparably Harmed
      Absent a Preliminary Injunction. .................................................................. 9

II.   Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims. .......................... 12

      a.    Plaintiffs' Claims Are Barred By Claim Preclusion................................. 12

      b.    NAD's Claims Are Barred By Its Settlement in *NAD I*. ......................... 17

      c.    Plaintiffs Are Not Likely to Succeed on Their Rehabilitation Act Claim............ 18

            i.    Plaintiffs Lack a Cause of Action Under Section 504. ..................... 18

            ii.   Plaintiffs Are Not Likely to Succeed in Establishing a Substantive
                  Section 504 Violation. .......................................................... 22

      d.    Plaintiffs Are Not Likely to Succeed on Their Claim for Mandamus. ................ 28

      e.    Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim. ............. 29

      f.    Plaintiffs Are Not Likely to Succeed on Their Remaining Claims...................... 33

III.  The Equities and Public Interest Do Not Favor a Preliminary Injunction. .............. 33

IV.   Any Preliminary Injunction Should Be Accompanied by Security and Should
      Be Stayed................................................................................................. 35

CONCLUSION ................................................................................................... 36

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Choate*,
    469 U.S. 287 (1985)..................................................................................... 22, 23

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)............................................................................................ 18

*Allen v. McCurry*,
    449 U.S. 90 (1980).............................................................................................. 14

*\*Am. Council of the Blind v. Paulson*,
    463 F. Supp. 2d 51 (D.D.C. 2006) ............................................................. 22, 23, 26

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ........................................................................................... 11

*Apotex, Inc. v. Food & Drug Admin.*,
    393 F.3d 210 (D.C. Cir. 2004) ........................................................................ 12, 14

*Armstrong v. D.C. Pub. Libr.*,
    154 F. Supp. 2d 67 (D.D.C. 2001) ...................................................................... 30

*Ateba v. Leavitt*,
    133 F.4th 114 (D.C. Cir. 2025) ...................................................................... 6, 31

*Bax v. Drs. Med. Ctr. of Modesto, Inc.*,
    52 F.4th 858 (9th Cir. 2022) ............................................................................... 23

*Burns v. Fincke*,
    197 F.2d 165 (D.C. Cir. 1952) ............................................................................ 16

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
    56 F.3d 343 (2d Cir. 1995).......................................................................... 15, 16

*Cheney v. U.S. Dist. Ct. for D.C.*,
    542 U.S. 367 (2004).......................................................................................... 28

*Clark v. Skinner*,
    937 F.2d 123 (4th Cir. 1991) ............................................................................. 19

*Clevinger v. Advocacy Hldgs., Inc.*,
    134 F.4th 1230 (D.C. Cir. 2025)........................................................................... 9

*Consol. Edison Co. of N.Y., Inc. v. Ashcroft*,
    286 F.3d 600 (D.C. Cir. 2002) ........................................................................... 28

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ................................................................................................. 31

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989) ................................................................................... 19

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ................................................................................. 9

*\*Doe A v. Spahn*,
  No. 1:23-cv-02859, 2025 WL 1305360 (D.D.C. May 6, 2025) ........................ 19, 20

*Doe v. Att'y Gen. of the U.S.*,
  941 F.2d 780 (9th Cir. 1991) ................................................................................... 19

*Doe v. Exxon Mobil Corp.*,
  473 F.3d 345 (D.C. Cir. 2007) ................................................................................. 28

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) ................................................................................. 9

*Durand v. Fairview Health Servs.*,
  902 F.3d 836 (8th Cir. 2018) ...................................................................... 22, 23, 25

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  266 F. Supp. 3d 297 (D.D.C. 2017) ........................................................................ 21

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................................................. 21

*Fund for Animals v. Frizell*,
  530 F.2d 982 (D.C. Cir. 1975) ................................................................................. 10

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................................... 35

*Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*,
  146 F. Supp. 3d 112 (D.D.C. 2015) ........................................................................ 33

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019) ....................................................................................... 9

*Hale v. Collis*,
  No. 1:21-cv-1469 , 2022 WL 3016747 (D.D.C. July 29, 2022) .............................. 15

*Hooper v. City of St. Paul*,
  No. 17-cv-3442, 2019 WL 4015443 (D. Minn. Aug. 26, 2019) .............................. 26

*Hutchins v. District of Columbia*,
  188 F.3d 531 (D.C. Cir. 1999) ................................................................. 33

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) ........................................................... 28, 29

*In re Medicare Reimbursement Litig.*,
  414 F.3d 7 (D.C. Cir. 2005) ..................................................................... 28

*J.L. v. Soc. Sec. Admin.*,
  971 F.2d 260 (9th Cir. 1992) .................................................................... 19

*Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*,
  331 F.2d 76 (D.C. Cir. 1963) .................................................................... 15

*Kim v. Nat'l Certification Comm'n for Acupuncture & Oriental Med.*,
  888 F. Supp. 2d 78 (D.D.C. 2012) ........................................................... 14

*Kissinger v. Reps. Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ................................................................................. 21

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ................................................................................. 30

*Lawlor v. Nat'l Screen Serv. Corp.*,
  349 U.S. 322 (1955) ................................................................................. 15

*Loye v. Cnty. of Dakota*,
  625 F.3d 494 (8th Cir. 2010) .............................................................. 23, 26

*Lu v. Lezell*,
  919 F. Supp. 2d 1 (D.D.C. 2013) ................................................... 12, 14, 16

*Martinez v. Cuomo*,
  459 F. Supp. 3d 517 (S.D.N.Y. 2020) ................................................. 25, 26

*Mathis v. U.S. Parole Comm'n*,
  749 F. Supp. 3d 8 (D.D.C. 2024) ....................................................... 19, 20

*Mayfield v. City of Mesa*,
  131 F.4th 1100 (9th Cir. 2025) ................................................................. 23

*Moya v. U.S. DHS*,
  975 F.3d 120 (2d Cir. 2020) ..................................................................... 19

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) .............................................................. 11

*Nat. Res. Def. Council v. EPA*,
    513 F.3d 257 (D.C. Cir. 2008) ................................................................ 12

*\*Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (2020) ............................................ *passim*

*Nat'l Treasury Emps. Union v. Trump*,
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) .................................. 36

*Navajo Nation v. Azar*,
    292 F. Supp. 3d 508 (D.D.C. 2018) ................................................................ 9, 12

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................ 11

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 33

*Page v. United States*,
    729 F.2d 818 (D.C. Cir. 1984) ................................................................ 12, 14

*Pigford v. Vilsack*,
    75 F. Supp. 3d 462 (D.D.C. 2014) ................................................................ 17

*Pittston Coal Grp. v. Sebben*,
    488 U.S. 105 (1988) ................................................................................ 28

*Pleasant Grove City v. Summum*,
    555 U.S. 460 (2009) ................................................................................ 31

*\*Sai v. DHS*,
    149 F. Supp. 3d 99 (D.D.C. 2015) ................................................ 18, 19, 20, 21

*SBC Commc'ns Inc. v. FCC*,
    407 F.3d 1223 (D.C. Cir. 2005) ................................................................ 13

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) ................................................................................ 21

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ................................................................................ 21

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ................................................................ 8

*Shoshone-Bannock Tribes v. Reno*,
    56 F.3d 1476 (D.C. Cir. 1995) ................................................................ 28

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) ................................................................ 9

*Stanley v. Georgia*,
    394 U.S. 557 (1969)................................................................................................... 30

*Stanton v. D.C. Ct. of Appeals*,
    127 F.3d 72 (D.C. Cir. 1997) ............................................................................... 12, 13

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)................................................................................................... 11

*Stonehill v. U.S. Dep't of Just. Tax Div.*,
    No. 1:19-cv-03770, 2022 WL 407145 (D.D.C. Feb. 10, 2022)................................ 16

*Trump v. Hawaii*,
    585 U.S. 667 (2018).............................................................................................. 1, 27

*Univ. of Colo. Health at Mem'l Hosp. v. Burwell*,
    233 F. Supp. 3d 69 (D.D.C. 2017) ........................................................................... 13

*Univ. of Colo. Health v. Azar*,
    486 F. Supp. 3d 185 (D.D.C. 2020) ......................................................................... 12

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)................................................................................................... 30

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002)................................................................................................... 21

*W. Watersheds Project v. Bernhardt*,
    468 F. Supp. 3d 29 (D.D.C. 2020) ....................................................................... 7, 11

*Waldman v. Vill. of Kiryas Joel*,
    39 F. Supp. 2d 370 (S.D.N.Y. 1999)......................................................................... 15

*Wilbur v. United States*,
    281 U.S. 206 (1929)................................................................................................... 28

*Wilderness Soc'y v. Bernhardt*,
    No. 20-cv-1176, 2020 WL 2849635 (D.D.C. June 2, 2020).................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................................................... 9

*Yelapi v. DeSantis*,
    487 F. Supp. 3d 1278 (N.D. Fla. 2020).......................................................... *passim*

**STATUTES**

15 U.S.C. § 1116................................................................................................................ 11

28 U.S.C. § 1331 ........................................................................................................ 17

29 U.S.C. § 791 ............................................................................................................ 3

29 U.S.C. § 794 ................................................................................................... *passim*

29 U.S.C. § 794a ................................................................................................... 4, 19

Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978,
    Pub. L. No. 95-602, 92 Stat. 2955 ...................................................................... *passim*

**RULES**

D.D.C. LCvR 40.5 ...................................................................................................... 13

Fed. R. Evid. 201 ......................................................................................................... 6

Fed. R. Civ. P. 41 .................................................................................... 7, 12, 16, 17

Fed. R. Civ. P. 65 ...................................................................................................... 36

**REGULATIONS**

3 C.F.R. part 102 ......................................................................................................... 4

3 C.F.R. § 102.103 ................................................................................................ 4, 5, 6

3 C.F.R. § 102.149 ...................................................................................................... 4

3 C.F.R. § 102.150 ...................................................................................................... 4

3 C.F.R. § 102.160 .............................................................................................. 4, 5, 29

3 C.F.R. § 102.170 ...................................................................................................... 5

**OTHER AUTHORITIES**

Rev.com, *Karoline Leavitt White House Press Briefing on 5/29/25*,
    https://www.rev.com/transcripts/karoline-leavitt-white-house-press-briefing-
    on-5-29-25 ......................................................................................................... 7, 24

Restatement (Second) of Judgments § 24 (1982) ...................................................... 13

The American Presidency Project, *Address Before a Joint Session of the Congress*
    (Mar. 4, 2025),
    https://www.presidency.ucsb.edu/documents/address-before-joint-session-
    the-congress-4 ............................................................................................. 6, 23, 24

The White House, *Briefings & Statements*,
    https://www.whitehouse.gov/briefings-statements/ ............................................................ 6, 24

The White House, *Press Secretary Karoline Leavitt Briefs Members of the Media, May 09, 2025*,
    https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-|
    the-media-may-09-2025/ ......................................................................................................... 7, 24

## INTRODUCTION

"The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). With that power comes the prerogative to shape his Administration's image and messaging as he sees fit. At the same time, the White House works diligently to ensure the public has timely access to important policy information. Holding press briefings—by the President, the Vice President, or the Press Secretary—is one of multiple ways the White House provides such access.

In addition to live press briefings, recordings and transcriptions are generally available. Briefings broadcast on network and cable television generally include closed captioning. In addition, closed captioning is included with video on online platforms. Complete transcripts, videos with captioning, or both are often available within hours of the briefings.

Notwithstanding these non-auditory means of access to the content of the briefings, Plaintiffs—two individuals who are deaf and an organization that advocates on behalf of individuals with similar disabilities—claim they are being denied access to information because the White House does not also include live American Sign Language ("ASL") interpretation at each briefing. The organizational plaintiff here (the National Association of the Deaf, or NAD) advanced similar claims in 2020 and settled a very similar lawsuit releasing "all claims" that were "asserted" or "could have been asserted in the [prior] Complaint." Settlement Agreement & Release, ECF No. 14-1 (*NAD I* Settlement Agreement).

Although the prior complaint could have sought ASL interpretation at all White House press briefings, Plaintiffs are trying again. As before, Plaintiffs assert a claim for disability-based discrimination in violation of Section 504 of the 1973 Rehabilitation Act. Plaintiffs also ask this Court to preliminarily enjoin the White House to require the President and his staff

1

immediately to begin providing live, televised ASL interpretations at all press briefings and "related events." Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. 1, ECF No. 2 ("Mot."). The difference is that the plaintiffs in the previous suit sought ASL interpretation only for COVID-19-related press briefings. Emphasizing the narrowness of the relief sought, Chief Judge (then Judge) Boasberg granted a preliminary injunction. This lawsuit seeks "considerably broader" relief. Minute Order (June 6, 2025).

The Court should deny that relief. Plaintiffs fail to carry their burden on any of the four elements required to justify a preliminary injunction. Their four-month delay in bringing this lawsuit alone underscores their inability to show irreparable harm absent an injunction. So does the availability of alternative means of access to the desired information. On the merits, although Plaintiffs allege that issues with real-time closed captioning make live ASL interpretation preferable for them, access to press briefings is available through alternative, non-auditory means. Indeed, the White House has consistently engaged in significant efforts to provide broad accessibility to information delivered in press briefings.

Even apart from those efforts, Plaintiffs have not demonstrated a likelihood of success on the merits. Section 504 does not provide a private right of action for their claims. Moreover, Plaintiffs' substantive arguments are not likely to succeed because they have not shown discrimination, denial of benefits, or exclusion as required by the statute. *See* 29 U.S.C. § 794(a). Plaintiffs' claims for mandamus relief and for a violation of the First Amendment also fail. They identify no ministerial duty that would support mandamus. And they identify no First Amendment harm from Defendants' actions.

The equities and public interest also do not favor Plaintiffs' requested relief. Plaintiffs do not account for the serious institutional and other costs associated with forcing a presidential

Administration to present its message and image in a particular way. And their requested relief sweeps more broadly than necessary to redress their alleged injuries. In addition, Plaintiffs' requested relief is vague and unwieldy: it would impose ongoing uncertainty about which events were subject to the order. Finally, Plaintiffs' claims are barred by preclusion principles. For these reasons and as further explained below, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.    Statutory and Regulatory Background

The Rehabilitation Act of 1973 prohibits disability-based discrimination by three sets of entities. Section 504 applies to two of them: federal agencies and recipients of federal funds. Although Section 504 originally applied only to recipients of federal funds, Congress amended the statute in 1978 to apply its provisions to federal agencies' programs or activities. *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, Pub. L. No. 95-602 tit. I, § 119(2), 92 Stat. 2955, 2982 (Nov. 6, 1978) ("1978 Act"). As amended, Section 504 of the Act provides that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination [1] under any program or activity receiving Federal financial assistance or [2] under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a). A third category of discrimination—by federal agencies as employers—is proscribed by Section 501. *Id.* § 791.

Section 505(a)(2) sets forth the remedies for certain alleged violations of section 504. It provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under" Section 504. *Id.* § 794a(a)(2).

However, the Act does not include similar language with respect to alleged discrimination "under any program or activity conducted by" an agency. Rather, in the provision extending § 504 to programs and activities "conducted by any Executive agency," Congress directed agencies to "promulgate such regulations as may be necessary to carry out the amendments." 1978 Act § 119(2), 92 Stat. at 2982.

In 1988, the Office of Administration within the Executive Office of the President ("EOP") promulgated a regulation implementing section 504. *See* 3 C.F.R. part 102. The regulation defines "agency"—a term not defined in the statute—to mean, "for purposes of this regulation only, the following entities in the Executive Office of the President": among others, "the White House Office, the Office of the Vice President, . . . and any committee, board, commission, or similar group established in the Executive Office of the President." *Id.* § 102.103. Substantively, the regulation provides generally that "no qualified individual with handicaps shall, because the agency's facilities are inaccessible to or unusable by individuals with handicaps, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity conducted by the agency." *Id.* § 102.149. With some exceptions, EOP "shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with handicaps." *Id.* § 102.150(a). Thus, for example, each agency within EOP "shall take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public." *Id.* § 102.160(a). Each agency is required to "furnish auxiliary aids where necessary to afford an individual with . . . equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency." *Id.* § 102.160(a)(1). However, the regulation leaves to the

agency the discretion to determine "what type of auxiliary aid is necessary," giving "primary consideration to the requests of the individual." *Id.* § 102.160(a)(1)(i).

In determining what aid is necessary, an agency within EOP is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens." *Id.* § 102.160(d). Instead, "the agency shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that . . . individuals with handicaps receive the benefits and services of the program or activity." *Id.* "Auxiliary aids useful for persons with impaired hearing include telephone handset amplifiers, telephones compatible with hearing aids, telecommunication devices for deaf persons (TDD's), interpreters, notetakers, written materials, and other similar services and devices." *Id.* § 102.103.

Finally, the regulations set forth a process for resolving any disputes through the filing and consideration of administrative complaints. *Id.* § 102.170. As relevant here, administrative complaints may be sent to the Director of Facilities Management, Office of Administration, at an address provided. *Id.* § 102.170(c). Among other requirements, a "complete complaint" must include "a written statement that contains the complainant's name and address and describes the agency's alleged discriminatory action in sufficient detail to inform the agency of the nature and date of the alleged violation of section 504." *Id.* § 102.103. All "complete complaints" are to be investigated and decided in writing within a set time period. *Id.* § 102.170(d). Decisions with which a complainant is dissatisfied may be administratively appealed. *Id.*

## II.    Factual Background

EOP includes the immediate staff to the President and the Vice President. As relevant here, EOP includes the Office of the Vice President ("OVP") and the White House Office ("WHO"),

which, in turn, includes the White House Press Office ("Press Office") and the Press Secretary. *See* 3 C.F.R. § 102.103.

The White House serves as the President's residence as well as provides office space for White House employees. *Ateba v. Leavitt*, 133 F.4th 114, 117 (D.C. Cir. 2025). The White House contains a Press Area in which properly credentialed journalists "attend press briefings, interview White House officials, and report on the day-to-day activities of the administration." *Id.* The Press Area "consists of the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents." *Id.*

Televised White House press briefings and similar events generally are made available online accompanied by captioning, followed by written transcripts, or both. For example, the full transcript of President Trump's March 4, 2025, address to a joint session of Congress was "released by the Office of Communications" the day after President Trump gave the address, and it is available on the Internet. The American Presidency Project, *Address Before a Joint Session of the Congress* (Mar. 4, 2025), https://www.presidency.ucsb.edu/documents/address-before-joint-session-the-congress-4.[1] Additionally, the White House website contains full text of "Briefings & Statements," including transcripts of remarks given live. The White House, *Briefings & Statements*, https://www.whitehouse.gov/briefings-statements/ (last accessed June 11, 2025).[2] The website also links to videos of press briefings (hosted by YouTube) for which closed captioning is available through the YouTube platform. *E.g.*, The White House, *Press Secretary Karoline Leavitt*

---

[1] This Court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and it may do so "at any stage of the proceeding." Fed. R. Evid. 201(b)(2), (d).

[2] This Court "may take judicial notice of documents provided on official government websites." *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 36 n.4 (D.D.C. 2020).

*Briefs Members of the Media, May 09, 2025*, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-may-09-2025/. Transcripts of press briefings are also available on the Internet. *E.g.*, Rev.com, *Karoline Leavitt White House Press Briefing on 5/29/25*, https://www.rev.com/transcripts/karoline-leavitt-white-house-press-briefing-on-5-29-25.

During most of the first Trump Administration, although captioning and transcripts were generally provided, ASL interpretation was not provided at public briefings. In August 2020, NAD and five individual plaintiffs sued President Trump in his official capacity as President of the United States, the Executive Office of the President, the White House Office, the Office of the Vice President, and Kayleigh McEnany in her official capacity as Press Secretary, alleging (among other claims) that those Defendants violated the Rehabilitation Act by failing to provide qualified ASL interpreters at public White House press briefings regarding the COVID-19 pandemic. Chief Judge Boasberg issued a preliminary injunction premised only on the Rehabilitation Act claim. *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (2020) (*NAD I*), *appeal filed sub nom. Nat'l Ass'n of the Deaf v. Trump*, No. 20-5349 (D.C. Cir. Nov. 25, 2020), *and dismissed*, 2021 WL 1438295 (D.C. Cir. Mar. 22, 2021).

Subsequently, and after the change in Administration, NAD and the individual plaintiffs entered into a binding settlement agreement and agreed to dismiss their suit with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). *See NAD I* Settlement Agreement. In that settlement agreement, NAD agreed to "a full and complete release of all claims asserted in the [prior] Complaint or that could have been asserted in the [prior] Complaint" in exchange for the government paying "attorney's fees, expenses, and costs" to Arnold & Porter Kaye Scholer, LLP (Plaintiffs' counsel here). *Id.* ¶ 4. NAD further agreed that the "Agreement shall be binding upon,

and inure to the benefit of, all successors and assigns of the Parties hereto." *Id.* ¶ 6. The government dismissed its appeal upon the settlement of the underlying litigation.

Over four years later, NAD and two individual plaintiffs brought this lawsuit against the almost all of the same parties (adding only the White House Chief of Staff). They assert mostly the same legal claims but seek a broader remedy. Now, rather than access to briefings on a particular topic (COVID-19), Plaintiffs seek an order requiring the White House to provide ASL interpreters "at *all* White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary." Compl. Request for Relief (a)(i) (emphasis added). As before, Plaintiffs filed a motion for a preliminary injunction. And as with the complaint, the relief sought in the motion is far broader than in *NAD I*. Plaintiffs seek an order compelling Defendants to:

> immediately provide qualified American Sign Language ("ASL") interpreters, including Certified Deaf Interpreters ("CDIs"), at all White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary, for which the White House Press Office or the White House Office of the Press Secretary provide public notice of their occurrence before the event commences and that are captured by the White House Communications Agency ("WHCA") or other White House communication channels.

Proposed Order, ECF No. 2-1.

## ARGUMENT

Plaintiffs have not come close to satisfying the requirements for a preliminary injunction. Such relief "is 'an extraordinary remedy.'" *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). It "may only be awarded" if the plaintiff makes "a clear showing" that it is appropriate. *Winter*, 555 U.S. at 22. That means the plaintiff must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor;

and (4) an injunction is in the public interest. *Id.* at 20. While the last two *Winter* factors tend to merge when the government is the opposing party, *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019), a plaintiff should not prevail without some showing on each of the four factors, *see Winter*, 555 U.S. at 23-24, 31-32.[3] Particularly where a requested injunction would—like this one—alter rather than preserve the status quo, the Court's power to issue a preliminary injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). Plaintiffs' broad motion does not warrant this Court's exercise of that power.

## I.    Plaintiffs Have Not Established That They Will Be Irreparably Harmed Absent a Preliminary Injunction.

Plaintiffs allege that the lack of qualified ASL interpreters at White House press briefings is causing Plaintiffs to suffer irreparable harm because they are unable to adequately access information originating from those briefings. Because their irreparable-harm argument falls short, their motion for a preliminary injunction must be denied. *See Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018) ("[I]n this Circuit, it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion.").

Plaintiffs contend that they are suffering irreparable harm because they "barred from accessing and receiving" information that the White House disseminates at each press conference. Mot. 25-27. Plaintiffs, however, indicate that they *do* have access to the information presented at the press conferences through means like closed captioning. Compl. ¶¶ 12-13; Decl. of Derrick

---

[3] The D.C. Circuit "has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions," by which a weak showing on one factor may be compensated for by a strong showing on another. *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016). "It is questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter* . . . ." *Clevinger v. Advocacy Hldgs., Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025); *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

Ford ¶¶ 3, 5, ECF No. 2-2 ("Ford Decl."); Decl. of Matthew Bonn ¶¶ 3, 5, ECF No. 2-3 ("Bonn Decl."). Although Plaintiffs may prefer to access the same information through live ASL interpreters, any harm from the absence of live ASL interpreters is not irreparable: captioning or transcripts allow access to the same information, even if less immediately. (The adequacy of these substitutes on the merits is addressed later in this brief.)

Moreover, even accepting Plaintiffs' framing that they are somehow being denied access to information, Plaintiffs have provided no reason that they need immediate access to information being presented at White House press briefings. That distinguishes this case from NAD's previous lawsuit seeking ASL interpreters at COVID-19 press briefings, where Judge Boasberg found that the plaintiffs were suffering irreparable harm because they were being denied access to "critical" information "about their health and safety," including the need to comply with current orders and advice about mask-wearing. *See NAD I*, 486 F. Supp. 3d at 58. Plaintiffs' general interest in being able to access information about the issues of the day is far less critical.

Plaintiffs' delay in filing this suit also undercuts their irreparable-harm argument. Although Plaintiffs allege that press briefings have not included qualified ASL interpreters since January 2025, Compl. ¶¶ 4, 12-13, they did not file suit until May 28, 2025—a delay of over four months. In this Circuit, a delay of "44 days" before seeking preliminary injunctive relief has been found "inexcusable" and "bolstered" the conclusion that "an injunction should not issue." *Fund for Animals v. Frizell*, 530 F.2d 982, 987 (D.C. Cir. 1975). And courts in this Circuit have repeatedly concluded that "delays" in filing for preliminary injunctive relief undermine allegations of irreparable harm, even in periods shorter than four months. *See, e.g.*, *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 49 (D.D.C. 2020) ("unexplained delays," including waiting three months before providing statutorily-required notice of suit and waiting five weeks after filing suit

to seek a preliminary injunction, "undermine[d] [plaintiffs'] contention that they will be irreparably harmed absent an injunction"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" (collecting cases)); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay in bringing suit and seeking injunctive relief, whether calculated as two months or eight months, "undercut" the plaintiff's "allegation of irreparable harm").

Plaintiffs even suggest—incorrectly—that they do not need to show irreparable harm at all. Specifically, they seek to benefit from a "presumption" of irreparable harm that they contend exists for violations of civil-rights statutes. Mot. 25. But nothing in the "text" of Section 504 of the Rehabilitation Act indicates that Congress intended to "alter[] the traditional equitable rules" that require plaintiffs to demonstrate irreparable harm to obtain a preliminary injunction. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 348 (2024); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (concluding that court of appeals improperly relied on a "presumption" of irreparable harm that was "contrary to traditional equitable principles and ha[d] no basis in" the relevant statute). Congress included "specific instruction[s]" in other statutes to "expressly relieve" challengers from showing irreparable harm. *Starbucks*, 602 U.S. at 348. For example, "plaintiffs alleging trademark violations are entitled to 'a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits.'" *Id.* (quoting 15 U.S.C. § 1116(a)). No such explicit instructions are present in Section 504 of the Rehabilitation Act, so there is no "presumption" of irreparable harm. Even if there were, Plaintiffs' delay and the availability of alternative sources of information would rebut it.

Because Plaintiffs have failed to establish irreparable harm, this Court need go no further. It should deny Plaintiffs' motion on that basis alone. *See Navajo Nation*, 292 F. Supp. 3d at 512.

**II.      Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.**

**a.   Plaintiffs' Claims Are Barred By Claim Preclusion.**

Claim preclusion (also known as *res judicata*) bars Plaintiffs from asserting their claims in this action. Claim preclusion bars "[a] subsequent lawsuit . . . if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Lu v. Lezell*, 919 F. Supp. 2d 1, 4 (D.D.C. 2013) (quoting *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008)). *NAD I* involved the same or similar "claims"; the parties are the same as, or are in privity with, parties to *NAD I*; and the lawsuit was resolved by a final judgment on the merits: namely, a stipulated dismissal with prejudice under Federal Rule of Civil Procedure 41(a).

First, Plaintiffs' claims here "involve[e] the same claims or cause[s] or action" in NAD's 2020 lawsuit. *See Lu*, 919 F. Supp. 2d at 4 (citation omitted). The claims or causes of action need not be legally identical for claim preclusion to apply. *See Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984). Instead, to determine if two cases share the same claims or causes of action, the D.C. Circuit has instructed courts to examine "whether [the claims] share the same nucleus of facts." *Apotex, Inc. v. Food & Drug Admin.,* 393 F.3d 210, 217 (D.C. Cir. 2004). In other words, do they arise from the same "transaction, or series of connected transactions"? *Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) (citation omitted); *accord Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 202-03 & n.11 (D.D.C. 2020), *reconsidered in part on other grounds sub nom. Univ. of Colo. Health at Mem'l Hosp. v. Becerra*, 531 F. Supp. 3d 10 (D.D.C. 2021). "What factual grouping constitutes a transaction and what groupings constitute a series" must "be

determined pragmatically, considering whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations . . . ." *Stanton*, 127 F.3d at 78 (quoting Restatement (Second) of Judgments § 24(1) (1982)). The goal is to prevent courts and parties from wasting resources litigating "matters that should have been raised in an earlier suit."[4] *SBC Commc'ns Inc. v. FCC*, 407 F.3d 1223, 1229-30 (D.C. Cir. 2005).

Both *NAD I* and this lawsuit arise from the same "transaction[] or series of connected transactions." In the 2020 lawsuit, plaintiffs alleged that various organizations (including NAD) asked "the White House"—during the first Trump Administration—"to provide ASL interpretation during its public COVID-19 briefings," but the White House allegedly "ignored th[ose] requests." Compl. ¶¶ 3–6, *Nat'l Ass'n of the Deaf v. Biden*, No. 1:20-cv-2107 (D.D.C. Aug. 3, 2020) ("*NAD I* Compl."). Plaintiffs there argued that failure to provide ASL interpretation during the briefings deprived them of the opportunity to access information from those briefings in violation of Section 504 of the Rehabilitation Act and the First Amendment, and they sought mandamus relief and non-statutory review. *Id.* ¶¶ 49–73.

In the present lawsuit, Plaintiffs again allege that the White House—now again occupied by President Trump—has failed to provide ASL interpretation during press briefings. They allege that Defendants are depriving them of the opportunity to access information from those briefings in violation of Section 504 of the Rehabilitation Act, the First Amendment, and the Fifth

---

[4] "[T]he legal standards for designation of a related case" under this District's local rules "and for res judicata are not the same." *Univ. of Colo. Health at Mem'l Hosp. v. Burwell*, 233 F. Supp. 3d 69, 82 (D.D.C. 2017) (holding that objection to relatedness designation under LCvR 40.5 did not estop defendant from asserting claim preclusion defense); *see also Wilderness Soc'y v. Bernhardt*, No. 20-cv-1176, 2020 WL 2849635, at *1 (D.D.C. June 2, 2020) (noting that LCvR 40.5(a)(4) is "strictly interpreted").

Amendment's Equal Protection principles, and they have sought mandamus relief and non-statutory review. Compl. ¶¶ 1–7, 62–98. The facts underlying the 2020 lawsuit and the present lawsuit are nearly identical—except that the facts relevant to both cases occurred at different times, and Plaintiffs' request for relief has broadened its focus from COVID-related briefings to all briefings. The lack of temporal alignment is not dispositive—as the D.C. Circuit has made clear, what matters is whether "the facts are related in time, space, origin, *or* motivation," not that they are identical. *Apotex*, 393 F.3d at 217 (citation omitted) (emphasis added). That standard is met here.

And even though Plaintiffs have now added a claim under the Fifth Amendment, that does not save the complaint. Claim preclusion, after all, bars "relitigating issues that were *or could have been* raised in" the previous action. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) (emphasis added). Plaintiffs' new Fifth Amendment claim—which is based on Equal Protection principles—relies on the same facts as Plaintiffs' other claims and thus could have been brought in the prior lawsuit. As the D.C. Circuit has held, it is "the facts," and "not the legal theory upon which a litigant relies," that courts must evaluate for claim-preclusion purposes. *Page*, 729 F.2d at 820.

Second, Plaintiffs' suit involves the "same parties" as the 2020 lawsuit or those parties' "privies." *See Lu*, 919 F. Supp. 2d at 4 (citation omitted). Claim preclusion "precludes claims not only between identical parties, but also between those in privity with the parties." *Kim v. Nat'l Certification Comm'n for Acupuncture & Oriental Med.*, 888 F. Supp. 2d 78, 82 (D.D.C. 2012). In the claim preclusion context, the concept of privity "is broader than a traditional privity analysis." *Waldman v. Vill. of Kiryas Joel*, 39 F. Supp. 2d 370, 380 (S.D.N.Y. 1999); *see also Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995). Thus, "whether privity exists is a functional inquiry and not merely a static examination of legal status." *Waldman*,

39 F. Supp. 2d at 380. That functional inquiry asks whether "a party in a prior suit" represented the interests of a "party in a subsequent lawsuit." *Hale v. Collis*, No. 1:21-cv-1469, 2022 WL 3016747, at *5 (D.D.C. July 29, 2022) (alteration in original) (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 n.19 (1955)); *see also Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*, 331 F.2d 76, 83 (D.C. Cir. 1963).

Plaintiff NAD was indisputably a party to *NAD I*. Defendants President Trump, EOP, WHO, and OVP were all defendants in the 2020 lawsuit. *NAD I* Compl. So was the Press Secretary (at the time, Kayleigh McEnany). *Id.* And although the Chief of Staff was not a party in the 2020 lawsuit, the office she "oversee[s]"—the EOP—was. *See* Compl. ¶ 18. And Plaintiffs are suing her in her official capacity. Thus, Chief of Staff Wiles is in "privity" with a party to *NAD I*. *See Hale*, 2022 WL 3016747, at *5.

That leaves only the two individual Plaintiffs here—Derrick Ford and Matthew Bonn. Although neither appeared as a named party in the 2020 lawsuit, both are in privity with NAD. The complaint identifies them as "member[s] of NAD." Compl. ¶¶ 12–13. Although it does not specify *when* they became members, their "interests [were] represented" by NAD in the 2020 lawsuit. *Hale*, 2022 WL 3016747, at *5 (citation omitted). Specifically, the complaint alleges that Ford and Bonn are "deaf;" that "ASL" is their "preferred and primary language"; that they want to watch "White House press briefings;" that they have difficulty understanding the briefings without the presence of ASL interpreters; and that they want to access the information being presented to the public at the briefings. Compl. ¶¶ 12–13. And in *NAD I*, NAD sued to require the White House to "provide ASL interpretation during its public COVID-19 related briefings" so that "deaf and hard of hearing [] Americans"—like Ford and Bonn—could access the "information" being presented at the briefings. *NAD I* Compl. ¶¶ 59–73. Ford and Bonn allege a similar (though

broader) interest here: the ability to access information from White House press briefings and related events. Thus, Ford and Bonn are in privity with NAD.

At minimum, the privity question is close enough that Ford and Bonn have not established a likelihood of prevailing on their substantive claims. And NAD—a named plaintiff in both lawsuits—is barred regardless of the Court's outcome on the privity question. Thus, the Court should reject all of Plaintiffs' claims for preliminary relief. If the Court declines to hold as a matter of law at this stage that Ford and Bonn are in privity with *NAD*, then it should withhold ruling on the matter until the parties can undertake discovery to establish facts such as the length of Ford's and Bonn's membership in NAD and whether they could have joined *NAD I* as parties. *See Chase*, 56 F.3d at 346 (noting that because privity "is a functional inquiry," "[s]ome courts have . . . held" that it presents "a factual issue").

Third, the 2020 lawsuit resulted in a "final, valid judgment on the merits . . . by a court of competent jurisdiction." *Lu*, 919 F. Supp. 2d at 4. As Judge Contreras stated recently, "the weight of authority in this district suggests that a stipulation of dismissal with prejudice under Rule 41(a) is a final judgment on the merits for the purpose of claim preclusion." *Stonehill v. U.S. Dep't of Just. Tax Div.*, No. 1:19-cv-03770, 2022 WL 407145, at *6 (D.D.C. Feb. 10, 2022); *accord Burns v. Fincke*, 197 F.2d 165, 166 (D.C. Cir. 1952) (analyzing stipulations of voluntary dismissal under Rule 41(a) and stating that since they "provide[d] for dismissal with prejudice, the first action is *res judicata* of the matters covered by the cause of action"). The 2020 lawsuit ended only after NAD and the individual Plaintiffs in that case entered into a binding settlement agreement and agreed to dismiss their suit with prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). *See NAD I* Settlement Agreement; Joint Stipulation of Dismissal with Prejudice, *Nat'l Ass'n of the Deaf v. Biden*, No. 1:20-cv-2107 (D.D.C. Dec. 16, 2021). After the settlement agreement was filed

16

with the court, Judge Boasberg dismissed the case "with prejudice" as the parties requested. Minute Order, *Nat'l Ass'n of the Deaf v. Biden*, No. 1:20-cv-2107 (D.D.C. Dec. 16, 2021). Moreover, the court had jurisdiction over Plaintiffs' claims under federal law. *See* 28 U.S.C. § 1331.

Because all the elements of claim preclusion are present with respect to NAD and the individual Plaintiffs' claims here, this new suit is precluded by the final, valid judgment on the merits in the 2020 lawsuit. Plaintiffs already had their day in court and received the relief they then requested.

### b. NAD's Claims Are Barred By Its Settlement in *NAD I*.

Even if claim preclusion did not bar all three Plaintiffs' claims, the *NAD I* settlement agreement would still bar NAD's claims. In that settlement, NAD agreed to "a full and complete release of *all claims asserted* in the [prior] Complaint *or that could have been asserted* in the [prior] Complaint." *NAD I* Settlement Agreement ¶ 3 (emphasis added). NAD further agreed that the "Agreement shall be binding upon, and inure to the benefit of, all successors and assigns of the Parties thereto." *Id.* ¶ 6.

The *NAD I* Settlement Agreement bars NAD's claims because it "could have asserted" in *NAD I* that the Rehabilitation Act and the First Amendment require ASL interpreters at *all* White House press briefings, press conferences, and related events. NAD cannot escape the "expansive language" of the Settlement Agreement. *See Pigford v. Vilsack*, 75 F. Supp. 3d 462, 467 (D.D.C. 2014). That NAD sought a more limited remedy in its previous suit is irrelevant. Under the Settlement Agreement's plain language, NAD released "all claims" that "could have been asserted in the [prior] Complaint." *NAD I* Settlement Agreement ¶ 3.

NAD may argue that this lawsuit falls within the settlement agreement's proviso excluding "claims based on any acts or omissions that may occur after the date of execution of" the settlement. *Id.* Such an argument would be meritless, however. The claims in this lawsuit are premised on the non-provision of ASL interpreters at White House press briefings: the same "omission[]" that prompted NAD to file its previous lawsuit. *See id.* Although Plaintiffs assert that the current Administration should have continued to provide ASL after the previous Administration did so, that is at most another argument in support of the same claims.

### c.   Plaintiffs Are Not Likely to Succeed on Their Rehabilitation Act Claim.

#### i.   Plaintiffs Lack a Cause of Action Under Section 504.

**1.** Plaintiffs' Rehabilitation Act claim fails for several reasons. First and foremost, Section 504 does not supply a private cause of action against an executive agency with respect to the operation of its programs or activities. *Sai v. DHS*, 149 F. Supp. 3d 99, 112 (D.D.C. 2015). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Determining whether Congress has created a private right of action requires the Court "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* A right of action may be either express or implied. Congress provided neither for Plaintiffs here.

We begin with express remedies. There is no dispute that Congress did not explicitly provide a right of action to enforce Section 504 against executive agencies as program providers. Thus, no express cause of action exists.

No implied cause of action exists either. The Rehabilitation Act provides that aggrieved persons may pursue remedies under federal civil-rights law against non-federal entities receiving federal financial assistance and against federal agencies acting as employers. 29 U.S.C.

§ 794a(a)(1)-(2). But it does *not* contain similar language regarding claims against federal agencies in their operation of federally-run programs or activities. Several judges of this Court have held that this asymmetry evinces Congress's exclusion of a private right of action in such cases. *Sai*, 149 F. Supp. 3d at 113; *Doe A v. Spahn*, No. 1:23-cv-02859, 2025 WL 1305360, at *4 (D.D.C. May 6, 2025); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 19 (D.D.C. 2024). Other courts— including three of the four courts of appeals to have addressed the issue—have reached the same result. *See, e.g.*, *Moya v. U.S. DHS*, 975 F.3d 120, 128 (2d Cir. 2020); *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 605-06 (1st Cir. 1989) (en banc) (Breyer, J.); *Clark v. Skinner*, 937 F.2d 123, 125-26 (4th Cir. 1991). Among courts of appeals, only the Ninth Circuit has held otherwise. *J.L. v. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992); *Doe v. Att'y Gen. of the U.S.*, 941 F.2d 780, 794-95 (9th Cir. 1991). But even the Ninth Circuit recognizes the significance of the 1978 Amendments. Specifically, when Congress directed agencies to "promulgate such regulations as may be necessary to carry out the amendments" extending Section 504 to programs and activities "conducted by any Executive agency," 1978 Act § 119(2), 92 Stat. at 2982, Congress made clear that "agencies themselves should take primary responsibility for compliance," *J.L.*, 971 F.2d at 265.

The statutory directive to adopt implementing regulations underscores the lack of congressional intent to create a private right of action. The directive's "focus is not 'on the individuals protected' but on the federal agencies that it instructs to implement the substantive provisions of the Act." *Sai*, 149 F. Supp. 3d at 112 (citation omitted). Therefore, an individual asserting disability discrimination in the operation of a federal program or activity may raise that claim through the agency's administrative complaint procedures under its applicable regulations.

Even without a private right of action, individuals aggrieved by an alleged Section 504 violation by a federal program do not lack a remedy.

**2.** In *NAD I*, Chief Judge Boasberg reached a different conclusion. He held that Section 504 creates a private right of action because it states that "[n]o otherwise qualified individual with a disability . . . shall . . . be subjected to discrimination," the type of language that has been interpreted to confer rights. *NAD I*, 486 F. Supp. 3d at 53 (quoting 29 U.S.C. § 794(a)). Judge Boasberg also viewed the statute's history as supporting a private right of action, and he cited the opinions of other courts that inferred such a right. *Id.* at 54-55.

This Court is not bound by the reasoning in *NAD I* and should not follow it. Indeed, two judges of this Court have since rejected that reasoning. *Doe A*, 2025 WL 1305360, at *4; *Mathis*, 749 F. Supp. 3d at 22. As the *Mathis* opinion noted, *NAD I* improperly "looks past" the "structural disparity" between the program-provider provision and the Rehabilitation Act's other two substantive prohibitions, which are expressly linked to remedial provisions. *Mathis*, 749 F. Supp. 3d at 22. Additionally, *NAD I* appeared partly motivated by a desire to avoid concluding that the plaintiffs lacked "a judicial remedy." 486 F. Supp. 3d at 57. But "Congress often passes statutes that prohibit certain conduct yet provide no private right of action." *Mathis*, 749 F. Supp. 3d at 20. In any event, the presence or absence of a particular judicial remedy in a given case should not drive the outcome of an interpretive question with much broader implications.

**3.** Plaintiffs argue that even if they have no statutory cause of action, this Court should grant relief under its inherent equitable authority. That is incorrect. Implied equitable causes of action are not available if Congress provided a "detailed and exclusive remedial scheme" by statute. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002). "Where Congress has created a remedial scheme for the enforcement of a particular federal right," the

courts "have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996); *see also Schweiker v. Chilicky,* 487 U.S. 412, 423 (1988).

A detailed, exclusive scheme is exactly what Congress provided for Rehabilitation Act violations. Specifically, agencies subject to the Rehabilitation Act enact regulations. *See* 29 U.S.C. § 794(a); *Sai*, 149 F. Supp. 3d at 111. To enforce Section 504 rights against a federal program, an aggrieved person can seek a remedy through the administrative pathway that Congress directed agencies to create. Then, if necessary, an aggrieved person may seek judicial review through the Administrative Procedure Act (APA). *Sai*, 149 F. Supp. 3d at 113. True, an APA action is not available against *these* Defendants. *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (holding that the President is not subject to the APA); *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (same regarding entities that merely "advise and assist the President" (citation omitted)); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 315 (D.D.C. 2017) (same regarding components of EOP that are comprised of close advisors to the President), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017). But that does not mean that a judicial remedy must be inferred based on district courts' equitable powers. On the contrary, it means that Congress made a deliberate choice not to provide APA review as a means of enforcing Section 504 against defendants such as the EOP, WHO, and OVP, who are subject to Section 504 but are not "agencies" within the meaning of the APA. Again, that does not leave Plaintiffs without a remedy because they may seek recourse through the agency's procedures. (They do not establish having exhausted such recourse.)

In sum, the text and context of Section 504 make plain that Congress meant to exclude a private statutory right of action. Because the statute provides an administrative route to relief, this

Court's equitable authority does not extend to enjoining alleged Section 504 violations by federal program providers. Thus, Plaintiffs' Section 504 claim cannot support a preliminary injunction.

### ii. Plaintiffs Are Not Likely to Succeed in Establishing a Substantive Section 504 Violation.

Even if Plaintiffs had a right of action (or if this Court had inherent equitable authority to enjoin violations), their Section 504 claim would be unlikely to succeed on the merits. That is because they were not, "solely by reason of [their] disability," "excluded from the participation in," "denied the benefits of," or "subjected to discrimination under any program or activity . . . conducted by any Executive agency." 29 U.S.C. § 794(a). Put plainly, Section 504 does not confer a right to ASL interpretation at all press briefings.

When applying the Rehabilitation Act, courts must keep in mind "two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985). The Act does not "require institutions to provide *all* requested auxiliary aids and services." *Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018) (citation omitted). That is because "[p]laintiffs are not entitled . . . to perfect access, or to remedies 'specially tailored' for their circumstances." *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 58 (D.D.C. 2006), *aff'd & remanded*, 525 F.3d 1256 (D.C. Cir. 2008). And "[a]ccommodations are not reasonable if they would entail either 'undue financial and administrative burdens' or a 'fundamental alteration in the nature of a program.'" *Id.*

In the context of disabilities that create communication barriers, the statute requires only "effective communication that results in meaningful access to government services." *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010); *see also Alexander*, 469 U.S. at 301. Whether Plaintiffs have received meaningful access is a "fact-intensive inquiry and is largely context-

dependent." *Durand*, 902 F.3d at 842; *see also Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 867, 869 & n.7 (9th Cir. 2022) (similar). "The trier of fact must weigh several factors, including the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025) (citation omitted). In the context of hearing-impaired plaintiffs, the Rehabilitation Act "does not require ASL interpreters whenever requested." *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278, 1286 (N.D. Fla. 2020) (denying preliminary injunction that would require ASL interpretation at all press briefings held by the Florida governor). Instead, "the answer always turns on a fact-intensive analysis." *Id.* at 1287; *see also id.* at 1289.

The facts presented here do not establish that Plaintiffs lack meaningful access. There is no dispute that televised White House press briefings and similar events generally are accompanied by captioning and followed by written transcripts. For example, a recent major event that Plaintiffs highlight—President Trump's March 4, 2025, address to a joint session of Congress—was transcribed, and the full transcript is readily available on the Internet. The American Presidency Project, *Address Before a Joint Session of the Congress* (Mar. 4, 2025), https://www.presidency.ucsb.edu/documents/address-before-joint-session-the-congress-4.    The website notes that "[t]he transcript was released by the Office of Communications on March 5"— the calendar day immediately following the event. *Id.* Additionally, the White House website contains full text of "Briefings & Statements," including transcripts of remarks given live. The White House, *Briefings & Statements*, https://www.whitehouse.gov/briefings-statements/ (last accessed June 11, 2025). The website also links to videos of press briefings (hosted by YouTube) for which closed captioning is available through the YouTube platform. *E.g.*, The White House,

*Press Secretary Karoline Leavitt Briefs Members of the Media*, May 09, 2025, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-may-09-2025/. Transcripts of press briefings are also available on the Internet. *E.g.*, Rev.com, *Karoline Leavitt White House Press Briefing on 5/29/25*, https://www.rev.com/transcripts/karoline-leavitt-white-house-press-briefing-on-5-29-25. Plaintiffs do not dispute the availability of captioning and transcripts through other fora.

Instead, Plaintiffs argue that "auxiliary aids, such as closed captioning," do not adequately accommodate their disability. Mot. 19. They allege that this is so because "[m]any thousands of deaf Americans . . . cannot communicate via written English," *id.*, and the individual plaintiffs have "great difficulty" doing so, Ford Decl. ¶ 3; Bonn Decl. ¶ 3 (same). Notably, however, the individual plaintiffs do not allege that they are *incapable* of reading English, and NAD does not state whether any of its other members are. Neither the motion nor the individual plaintiffs' declarations assert that a transcript—such as those routinely available after White House events—is insufficient. On a commonsense level, transcripts are simply a different—and for many, perhaps more accessible—type of aid than captioning because transcripts can be consumed more easily at the reader's preferred pace. In sum, Plaintiffs have not established a likelihood of success in proving that the combination of transcripts and captioning often both made available for various press events does not provide them with meaningful access.

To avoid this conclusion, Plaintiffs primarily cite two decisions. The first is *NAD I*, which held that "[c]losed captioning and transcripts" did not provide a "reasonable" accommodation. 486 F. Supp. 3d at 58. However, the Court should not follow suit. Chief Judge Boasberg acknowledged that captions and transcripts "may constitute a reasonable accommodation under some circumstances." *Id.* To reach the conclusion that they did not in the circumstances presented, he

simply accepted the plaintiffs' conclusory statement that they could not "effectively receive" communications through written English. *Id.* And he did so despite acknowledging that—as here—the plaintiffs did not "directly address Defendants' provision of written English transcripts following briefings." *Id.* at 57. In short, the court did not engage in the required "fact-intensive inquiry." *Durand*, 902 F.3d at 842; *see Yelapi*, 487 F. Supp. 3d at 1289 (denying preliminary injunction partly because it was not clear "[h]ow critical . . . the immediate receipt (as opposed to delayed receipt) of the information" presented at press briefings would be).

Second, Plaintiffs cite *Martinez v. Cuomo*, which entered a preliminary injunction ordering the Governor of New York to provide "in-frame ASL interpretation during his daily press briefings" on the COVID crisis. 459 F. Supp. 3d 517, 527 (S.D.N.Y. 2020). Several points about *Martinez* distinguish it from this case. For one, the court emphasized that each individual plaintiff alleged either that he or she could not understand English at all, lacked regular Internet access to the press briefings, or both. *Id.* at 521 & n.2, 522. Plaintiffs here make no such assertion. Furthermore, the plaintiffs' request for relief was limited to "vital and continually changing information regarding their health and safety." *Id.* at 526. Here, by contrast, Plaintiffs seek far broader relief. What the *Martinez* court set as a floor for "reasonable" accommodations in the COVID context does not translate to the broader context of any and all press briefings and related events, where the need to access information quickly is generally much less acute. *See id.* at 527 ("agree[ing] that [p]laintiffs cannot follow Governor Cuomo's executive orders or health department recommendations if they are not aware of them").

Several more points undermine Plaintiffs' merits argument. For one, Defendants have no reason to dispute that Plaintiffs (and many other members of NAD) "prefer[]" ASL. Mot. 19. But "Plaintiffs are not entitled . . . to perfect access, or to remedies 'specially tailored' for their

circumstances." *Paulson*, 463 F. Supp. 2d at 58. What the law requires, instead, is a reasonable accommodation. *See Yelapi*, 487 F. Supp. 3d at 1288 (noting that "every case requires a fact-intensive inquiry and . . . there can be adequate communication without ASL"); *Hooper v. City of St. Paul*, No. 17-cv-3442, 2019 WL 4015443, at *7 n.10 (D. Minn. Aug. 26, 2019) (holding that although police department had "a duty to provide appropriate auxiliary aids to ensure effective communication," it did "not have a duty to provide the precise auxiliary aid demanded by the deaf individual (unless, of course, it [was] impossible for the individual to effectively communicate without that aid)"); *id.* at *17 (holding that plaintiff had no right to "a certified ASL interpreter" unless police officer "proved to be unable to communicate with her effectively"). For similar reasons, Plaintiffs' assertion that they need "real-time" access to White House press briefing overlooks that a delay in receiving information does not necessarily support a Section 504 claim. *See, e.g.*, *Loye*, 625 F.3d at 499 (holding that delays in communicating information through ASL did not deny "effective communication and meaningful access to the services being provided"); *Yelapi*, 487 F. Supp. 3d at 1289 ("If new important matters are announced, but the same information is later transmitted in another viable form, it might be that the delay is not unreasonable."). The claim is especially weak where Plaintiffs demand such real-time access on *all* topics—including those in which they have not expressed particular interest through their pleadings and declarations.

On the other side of the ledger, Plaintiffs' requested relief would result in "a fundamental alteration in the nature of a program." *Paulson*, 463 F. Supp. 2d at 58 (citation omitted). Although Plaintiffs allege that providing ASL interpretation is "relatively inexpensive and administratively feasible," relying on "the last four years," Mot. 28, that argument ignores the institutional intrusion of compelling an Administration to present its messaging in a certain manner. "The President of

the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Hawaii*, 585 U.S. at 701. Requiring the President to share his platform with ASL interpreters every time he or his Press Secretary communicates with the nation is a major incursion on his central prerogatives.

It is worth stepping back and considering the broader implications of Plaintiffs' position. The upshot is that the White House must arrange simultaneous ASL interpretation for *all* presidential, vice presidential, first- and second-spouse, and press secretary briefings, conferences, and "related events." That is a strikingly novel and unsupported account of the 47-year-old Rehabilitation Act provisions at issue. It suggests that some of the most high-profile presidential speeches in American history—such as President Reagan's Oval Office address after the explosion of the Space Shuttle Challenger and President George H.W. Bush's Rose Garden ultimatum to Saddam Hussein—were unlawfully presented because they were not broadcast to the world with an ASL interpreter in the picture. The suggestion that Congress imposed that substantial obligation on the President (and other executive agencies) in 1978, and yet no one noticed that it was being systematically violated until now, is implausible. The Court should decline Plaintiffs' invitation to read the Act so broadly.

In sum, Plaintiffs have not demonstrated a likelihood of success on the merits of their Section 504 claim.

### d. Plaintiffs Are Not Likely to Succeed on Their Claim for Mandamus.

Plaintiffs are also unlikely to succeed on their claim for mandamus. The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (citation omitted); *see also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 353 (D.C. Cir. 2007). Mandamus "is hardly ever granted."

*In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005). It is available only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig*., 414 F.3d 7, 10 (D.C. Cir. 2005) (citation omitted). "[E]ven if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d at 729.

Mandamus is not available except to compel a nondiscretionary duty. *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988). The writ may issue only where "the duty to be performed is ministerial and the obligation to act peremptory and clearly defined." *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995) (citation omitted). A duty is not "ministerial" unless it is "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Consol. Edison Co. of N.Y., Inc. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting *Wilbur v. United States*, 281 U.S. 206, 218-19 (1929)). "[W]here the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." *Id.* (quoting *Wilbur*, 281 U.S. at 218-19).

Plaintiffs do not have a "clear and compelling" right to ASL interpretation for all briefings. *See In re Cheney*, 406 F.3d at 729. If the foregoing merits discussion demonstrates anything, it is that the Rehabilitation Act does not clearly impose a ministerial duty on Defendants. Instead, the Act's general prohibition of discrimination preserves to federal agencies the discretion to make fact-specific, case-by-case assessments of the reasonableness of the changes requested by disabled individuals. Thus, EOP's implementing regulation concerning communications, for example, describes its discretion to determine appropriate auxiliary aids to provide effective communication to persons with disabilities without incurring

undue burden or fundamentally altering the program or activity. 3 C.F.R. § 102.160. EOP exercises its own judgment to assess particular requests and balance relevant considerations to make fact-specific determinations about reasonable accommodations on a case-by-case basis. Especially given the availability of non-auditory means of access to information from White House press briefings, Plaintiffs cannot show that the statute clearly and indisputably requires providing ASL interpretation at all press briefings. Plaintiffs' claim for mandamus is not likely to succeed.

### e.   Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim.

Plaintiffs' First Amendment claim suffers from two distinct flaws. First, they fail to identify a First Amendment injury. Second, they incorrectly describe the forum and tailoring requirement.

Plaintiffs argue that they have a "right to receive information" that is being denied by the absence of ASL interpretation. Mot. 22 (citation omitted). To the extent the "right to receive information" might apply here, it has not been violated. *Id.* (citation omitted). Defendants are not restricting Plaintiffs' access to speech. Deaf and hard-of-hearing individuals are not barred from accessing press briefings. Instead, Plaintiffs' complaint is that Defendants are not taking additional steps to make speech that is already publicly accessible *more* accessible. They have not shown why that theory supports First Amendment injury. Indeed, this claim appears to simply repackage Plaintiffs' Section 504 discrimination theory: they argue that they lack access to information "to which the rest of the country has unencumbered, real-time access." Mot. 23. As already discussed, however, Plaintiffs' discrimination theory lacks merit.

What is more, Plaintiffs' cases do not support their "right to receive" theory. Those cases involved affirmative governmental limitations on the information a person might receive or possess. *See Stanley v. Georgia*, 394 U.S. 557, 568 (1969) (holding that states may not criminalize

mere possession of obscene material); *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (holding that a group of professors' arguable First Amendment interest in academic interactions with a foreign scholar did not override the Attorney General's discretion to make immigration decisions); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (addressing consumers' asserted right to receive pharmacists' advertisements in the context of restrictions on such advertisements); *Armstrong v. D.C. Pub. Libr.*, 154 F. Supp. 2d 67, 72 (D.D.C. 2001) (addressing the claims of a would-be library patron who was denied access based on his appearance). In sum, none of Plaintiffs' "right to receive" cases held that the government must provide already free-flowing information in a different language or format.

Next, Plaintiffs get the forum analysis wrong. They assert that White House press briefings are a public forum, and thus Defendants must show that "eliminating ASL interpreters [from briefings] is 'narrowly tailored to serve a significant governmental interest.'" Mot. 23 (quoting *Armstrong*, 154 F. Supp. 2d at 75-76). The forum analysis is a poor fit for Plaintiffs' claims because they are not seeking access to a platform for the purpose of speaking. Instead, they are seeking to require the government to provide ASL interpreters when members of the government are speaking. "When the government is speaking"—as here—"forum analysis is usually inapplicable because while the First Amendment 'restricts government regulation of private speech[,] it does not regulate government speech.'" Stay Order at 19, *Associated Press v. Budowich*, No. 25-5109 (D.C. Cir. June 6, 2025) (concurring statement of Rao, J., joined by Katsas, J.) (alteration in original) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)).

Regardless, as this Circuit recently made clear, "the White House Press Area is a nonpublic forum" for First Amendment purposes. *Ateba*, 133 F.4th at 122 (cited by Plaintiffs at Mot. 24). "As a nonpublic forum, access to the White House Press Area 'can be restricted as long as the

restrictions are' viewpoint neutral and reasonable"—narrow tailoring is not required. *Id.* at 123 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Plaintiffs do not argue—nor could they—that the absence of ASL interpreters at press briefings constitutes viewpoint discrimination. Plainly, it does not. And they do not allege that they were wrongly excluded from the Press Area. Regardless, the government enjoys "substantial leeway to regulate access to a nonpublic forum." *Id.*

Plaintiffs' remaining arguments fare no better. They appear to suggest that a *broadcast* of a press briefing is a "forum" because the "White House has chosen to make the video feed" public. Mot. 23. But a press briefing's content is speech, not a forum. If Plaintiffs' argument is that the public airwaves must be accessible to all, their argument fails because they do not lack access to the broadcast content they seek. Nor have Defendants infringed Plaintiffs' right to petition the government. Although Plaintiffs argue that they "are precluded from knowing what to petition the government for," *id.*, that statement rests on the inaccurate premise that they have no access at all to information provided in White House press briefings. Plaintiffs do have access—through closed captioning, through transcripts, and through media analysis, to name a few. That Plaintiffs do not have the exact form of access they want does not prove a First Amendment violation.

Indeed, Plaintiffs cite no caselaw endorsing their theory. No wonder: taken to its logical extent, Plaintiffs' claim would require every Administration (and branch of government) to meet every member of the public at his or her preferred language and reading level by providing translation services. Under Plaintiffs' theory, are Defendants constitutionally required to provide real-time translation in the native language of every person that might tune in to the broadcast? Are ASL interpreters required at every Senate hearing? Is the U.S. Supreme Court violating the First Amendment by providing an audio-only livestream of oral arguments? Is this Court violating

the law if it does not provide ASL interpreters at public hearings? Plaintiffs cite no authority that would require this Court to go that far. Yet their First Amendment theory begs all of these questions.

Finally, Plaintiffs suggest that "Defendants' decision to stop providing such interpreters" at all briefings, after the previous Administration did so, is part of their alleged First Amendment harm. Mot. 23. But that argument implies that it was a First Amendment violation for Defendants not to provide ASL interpretation at *all* briefings in 2020 as well. NAD and the other plaintiffs apparently did not think so at the time, however. Although the plaintiffs in *NAD I* brought a First Amendment claim, they asserted a right to ASL interpretation at COVID-related briefings only. *NAD I* Compl. Request for Relief ¶ c. The fact of an intervening Administration with different policies or practices does not change the First Amendment's content.[5]

### f.    Plaintiffs Are Not Likely to Succeed on Their Remaining Claims.

Without substantively arguing why, Plaintiffs assert in passing that they are likely to succeed on their claims for violation of their Equal Protection rights under the Fifth Amendment and non-statutory review. Mot. 24 n.8. They have forfeited those claims as a basis for preliminary injunctive relief. *See Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (noting that the court need not "consider cursory arguments made only in a footnote"); *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126 (D.D.C. 2015) (finding argument forfeited "where the only reference to the argument" was in a "brief footnote" (citation omitted)). The Court should not consider those claims at this stage.

---

[5] Defendants do not interpret Plaintiffs' motion or complaint as asserting that the change in position from the previous Administration forms a discrete basis for relief under the Rehabilitation Act or the First Amendment. However, to the extent Plaintiffs' motion or complaint might be construed as making such an assertion, it fails because they do not develop it and because, as discussed throughout this brief, they have not shown a statutory or constitutional injury.

### III.    The Equities and Public Interest Do Not Favor a Preliminary Injunction.

Even if Plaintiffs could show irreparable harm or a likelihood of success on the merits—and they cannot—the equities and public interest do not favor a preliminary injunction that would immediately require live ASL interpretation at "all White House press briefings and related events." Mot. 2. As noted, these two factors merge when the government is the party opposing a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). They do not favor Plaintiffs for several reasons.

First, the requested relief is extraordinarily broad and vague. Plaintiffs' proposed order would compel Defendants to:

> immediately provide qualified American Sign Language ("ASL") interpreters, including Certified Deaf Interpreters ("CDIs"), at all White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary, for which the White House Press Office or the White House Office of the Press Secretary provide public notice of their occurrence before the event commences and that are captured by the White House Communications Agency ("WHCA") or other White House communication channels.

ECF No. 2-1 at 1. As Chief Judge Boasberg observed, "[t]he relief sought is considerably broader here" than in *NAD I*. Minute Order (June 6, 2025). Thus, Plaintiffs' public interest and equities analysis from that case does not simply map onto this one. And they have not established that the equities favor the extremely wide-ranging relief they seek. Most problematically, the preliminary injunction would severely intrude on the President's prerogative to control the image he presents to the public. It would also raise thorny questions such as whether, if the President "has urgent, time-sensitive information to convey," he must "delay delivering it until an ASL interpreter is available." *Yelapi*, 487 F. Supp. 3d at 1290.

Even beyond that, the requested relief is problematic because its parameters are not clear. For example, what are the limits of "related events"? Would CDIs be required at every press

briefing, or would ASL interpreters who are not CDIs suffice for some? *See id.* (noting the problems with attempting to craft preliminary relief in the face of similar "unanswered" questions). The public interest does not favor subjecting Defendants to an order that requires them to analyze whether a CDI is required at every event—however sparsely attended—at which the Vice President or Second Lady might briefly speak.

Second, the availability of alternative means of accessing the information Plaintiffs seek significantly undermines their argument that the equities favor sweeping and immediate preliminary relief. Resolving Plaintiffs' claims correctly will require factual development regarding whether hearing-impaired individuals are unable, in meaningful numbers, to benefit from captioning or transcripts. And it will require factual development regarding the practicality of providing ASL interpretation at "all White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary, for which" public notice is provided and which "are captured by . . . White House communication channels." Compl. Request for Relief ¶ a.i. Plaintiffs have not shown emergent need for such relief. Even if this Court may eventually conclude—after a substantive merits-stage analysis—that captioning or transcription are not adequate accommodations for some or all Plaintiffs, those alternatives at least provide Plaintiffs with some access to the content of White House press events. Particularly given the available alternatives, issuing a preliminary injunction would be imprudent—especially one with the extraordinary consequence of dictating to the President the image he is allowed to present to the world.

Third, the broad relief that Plaintiffs seek transgresses the requirement that a preliminary injunction be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). The individual Plaintiffs have not established that they are interested in all possible

topics of White House press briefings. *See generally* Bonn Decl.; Ford Decl. Unlike in *NAD I*—where Chief Judge Boasberg emphasized that the Plaintiffs had "narrowed the scope" of their motion and sought "access to critical public-health information to benefit themselves and their loved ones," 486 F. Supp. 3d at 59-60—Plaintiffs now seek broad relief that is not tied to their particular circumstances, interests, or needs.

Fourth, the equities and public interest—as well as the law—strongly disfavor an order purporting to enjoin the President. Chief Judge Boasberg noted serious "uncertainties about the extent of [the court's] power to enjoin [the President] and the Vice President to act in a specific way." *Id.* at 59 (collecting cases). He "sidestep[ped]" those uncertainties by limiting his order so that it did not apply to the President. *Id.* Less concerned are Plaintiffs, who again seek an injunction directly against the President. The Court should deny that relief.

## IV.    Any Preliminary Injunction Should Be Accompanied by Security and Should Be Stayed.

Although the Court should deny Plaintiffs' requested relief, if it enters a preliminary injunction, it should require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The D.C. Circuit recently clarified that "injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025). In the event the Court issues a preliminary injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of the injunction.

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: June 11, 2025                          Respectfully submitted,

                                              BRETT A. SHUMATE
                                              Assistant Attorney General
                                              Civil Division

                                              ERIC J. HAMILTON
                                              Deputy Assistant Attorney General

                                              TYLER J. BECKER
                                              Counsel to the Assistant Attorney General
                                              Civil Division

                                              DIANE KELLEHER
                                              Director
                                              Civil Division, Federal Programs Branch

                                              */s/ Elizabeth Hedges*
                                              ELIZABETH HEDGES
                                              Counsel to the Assistant Attorney General
                                              Civil Division
                                              United States Department of Justice
                                              950 Pennsylvania Avenue NW
                                              Washington, DC 20530
                                              (202) 616-0929
                                              Elizabeth.T.Hedges@usdoj.gov

                                              *Counsel for Defendants*