**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

*Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No. 1:25-cv-1683-AHA

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .....................................3

    A.    Defendants Are Likely to Succeed on their Rehabilitation Act Claim ...................3

        1.    Defendants Have Violated the Rehabilitation Act .......................................3

        2.    The Rehabilitation Act Provides an Implied Private Right of Action
Against the Government ...............................................................................7

        3.    Alternatively, Relief is Available in Equity...............................................10

    B.    Alternatively, Plaintiffs Are Likely to Succeed on Their Claim for Mandamus ...11

    C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim ....................12

    D.    Defendants' Remaining Procedural Objections Fail.............................................14

        1.    This Action Poses No *Res Judicata* Issues ...............................................14

        2.    The 2021 Settlement Agreement Explicitly Permits Future Lawsuits
Predicated on Post-Settlement Conduct.....................................................17

II.   PLAINTIFFS ARE SUFFERING IRREPARABLE HARM THAT WILL CONTINUE
ABSENT A PRELIMINARY INJUNCTION ................................................................19

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN
FAVOR OF PLAINTIFFS.................................................................................................23

IV.   THE COURT SHOULD NOT REQUIRE SECURITY ..................................................24

CONCLUSION...............................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001).................................................................................................8

*Apotex, Inc. v. FDA*,
    393 F.3d 210 (D.C. Cir. 2004)................................................................................15

*Archdiocese of Wash. v. WMATA*,
    897 F.3d 314 (D.C. Circ. 2018)..............................................................................14

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)...............................................................................................10

*Ateba v. Leavitt*,
    133 F.4th 114 (D.C. Cir. 2025)........................................................................13, 14

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982)...............................................................................................13

*Blassingame v. Trump*,
    87 F.4th 1 (D.C. Cir. 2023)....................................................................................12

*Bonnette v. D.C. Ct. of Appeals*,
    796 F. Supp. 2d 164 (D.D.C. 2011)........................................................................19

*Bryant v. Gates*,
    532 F.3d 888 (D.C. Cir. 2008)...............................................................................13

*Cal. Cosmetology Coal. v. Riley*,
    871 F. Supp. 1263 (C.D. Cal. 1994) ......................................................................16

*Cent. United Life, Inc. v. Burwell*,
    128 F. Supp. 3d 321 (D.D.C. 2015) .......................................................................21

*\*Cigar Ass'n of Am. v. U.S. FDA*,
    436 F. Supp. 3d 70 (D.D.C. 2020) .........................................................................16

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)...............................................................................................20

*Clark v. Skinner*,
    937 F.2d 123 (4th Cir. 1991) ...................................................................................9

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
   880 F.2d 603 (1st Cir. 1989) ...................................................................9

*Dodge v. Trs. of Nat. Gallery of Art*,
   326 F. Supp. 2d 1 (D.D.C. 2004) ...........................................................18

*Does I through III v. Dist. of Columbia*,
   238 F. Supp. 2d 212 (D.D.C. 2002) ........................................................16

*First Nat'l Bank of Bos. v. Bellotti*,
   435 U.S. 765 (1978) ...............................................................................13

*Friends of Animals v. Culver*,
   610 F. Supp. 3d 157 (D.D.C. 2022) ........................................................11

*Gordon v. Holder*,
   632 F.3d 722 (D.C. Cir. 2011) ...............................................................21

*Hale v. Collis*,
   2022 WL 3016747 (D.D.C. July 29, 2022) ............................................17

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ...............................................................................13

*Heyer v. U.S. Bureau of Prisons*,
   849 F.3d 202 (4th Cir. 2017) ...................................................................4

*Jud. Watch, Inc. v. U.S. Dep't of Com.*,
   736 F. Supp. 2d 24 (D.D.C. 2010) ..........................................................11

*Kingdomware Techs., Inc. v. United States*,
   579 U.S. 162 (2016) ...............................................................................11

*Klayman v. Obama*,
   142 F. Supp. 3d 172 (D.D.C. 2015) ........................................................21

*Lamont v. Postmaster Gen.*,
   381 U.S. 301 (1965) ...............................................................................12

*Lee v. U.S. Agency for Int'l Dev.*,
   859 F.3d 74 (D.C. Cir. 2017) ...................................................................8

*Loye v. Cnty. of Dakota*,
   647 F. Supp. 2d 1081 (D. Minn. 2009) .....................................................6

*Loye v. Cnty. of Dakota*,
   625 F.3d 494 (8th Cir. 2010) ....................................................................6

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
  590 U.S. 405 (2020)................................................................................15

*Martinez v. Cuomo*,
  459 F. Supp. 3d 517 (S.D.N.Y. 2020)..........................................................5

Mathis v. U.S. Parole Comm'n,
  749 F. Supp. 3d 8 (D.D.C. 2024) ........................................................10, 11

Moya v. U.S. Dep't of Homeland Sec.,
  975 F.3d 120 (2d Cir. 2020).......................................................................9

Mylan Pharms., Inc. v. Shalala,
  81 F. Supp. 2d 30 (D.D.C. 2000) ..............................................................22

*NAD v. State*,
  318 F. Supp. 3d 1338 (S.D. Fla. 2018) .....................................................19

*Nat'l Ass'n of the Deaf v. Trump*,
  486 F. Supp. 3d 45 (D.D.C. 2020) ..................................................... passim

Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,
  767 F. Supp. 3d 243 (D. Md. 2025)...........................................................24

Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) ..................................................24

Newdow v. Bush,
  355 F. Supp. 2d 265 (D.D.C. 2005)...........................................................22

Pell v. Procunier,
  417 U.S. 817 (1974).................................................................................13

Pierce v. Dist. of Columbia,
  128 F. Supp. 3d 250 (D.D.C. 2015) .............................................................5

Pierce v. Underwood,
  487 U.S. 552 (1988).................................................................................11

Price v. Garland,
  45 F.4th 1059 (D.C. Cir. 2022)......................................................12, 13, 14

Proctor v. Trans Union, LLC,
  2024 WL 4239501 (D.D.C. Sept. 19, 2024) ...............................................17

Ramirez v. U.S. Immigration & Customs Enforcement,
  310 F. Supp. 3d 7 (D.D.C. 2018) .........................................................21, 22

*Reininger v. Oklahoma,
  292 F. Supp. 3d 1254 (W.D. Okla. 2017) ............................................................20

Sai v. Dep't of Homeland Sec.,
  149 F. Supp. 3d 99 (D.D.C. 2015) .........................................................................9

Silver Sage Partners, Ltd. v. City of Desert Hot Springs,
  251 F.3d 814 (9th Cir. 2001) ...............................................................................19

Singh v. Berger,
  56 F.4th 88 (D.C. Cir. 2022) ...............................................................................19

Stanley v. Georgia,
  394 U.S. 557 (1969) .............................................................................................12

*Stanton v. D.C. Ct. of Appeals,
  127 F.3d 72 (D.C. Cir. 1997) .........................................................................15, 16

Starbucks Corp. v. McKinney,
  602 U.S. 339 (2024) .............................................................................................19

Tex. Children's Hosp. v. Burwell,
  76 F. Supp. 3d 224 (D.D.C. 2014) ...................................................................21, 22

Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.,
  2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ......................................................16

Trump v. Hawaii,
  585 U.S. 667 (2018) .............................................................................................12

W. Watersheds Project v. Bernhardt,
  468 F. Supp. 3d 29 (D.D.C. 2020) ........................................................................22

Yelapi v. DeSantis,
  487 F. Supp. 3d 1278 (N.D. Fla. 2020) ...............................................................6, 7

## Statutes

29 U.S.C. § 794(a) ...................................................................................................6, 11

## Regulations

3 C.F.R. §§ 102.160(a) ...................................................................................................11

## Other Authorities

18A Charles Alan Wright et al., Federal Practice & Procedure § 4456 (2d ed.
  2017) .....................................................................................................................16

Brian Stelter, *The curious case of Trump's disappearing media transcripts*, CNN,
https://www.cnn.com/2025/05/22/media/donald-trump-media-white-house-
transcript-purge (last accessed June 18, 2025) ..........................................................................6

Peter Nicholas et al., *White House purges transcripts of Trump's remarks from its
website*, NBC News, https://www.nbcnews.com/politics/donald-trump/white-
house-purges-transcripts-trump-remarks-website-rcna208059 (last accessed
June 18, 2025).............................................................................................................................6

## INTRODUCTION

For nearly four years, the White House provided ASL interpreters for all of its press briefings, which made them fully accessible to hundreds of thousands of deaf Americans who rely on ASL to communicate, including the individual Plaintiffs and National Association of the Deaf's (NAD) members.  However, the White House recently and inexplicably cut off this access by suspending its use of ASL interpreters.  This was unlawful, and Plaintiffs are entitled to a preliminary injunction directing the White House to resume providing ASL interpreters for all press briefings.

In their opposition, Defendants identify only one reason for the White House's decision to halt its use of ASL interpreters: "the President's prerogative to control the image he presents to the public."  Opp. 33.  Setting aside how the President believes his "image" is tarnished by an ASL interpreter, concerns over a person's "image"—even a President's—do not excuse non-compliance with our Nation's anti-discrimination laws or the U.S. Constitution.  And restoring ASL interpreters to press briefings will not alter the President's image or impose any undue burden.  Rather, it will *enhance* the President's "extraordinary power to speak to his fellow citizens" (Opp. 1) by enabling his fellow *deaf* citizens to access his speech and the speech of his designees.

Defendants argue that ASL interpreters are unnecessary because the White House already provides closed-captioning and written transcripts of its press briefings.  That is wrong.  Plaintiffs have presented overwhelming evidence—including declarations from expert linguists, the individual Plaintiffs, and NAD—that clearly demonstrates that Plaintiffs and thousands of other deaf Americans cannot read and understand written English in the form of closed captions and transcripts.  Indeed, in *Nat'l Ass'n of the Deaf v. Trump,* 486 F. Supp. 3d 45, 58 (D.D.C. 2020) ("*NAD I*"), Chief Judge Boasberg agreed, finding that closed captions and transcripts were *not*

adequate accommodations for deaf persons, like Plaintiffs, who rely on ASL to communicate. Judge Boasberg thus ordered the White House to begin providing ASL interpreters at all COVID-related press briefings. The same outcome is warranted here for *all* White House press briefings because the Rehabilitation Act prohibits discrimination in "*any* program or activity" conducted by the White House—not just those related to emergencies.

Defendants try to avoid another injunction by identifying purported legal defects in Plaintiffs' claims. But these arguments fail. For example, Defendants argue that the Rehabilitation Act does not provide Plaintiffs with a private right of action against the government. But Judge Boasberg considered and rejected this exact argument in *NAD I*, and this Court should do the same. Indeed, to hold otherwise would effectively immunize Defendants from any and all claims based on violations of the Rehabilitation Act. The White House is not above the law, and the Court also has inherent equitable authority and mandamus power to enforce the substantive provisions of the Rehabilitation Act. Defendants further argue that Plaintiffs' claims are barred by the dismissal with prejudice of the claims asserted in *NAD I*. This *res judicata* argument ignores black letter law that claim preclusion does not apply where—as here—the events giving rise to the claims postdate the judgment in the prior case. Further, Plaintiffs Bonn and Ford were not even parties to *NAD I* and thus could not possibly be bound by it.

Plaintiffs have also established irreparable harm. Defendants argue that the harm is not so bad because deaf persons' "general interest" in "the issues of the day" is not critical. Opp. 10. But this glosses over the fact that the President and his designees routinely address serious matters of national and international importance that directly affect all Americans. Without access to the President's speech, Plaintiffs cannot adequately and equally engage with their leaders or fully participate in the democratic process. Deprivation of this access is irreparably harmful.

Each preliminary injunction factor favors Plaintiffs. Thus, the Court should grant Plaintiffs' motion and order the White House to provide ASL interpreters for all press briefings.

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. Defendants Are Likely to Succeed on their Rehabilitation Act Claim

##### 1. Defendants Have Violated the Rehabilitation Act

Plaintiffs are likely to prevail on the merits of their Rehabilitation Act claim. Mot. 16-21. Defendants do not dispute, and thus concede, two of the three elements: (1) that the individual Plaintiffs, as well as numerous members of Plaintiff NAD, "are disabled within the meaning of the Rehabilitation Act [and] are otherwise qualified" and (2) that the White House's press conferences constitute "program[s] or activit[ies] . . . carried out by a federal executive agency or with federal funds." *Id.* at 16. Defendants do, however, argue that their refusal to provide ASL interpreters at White House press briefings does not exclude Plaintiffs from, deny them the benefit of, or subject them to discrimination under any program or activity. Opp. 22. Defendants are wrong.

Defendants argue—without citing *any* evidence—that closed captions and written transcripts are sufficient to permit Plaintiffs to access White House press briefings. Opp. 23-25. Defendants are simply wrong, and their *ipse dixit* argument flies in the face of four unrebutted affidavits (including from two expert linguists), Chief Judge Boasberg's decision in *NAD I*, cogent decisions from many other courts, and various other academic and expert sources. This robust factual record—wholly ignored by Defendants—clearly demonstrates that Plaintiffs and thousands of other deaf Americans cannot read and understand written English in the form of closed captions and transcripts.

For example, expert linguists Dr. Judy Shepard-Kegl and Dr. Amy June Rowley explain in detail how ASL and English are "two completely distinct languages," Shepard-Kegl/Rowley Decl.

¶¶ 27-30 (ECF 2-4), and that many deaf individuals have "little to no mastery of English" and thus cannot "reliably understand" written English, *id.* ¶ 31. Indeed, studies show that the median reading level for deaf adults is around grade four and that only ten percent of 20-year-old deaf adults read at or above an eighth-grade level. *Id.* ¶ 33; *see also* Mot. at 19 n. 7 (collecting studies that show low English literacy for deaf persons). "White House press briefings, by their very nature, involve dense language and complex concepts that, when expressed in English text, exceed many Deaf individuals reading ability." ECF 2-4 ¶ 39. Mr. Kelby Brick, the COO of NAD, likewise explains that "many deaf persons know virtually no English," and thus they cannot effectively communicate in, or receive information conveyed through, written English. Brick Decl. ¶¶ 3, 5, ECF 2-5. "Therefore, even when closed captioning is provided, those deaf individuals cannot effectively receive the messages conveyed at the White House press briefings." *Id.* ¶ 5. Consistent with this evidence, Plaintiffs Ford and Bonn submitted declarations explaining that they "have great difficulty reading and understanding English." Ford Decl. ¶ 3, ECF 2-2; Bonn Decl. ¶ 3, ECF 2-3. When they attempted to watch press briefings without ASL interpreters, they "could not understand much of what was discussed, even with closed captioning." *Id.* ¶ 5. Defendants do not even acknowledge most of this evidence, let alone dispute any of it.

Moreover, in *NAD I*, Judge Boasberg considered and rejected the identical argument made by Defendants here, and held that closed captions and transcripts do not provide deaf persons with meaningful access to White House press briefings. *See NAD I*, 486 F. Supp. 3d at 58. His decision was consistent with decisions recognizing that written English does not provide effective communication for deaf persons, particularly when the content or subject matter is complex or non-routine. *See, e.g.*, *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 213-14 (4th Cir. 2017) (finding deaf plaintiff with "extremely limited proficiency in English" could not "communicate

effectively through written English"); *Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250, 275-76 (D.D.C. 2015) (observing that "the vast majority of deaf people—[Plaintiff] included—lack the ability to communicate effectively in English" and rejecting defendants' unsupported argument to the contrary) (Jackson, J. Ketanji Brown).

Defendants urge this Court to reject Judge Boasberg's decision because he "simply accepted the plaintiffs' conclusory statement" that they could not read or understand written English. Opp. 24-25. Not so. In *NAD I*, Judge Boasberg considered six declarations, including from the CEO of NAD, which explained how "[w]ritten English is not an effective means of communication for many deaf individuals," and "even when closed-captioning is provided, those [deaf] individuals cannot effectively receive the messages conveyed at the White House press briefings." ECF 2-8 (1:20cv2107). The record in *NAD I* also contained a letter from the Linguistic Society of America, which explained that "solely relying on closed-captioning is not an option for all ASL users, and that a certified sign language interpreter (who must remain visible during the entirety of each briefing) is necessary." ECF 1-4 (1:20cv2107); *see also* Letter from National Council on Disability, ECF 1-2 (1:20cv2107) (similar). Judge Boasberg's decision was clearly based on ample record evidence—not "conclusory statement[s]"—and here the addition of an expert linguist declaration (ECF 2-4) makes the factual record even *more* robust.

Defendants likewise fail in their attempt to distinguish *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 525 (S.D.N.Y. 2020), which found that closed captions did not provide "deaf New Yorkers who cannot read English" with access to gubernatorial press briefings. Defendants argue that the COVID-specific context of *Martinez* "does not translate to the broader context of any and all press briefings . . . where the need to access information is generally much less acute." Opp. 25. But the Rehabilitation Act does not distinguish between emergency-related programs and activities

versus everyday programs and activities, and Defendants cite no authority for this purported distinction.  Rather, the Rehabilitation Act prohibits discrimination in, and guarantees accessibility for, "*any* program or activity" conducted by Defendants.  29 U.S.C. § 794(a) (emphasis added).

Defendants also argue that after-the-fact transcripts are adequate because Plaintiffs do not require "real-time access" to the information conveyed.  Opp. 26.  But as explained, written English transcripts are not adequate—whenever (and if ever) provided.[1]  Moreover, the primary case cited by Defendants—*Loye v. County of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010)—does not support their argument.  There, information that had been provided at two public meetings was later provided to the deaf plaintiff via "an ASL-interpreted private meeting"—not via any written transcripts.  *Loye v. Cnty. of Dakota*, 647 F. Supp. 2d 1081, 1091 (D. Minn. 2009).

Defendants' reliance on *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278 (N.D. Fla. 2020) is similarly misplaced.  Opp. 23-26.  Though the *Yelapi* court denied the plaintiffs' motion for preliminary injunction seeking ASL interpreters at Governor DeSantis's emergency-related press briefings, the governor already was already providing "many (perhaps most) briefings with an ASL interpreter," which "factor[ed] significantly" into the court's decision.  *Yelapi*, 487 F. Supp. 3d at 1287.  Indeed, one of the "critical facts" missing from the record was "what portion of the

---

[1] Though Defendants repeatedly invoke the availability of written transcripts as an adequate accommodation for Plaintiffs—they are not—recent reporting indicates that the White House is no longer releasing full transcripts of President Trump's remarks, and that it has removed official transcripts that had previously been available.  *See, e.g.*, Peter Nicholas et al., *White House purges transcripts of Trump's remarks from its website*, NBC News, https://www.nbcnews.com/politics/donald-trump/white-house-purges-transcripts-trump-remarks-website-rcna208059 (last accessed June 18, 2025); Brian Stelter, *The curious case of Trump's disappearing media transcripts*, CNN, https://www.cnn.com/2025/05/22/media/donald-trump-media-white-house-transcript-purge (last accessed June 18, 2025).  Indeed, several of the transcripts cited in Defendants' opposition are from third party websites—not the White House—and one appears to be an automated transcript generated from a video of a press briefing.  *See* Opp. 6-7.  Seeking third-party transcripts would impose an unfair burden on deaf people in accessing press briefing information.

[press] conferences [going forward] will include ASL?" *Id.* at 1288-89.  Here, by contrast, there is no mystery: Defendants are not providing ASL interpreters for any press briefings and do not intend to do so going forward.  Further, while the court in *Yelapi* hypothesized that the deaf plaintiffs could obtain COVID-related information from other "widely available" sources, *id.* at 1289, here the record overwhelmingly demonstrates that after-the-fact written transcripts—the only alternative means of access identified by Defendants—do not provide meaningful access.[2]

Finally, Defendants do not argue that providing ASL interpreters would entail undue financial and administrative burdens.  Instead, they assert that providing ASL interpreters would fundamentally alter the nature of the White House's press briefings because it would require the President to "share his platform" with an interpreter.  Opp. 27.  Not so.  All White House press briefings for nearly the last four years included ASL interpreters.  As such, it is the White House's recent *suspension* of ASL interpreters that has altered those briefings—not Plaintiffs' effort to restore the interpreters.  Moreover, Defendants can utilize a remote ASL interpreter (not physically located next to the President or other speaker) and add the video feed of the interpreter to its broadcast via picture-in-picture technology.  *See* Compl. ¶ 39 (displaying example).  This is precisely what Defendants did from 2021 to early 2025 and it did not fundamentally alter the nature of the White House's press briefings.  Nor will it going forward.

### 2.    The Rehabilitation Act Provides an Implied Private Right of Action Against the Government

Plaintiffs' motion explained why the text, structure, and history of the Rehabilitation Act all support the conclusion that Section 504 contains an implied private right of action against the Government to enforce that provision's prohibition on discrimination in an executive agency's

---

[2] Governor DeSantis later adopted a policy to provide ASL interpreters at all emergency-related press conferences, which provided much of the relief the deaf Plaintiffs had sought in that case. *See* Defs' Mot. for SJ, *Yelapi v. DeSantis*, ECF 129 ¶¶ 20-23 (No. 4:20cv351 (N.D. Fla)).

programs or activities.  Mot. 14-15.  Regarding the text, Plaintiffs explained that Section 504 begins with the same "'rights-creating' language" that the Supreme Court has "consistently found" to be "the most accurate indicator" of whether Congress intended to create a private cause of action.  *NAD I*, 486 F. Supp. 3d at 53-54.

In their opposition, Defendants barely acknowledge, let alone actually grapple with, the statute's text.  Opp. 20.  Nor do Defendants address the significance of the statute's text when considered in the context of the statute's history.  *See id.* at 19-20.  In *NAD I*, Judge Boasberg explained how the "text of section 504 was modeled on the language" of other civil rights statutes passed contemporaneously with the Rehabilitation Act.  486 F. Supp. 3d at 54.  Congress knew that the language of these other statutes "had been interpreted to provide private rights of action." *Id.*  This, in turn, led Judge Boasberg to conclude that Congress's "verbatim" inclusion of the same statutory text in Section 504 indicated the drafters' intent to create a private right of action against the Government for violations of that provision.  *Id.*

Aside from noting that this Court is not bound by *NAD I*, Defendants do not refute Judge Boasberg's analysis of the textual parallels between Section 504 and other civil rights statutes held to contain a private right of action.  Opp. 20.  Defendants' failure to engage with Judge Boasberg's analysis is telling.  To determine whether a statute provides a private right of action, courts "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "Statutory intent . . . is determinative."  *Id.*  As such, the court's inquiry "begins with the text and structure of the statute."  *Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017).

Defendants do not appear to contest these principles.  Still, they nevertheless focus singularly on one aspect of the Rehabilitation Act's structure—the private right of action in Section

505 against non-federal entities receiving federal financial assistance or federal agencies acting as employers—to argue that there can be no private right of action for discrimination under an executive agency's programs or activities in violation of Section 504. Opp. 19 (citing *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603 (1st Cir. 1989); *Clark v. Skinner*, 937 F.2d 123 (4th Cir. 1991); *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020)).

In *NAD I*, Judge Boasberg considered, and rejected, this argument, distinguishing *Cousins* and *Clark*. Those decisions, he explained, "dealt with Executive agencies' acting as a *regulator*, as opposed to in a substantive capacity." *NAD I*, 486 F. Supp. 3d at 56.[3] When an agency is acting as regulator, plaintiffs who suffer discrimination at the hands of that agency may seek a remedy under the Administrative Procedure Act ("APA"). *See id.* at 57. Here, none of the Defendants are acting in a regulatory capacity. Indeed, Defendants themselves insist no APA remedy is available to Plaintiffs. Opp. 21. In the end, Judge Boasberg's interpretation of Section 504 is most consistent with the text, structure, and history of the statute. It is also most consistent with other persuasive authority on the subject. *See* Mot. 14-15 (collecting cases); *NAD I*, 486 F. Supp. 3d at 53-57 (collecting additional cases).

Finally, Defendants argue that EOP's administrative complaint procedure affords a remedy for Rehabilitation Act violations, which cuts against finding an implied right of action against the Government within Section 504. Opp. 19-20 (citing *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 111 (D.D.C. 2015)). But whatever remedy EOP's regulations ostensibly provide, it likely is not judicially enforceable: Defendants themselves emphasize that EOP is not subject to the APA (Opp. 21), which would otherwise provide for review of final agency action. A non-judicially

---

[3] *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 128 (2d Cir. 2020) (cited at Opp. 19), which was issued shortly after *NAD I*, is distinguishable on the same grounds.

reviewable administrative remedy is not a sufficient *judicial* remedy, and the need for a private right of action remains. *See NAD I*, 486 F. Supp. 3d at 57 (emphasizing that "following *Sai* . . . would leave Plaintiffs without a judicial remedy").

### 3.    Alternatively, Relief is Available in Equity

Even if the Court concludes that the Rehabilitation Act does not provide a private right of action against the Government (and it does), this Court still "possess[es] inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 22 (D.D.C. 2024). This power "operates even in the absence of a statutory cause of action." *Id*. (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). Indeed, in *Mathis*—which Defendants discuss and identify as one of their key authorities (Opp. 19-20)—Judge McFadden found plaintiffs were "likely to succeed on the merits of their Rehabilitation Act claim," despite finding no private right of action, based on the Court's inherent equitable power to enforce the statute. *Mathis*, 749 F. Supp. 3d at 24.

Defendants ignore this aspect of *Mathis* because they have no answer for it. Instead, Defendants argue that by directing "agencies subject to the Rehabilitation Act [to] enact regulations" through which individuals may seek relief for an agency's violation of that Act, Congress established the type of "detailed, exclusive" remedial scheme that displaces the Court's jurisdiction in equity. Opp. 20-21. But the Court in *Mathis* considered and rejected this very argument, explaining that the Rehabilitation Act's directive to engage in "in-house rulemaking" is nothing like the type of detailed and exclusive remedial schemes found to supplant a court's equity jurisdiction. *Mathis*, 749 F. Supp. 3d at 23. Unlike the Indian Gaming Regulatory Act (the counter-example cited in *Mathis*), the Rehabilitation Act neither establishes any intricate procedures for seeking relief, nor restricts the relief a court can award. In short, "[b]eyond in-

house rulemaking," the Rehabilitation Act "prescribes no remedy at all for . . . individuals mounting a challenge" to an agency's violation of the statute in conducting a program or activity. *Id.* (quoting *Seminole Tribe*, 517 U.S. at 75). Accordingly, this Court retains its inherent equitable power to enforce the Rehabilitation Act.

### B.    Alternatively, Plaintiffs Are Likely to Succeed on Their Claim for Mandamus

Even if the Court concludes that Plaintiffs lack a private right of action under the Rehabilitation Act, Plaintiffs are still likely to succeed on their claim for mandamus relief. Mot. 21-22. Defendants argue they lack a "clear duty to act" because EOP's implementing regulation provides the White House with some discretion in its execution. Opp. 28. This argument fails. Where the law mandates that an agency "shall" take a certain action, that action is not discretionary for the purposes of mandamus. *See Pierce v. Underwood*, 487 U.S. 552, 570 (1988); *see also Jud. Watch, Inc. v. U.S. Dep't of Com.*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010). This is because the term "shall" imposes a "mandatory duty." *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016); *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 170 (D.D.C. 2022). Here, the Rehabilitation Act provides that covered agencies "*shall* [not], solely by reason of her or his disability" "exclude[]" a "qualified individual with a disability" "from the participation in" or "the benefits of" agency programs. 29 U.S.C. § 794(a) (emphasis added). And EOP's implementing regulations provide that it "*shall* take appropriate steps to ensure effective communication with . . . members of the public" and "*shall* furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted" by EOP. 3 C.F.R. §§ 102.160(a), (a)(1) (emphases added). And as this record evinces, *only* a qualified ASL interpreter provides the "meaningful access" that the Rehabilitation Act and EOP's implementing regulation mandates. *NAD I*, 486 F. Supp. 3d at 58. Thus, Defendants have no discretion but to provide such a service.

11

### C.    Plaintiffs Are Likely to Succeed on Their First Amendment Claim

As Defendants assert, the President "possesses an extraordinary power to speak to his fellow citizens and on their behalf." Opp. 1 (quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)). The "bully pulpit," after all, is a core, "everyday tool of the presidency." *Blassingame v. Trump*, 87 F.4th 1, 15 (D.C. Cir. 2023). And when the President and his designees ascend that pulpit, Americans listen and watch. Currently, however, many Americans who *want and need* to receive the President's message cannot do so because the White House has removed Plaintiffs' and many other deaf Americans' ability to access the President's and his designees' speech. So, the question here is whether the White House, having offered the public access to its speech, may then arbitrarily restrict a particular group of people's access to that speech. In light of the "cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs," *Price v. Garland*, 45 F.4th 1059, 1070-71 (D.C. Cir. 2022), the answer is "no."

In opposition, Defendants argue that the First Amendment only prevents "affirmative governmental limitations on the information a person might receive." Opp. 29. But terminating all ASL interpretation from White House press briefings *was* an affirmative step that *does* limit the information Plaintiffs and other deaf persons may receive. Whether characterized as affirmative or passive, the White House's decision to make its press briefings public to everyone *but* deaf persons who rely on ASL supports Plaintiffs' First Amendment claim (as well as their Fifth Amendment claim, *see* Compl. ¶¶ 82-90). Indeed, it is "well established that the Constitution protects the right to *receive* information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (emphasis added). "It would be a barren marketplace of ideas that had only sellers." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring). As a result, *both* the right to speak *and* the right to receive speech protect "the paramount public interest in a free flow of

information to the people concerning public officials," including the most important public official of them all, the President of the United States. *See Pell v. Procunier*, 417 U.S. 817, 832 (1974).

Defendants suggest that the "right to receive" *never* applies to speech in a government forum, but that is wrong. Students, for example, have a right to "receive" speech within a public library. *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866 (1982) ("[W]e think that the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library."). They enjoy such a right because the First Amendment *also* has a key "role in affording the public *access* to discussion, debate, and the dissemination of information and ideas." *Id.* (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)). Although the government may have "discretion" in managing its speech (and programming), the government must do so "in a manner that comports with the transcendent imperatives of the First Amendment." *See id.* at 864; *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).

Next, Defendants insist that Plaintiffs' First Amendment claim fails because the White House is a nonpublic forum. But a government restriction on its nonpublic forum must be not only "viewpoint neutral" but also "reasonable." *Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025). *Unreasonable* restrictions on access to government speech in a nonpublic forum, even if viewpoint-neutral, violate the First Amendment. *See Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008). In this context, "reasonableness" requires "something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power." *Price*, 45 F.4th at 1072.

Defendants make no attempt to defend the reasonableness of their sudden termination of ASL interpreting services, instead merely claiming "substantial leeway to regulate access to a nonpublic forum." Opp. 31 (quoting *Ateba*, 133 F.4th at 123). Leeway, however, is not

unreviewable discretion: Defendants still must articulate how those restrictions are reasonable in light of the nonpublic forum at issue. *See, e.g.*, *Price*, 45 F.4th at 1073 (revenue-raising rules made restriction reasonable); *Ateba*, 133 F.4th at 123 (security concerns). Here, Defendants do not offer *any* defense—not revenue-raising, not security, nothing at all.

Further, Plaintiffs do not seek *physical* access to the White House press briefing room, which could raise a host of security and other administrative concerns. Rather, Plaintiffs merely seek to watch the press briefings online, via the official White House communication channels, with the addition of ASL interpretation. Providing interpretation in such a forum is reasonable and does not burden any governmental interest, as confirmed by Defendants' provision of ASL interpretation for years. Defendants' abrupt reversal of that practice is just the kind of "inconsistent[] enforce[ment]" of a challenged restriction that makes it unreasonable as a matter of law. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 330 (D.C. Circ. 2018).

As such, Plaintiffs are also likely to succeed on their First Amendment claim.

### D.    Defendants' Remaining Procedural Objections Fail

#### 1.    This Action Poses No *Res Judicata* Issues

Defendants argue that Plaintiffs' claims are precluded based on the voluntary dismissal with prejudice of claims asserted in *NAD I*. Opp. 12-17. This argument fails on multiple levels.

As an initial matter, Defendants seek to have their cake and eat it, too. Barely two weeks ago, Defendants successfully maintained that this case is so *unrelated* to *NAD I* that it did not justify assignment to Judge Boasberg under Local Civil Rule 40.5(a)(4). In that filing, Defendants argued that the two cases "do not 'relat[e] to the same subject matter'" (quoting LCvR 40.5(a)(4)) because they "involve different alleged policies and practices allegedly carried out by different administrations and separated by a span of several years." ECF 7 at 3-4. Defendants also argued the two cases "do not involve 'the same parties'" because there are different plaintiffs and a

different defendant in the present case. *Id*. at 2-3. Now, Defendants take the opposite view, arguing that this case involves the "same claims" and "same parties or their privies" from *NAD I*. Opp. 12-17. Defendants' opportunistic flip-flop confirms that their claim preclusion argument is simply not credible. It also fails on the merits.

*First*, Plaintiffs' claims do not arise from the same "nucleus of facts" as those in *NAD I* because the claims are based on conduct that began years *after* the judgment in *NAD I* and is ongoing today. "Claim preclusion generally does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 414 (2020) (quotation marks and citation omitted). "Federal law is clear that post-judgment events give rise to new claims, so that claim preclusion is no bar." *Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997); *see also Apotex, Inc. v. FDA*, 393 F.3d 210, 218 (D.C. Cir. 2004) ("*Res judicata* does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit.").

Here, Plaintiffs' claims are based on events that post-date the dismissal of *NAD I*. That case was filed in August 2020 and was based on the White House's failure to provide ASL interpreters at press briefings related to COVID-19. In April 2021, the White House implemented a new policy to provide ASL interpreters at *all* White House briefings. In light of that policy, the plaintiffs in *NAD I* agreed to a settlement and voluntarily dismissed their claims with prejudice. For the next four years, the White House provided ASL interpreters for all briefings. However, the White House rescinded that policy immediately following President Trump's inauguration in January 2025. Since then, Defendants have refused to provide ASL interpreters at any White House press briefings. As such, the conduct giving rise to *this* action began in January 2025—five years after the complaint in *NAD I* and four years after the settlement that ended *NAD I*. This

conduct post-dates the 2021 dismissal of *NAD I* by nearly four years and arises after "a break in administrations."  Min. Order (June 6, 2025).  Because these "post-judgment events give rise to new claims . . . claim preclusion is no bar."  *Stanton*, 127 F.3d at 78; *see also, e.g.*, *Does I through III v. Dist. of Columbia*, 238 F. Supp. 2d 212, 219 (D.D.C. 2002) ("The more distant in time, the more likely it is that the claims constitute two causes of action.").[4]

  *Second*, this case and *NAD I* do not involve the same parties or their privies.  While NAD was a plaintiff in both cases, Plaintiffs Ford and Bonn were not plaintiffs in *NAD I*.  Nor are Plaintiffs Ford or Bonn in privity with any of the individual plaintiffs in *NAD I*.  Defendants assert that Plaintiffs Ford and Bonn are in privity based on the Complaint's allegation that they are NAD members.  Regardless of whether Plaintiffs Ford and Bonn were members when *NAD I* was filed, that would not preclude them from bringing this suit.  A plaintiff's "mere membership in or affiliation" with an association that litigated a prior case "does not foreclose [the association's members'] present claims."  *Cigar Ass'n of Am. v. U.S. FDA*, 436 F. Supp. 3d 70, 82 (D.D.C. 2020); *see also Cal. Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) ("Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization."); *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 2023 WL 5489028, at *12 (E.D. Tex. Aug. 24, 2023) (similar).  This is particularly so for association members who did not "actively participate[]" in the prior action.  *Cigar Ass'n of Am.*, 436 F. Supp. 3d at 82 (quoting 18A Charles Alan Wright et al., *Federal Practice & Procedure*

---

[4] Even if the conduct at issue in the present case is similar to the conduct at issue in *NAD I*, that does not satisfy the "same claim" element of claim preclusion.  "Litigation of the validity of one past course of conduct is not the same 'claim' as . . . litigation over the validity of similar conduct occurring after the acts covered by the initial litigation."  *Stanton*, 127 F.3d at 79.

§ 4456 (2d ed. 2017)).  Even if Plaintiffs Ford and Bonn had been NAD members during the prior

litigation, the mere fact of such membership would not bind them to the result of *NAD I*.

Defendants also appear to go so far as to suggest that Plaintiffs Ford and Bonn are bound

by claim preclusion simply because their "interests were represented by NAD in the 2020 lawsuit,"

regardless of whether they were even NAD members at the time.  Opp. 15 (cleaned up).  That

sweeping view of claim preclusion would have stupendous implications:  essentially, that all deaf

Americans who would benefit from the relief sought in *NAD I* are bound by *res judicata* as if they

had been parties to that case.  Defendants cite no authority for such a sweeping proposition, which

would raise profound due process concerns.[5]  Defendants' claim preclusion argument fails.

### 2. The 2021 Settlement Agreement Explicitly Permits Future Lawsuits Predicated on Post-Settlement Conduct

The parties' 2021 settlement agreement also does not bar Plaintiffs' claims.  As an initial

matter, the agreement does not and could not bar Plaintiffs Ford and Bonn from pursuing their

claims given that they were not parties to the settlement agreement.  Nor does it bar NAD's claims.

After all, the settlement agreement explicitly excludes "claims based on any acts or omissions that

may occur *after* the date of execution of this Agreement."  Settlement Agreement & Release, at 3,

ECF 14-1 ¶ 3 (emphasis added).  The preclusive effect of a settlement agreement depends on

"familiar principles of contract law," particularly "when, as here, a court was not asked to approve

the settlement in any way." *Proctor v. Trans Union, LLC*, 2024 WL 4239501, at *3 (D.D.C. Sept.

19, 2024) (cleaned up).  Thus, a settlement agreement precludes litigation of subsequent claims

---

[5] Defendants' reliance on *Hale v. Collis*, 2022 WL 3016747, at *5 (D.D.C. July 29, 2022) is unavailing.  In *Hale*, the same plaintiff brought both cases.  In the first case, he asserted claims against the Bureau of Prisons ("BOP"), and in the second case, he asserted claims against a BOP official responsible for carrying out the challenged policy. *Id.*  The court found the claims in the second case precluded because  "government employees sued in their personal capacity for official acts are in privity with the government." *Id.* at *1, *5.  That principle clearly does not apply here.

*only* "if its terms fairly indicate the intent of the parties to do so." *Id.*; *see also Dodge v. Trs. of Nat. Gallery of Art*, 326 F. Supp. 2d 1, 9 (D.D.C. 2004) (contract law principles "determine what claims the parties intended to foreclose from future litigation" (cleaned up)).

Here, the terms of the *NAD I* settlement agreement clearly evince the parties' intent *not* to foreclose future claims based on later-arising events. The agreement was expressly based on the fact that, in 2021, the White House implemented a new policy to provide ASL interpreters at all press briefings, which the parties agreed was "consistent with the relief Plaintiffs seek in the Complaint" in *NAD I*. *See* Settlement Agreement & Release, at 3, ECF 14-1. Most significantly, the parties expressly agreed that the settlement "shall not be construed to include claims based on any acts or omissions that may occur after the date of execution of this Agreement." *Id.* ¶ 3. Defendants' 2025 decision to halt providing ASL interpreters after the White House had continuously done so for four years—pursuant to the Policy on which the settlement agreement was based—plainly constitutes "acts or omissions that . . . occur[ed] after the [2021] date of execution of this Agreement." Accordingly, the agreement does not bar the present claims.

Defendants' position would also produce absurd results: even if the White House had stopped providing ASL interpreters *the day after the settlement agreement was signed*, the release of past claims would bar NAD from challenging the violative conduct. Indeed, Defendants' position would bar NAD from ever again bringing a suit seeking the White House's provision of ASL interpreters, regardless of whether Defendants stopped providing those interpreters five, ten, or fifty years after the execution of the settlement agreement. This is simply not a reasonable interpretation of the plain language of the settlement agreement. The present claims arise from conduct that occurred *after* the agreement's execution. As such, they are not released.

## II. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM THAT WILL CONTINUE ABSENT A PRELIMINARY INJUNCTION

Plaintiffs have made a strong showing that, absent preliminary injunctive relief, they will continue to suffer irreparable harm.  Mot. 24-27.  As an initial matter, Defendants' conduct is discriminatory and discrimination is presumed to be irreparable harm.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (violations of anti-discrimination laws generally); *Bonnette v. D.C. Ct. of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) (Rehabilitation Act specifically).[6]  Moreover, even momentary violations of the First Amendment "unquestionably constitute[] irreparable injury." *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (citation omitted); *see* Mot. 25 (collecting cases).

In response, Defendants first argue that Plaintiffs "*do* have access to the information presented at the press conferences through means like closed captioning." Opp. 9.  Defendants are wrong: as discussed and as the Court recognized in *NAD I*, ASL interpretation is necessary for Plaintiffs to meaningfully access White House press briefings; closed captions are insufficient. *See supra* Part I.A.1.

Defendants next argue that Plaintiffs do not "need immediate access to information being presented at White House press briefings" because "information about the issues of the day is far less critical" than COVID-related information.  This too is wrong.  Defendants' refusal to provide ASL interpreters deprives Plaintiffs and other deaf persons of the ability to understand what their elected leaders are saying, and thus deprives them of the ability to fully participate in the democratic process—a fundamental right of American citizens.  *See NAD v. State*, 318 F. Supp.

---

[6] *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), on which Defendants rely (Opp. 11), does not hold otherwise.  Rather, it simply confirms that the familiar *Winter* factors governing motions for preliminary injunctions apply to certain actions to enjoin unfair labor practices under the National Labor Relations Act.  *Id.* at 350-51.  *Starbucks* does not address the Rehabilitation Act, or any other anti-discrimination laws, and has no bearing on this action.

3d 1338, 1346 (S.D. Fla. 2018) (claim seeking closed-captioning on videos of state legislative proceedings "implicated the fundamental right to participate in the democratic process" because plaintiffs sought "information that goes to the very heart of the democratic process: the text of legislative proceedings. Accordingly, their fundamental right to participate in the democratic process is implicated."); *Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1262 (W.D. Okla. 2017) (similar); *see generally Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) ("The right of citizens to inquire, to hear, to speak, and to use the information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it"). This deprivation likewise offends Plaintiffs' First Amendment right to "petition the Government for a redress of grievances." U.S. Const. amend. I. If Plaintiffs cannot understand what the senior-most leaders of the government are saying, they cannot know what to petition the government for.

Further, each time the President or his designee takes the podium for a press briefing, they address important issues that impact the lives of *all* American citizens, including deaf Americans. For example, in the last month alone, White House press briefings have addressed ICE raids in California and countervailing protests, federal plans for addressing the upcoming hurricane season, and the status of the Administration's so-called "One Big Beautiful Bill," which may dramatically impact Medicare and Medicaid, among other public services. The views of the President and his officials on these issues can shape national and international policy and affect world events. The ability to access this information is "needed to participate in the [democratic] process," and the denial of access, as a result, "severely impair[s]" Plaintiffs' "ability to adequately" do so. *Reininger*, 292 F. Supp. 3d at 1262. Depriving deaf Americans of this information is harmful and irreparable. Absent preliminary injunctive relief, that deprivation could persist for *years* while awaiting a final judgment.

Defendants argue that Plaintiffs' purported "delay" in filing suit "undercuts their irreparable-harm argument." Opp. 10. But delay "is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder,* 632 F.3d 722, 724 (D.C. Cir. 2011); *see also Klayman v. Obama*, 142 F. Supp. 3d 172, 195 n.22 (D.D.C. 2015) ("[T]he Government incredibly argues that the . . . plaintiffs' claim of irreparable harm is necessarily undercut by their more than two-year delay in joining this suit. Come on! [L]ate filing alone is not a sufficient basis for denying a preliminary injunction"). Only "[w]here a delay is unjustified and prejudicial" to the defendant can it warrant denial of an injunction. *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 329 (D.D.C. 2015) (finding six-month delay justified and not prejudicial). Here, the timing of Plaintiffs' lawsuit filing was justified and not prejudicial to Defendants.

First, promptly after Defendants rescinded ASL interpreters for White House press briefings, Plaintiff NAD asked the White House to voluntarily resume the practice before filing suit. *See* ECF 2-6, NAD Letter to Susan Wiles (Jan. 31, 2025). Defendants did not respond, and NAD sent a follow-up letter on April 12, 2025, reiterating its request. *See* ECF 2-8, NAD Letter to Susan Wiles (Apr. 12, 2025). Defendants did not respond to that letter either, and Plaintiffs filed suit the following month, on May 28, 2025. Plaintiffs should not be penalized for such good faith efforts to secure voluntary compliance with the law before filing suit, which in no way undermine the fact of irreparable harm. *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) ("In light of plaintiffs' diligent pursuit of a variety of avenues for reversing [the] policy [at issue], plaintiffs' 'delay' does not give rise to an inference that the harm is [neither] irreparable [nor] imminent"); *Ramirez v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (finding two-month delay after plaintiffs "engaged in attempts to persuade [the] [d]efendants to comply" with the statutory provision at issue did not undermine assertions of

irreparable harm). Indeed, "Plaintiffs likely would not have had occasion to file this lawsuit" if Defendants had complied with Plaintiffs' requests. *Id*. These pre-suit attempts to resolve the issue do not negate the fact of Plaintiffs' irreparable harm absent preliminary injunctive relief.

Second, identifying and communicating with deaf clients in anticipation of litigation can be time-consuming, particularly where—as here—the individuals (like Plaintiffs Bonn and Ford) have a very limited ability to read and understand English. In this case, undersigned counsel retained teams of qualified ASL interpreters, including Certified Deaf Interpreters, to help conduct client interviews, review engagement letters, develop and revise client declarations, and review draft pleadings with the individual Plaintiffs. This process was time-consuming but necessary, and its impact on the timing of the lawsuit does not undermine Plaintiffs' irreparable harm.

In the cases cited by Defendants, filing delay blunted irreparable harm not due to mere timing, but because the plaintiffs' purported explanation for the delay was unjustified or unexplained—which is not the case here. *See W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 49-50 (D.D.C. 2020) (finding "unexplained delay" in filing suit, combined with waiting five weeks to move for a preliminary injunction, undermined assertions of irreparable harm); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000) (rejecting plaintiffs' "mistaken belief" excuse for eight-month delay); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (unjustified delay in filing suit before impending inauguration).

Finally, the irreparable harm suffered by Plaintiffs is ongoing, due to Defendants' continuing and repeated instances of unlawful conduct. "[T]ardiness is not particularly probative in the context of ongoing, worsening injuries" because "the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was sleeping on its rights." *Tex. Children's Hosp.*, 76 F. Supp. 3d at 245 (quotation marks omitted). The harm suffered

by Plaintiffs continues to grow in both scope and irreparability with every inaccessible press briefing. The more information missed, the less opportunity Plaintiffs have to participate in the democratic process. Accordingly, any alleged delay in filing suit does not undermine the fact that, absent an injunction, Plaintiffs will be irreparably harmed for years to come.

## III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF PLAINTIFFS

Defendants argue that Plaintiffs' requested relief is inequitable because it is "extraordinarily broad and vague," and raises "practicality" concerns. Opp. 33, 34. Yet, Plaintiffs' requested injunction is modeled on the White House's *own* ASL Policy, attached to the Complaint as Exhibit A, and its own practices from 2021 to 2025. *Compare* ECF 1-1 *with* Compl. at Request for Relief. Plaintiffs are simply asking for a return to this *status quo ante*, before Defendants suspended the use of ASL interpreters for White House press briefings. As such, the scope and parameters of the requested injunction are clear.

Additionally, the requested relief is feasible. Not only did the White House provide this relief for years, White House officials—before the change in administration—developed guidelines and best practices for providing ASL interpretation going forward. Compl. ¶ 45. "The guidelines are complete and it's 'gold.' The packet of information has been available since August [2024] and it includes everything needed to make [the White House's] events accessible for everyone." *Id*. (quoting former White House ASL interpreter Elsie Stecker). Defendants also fret that providing ASL interpretation could cause delay if the President had pressing matters to address. Opp. 33. Not only is this highly speculative, but the prior Administration surely confronted such circumstances and apparently navigated them without issue.

Defendants also argue that the requested injunction "would severely intrude on the President's prerogative to control the image he presents to the public," and would "dictat[e] to the

23

President the image he is allowed to present to the world." Opp. 33, 34. But Defendants cite no authority for the proposition that the President's power over his image is sacrosanct. Defendants also do not explain how the addition of an ASL interpreter on the side of the video frame carrying the press briefing would affect the President's "image"—it wouldn't. Picture-in-picture technology allows ASL interpretation to be provided remotely, with the interpreter at an entirely separate location from the speaker, and the video feed of the interpreter joined with the video feed of the press conference. *See* Compl. ¶ 39 (displaying example); ECF 2-4 ¶¶ 40-41 (expert declaration). This is the format used by the White House from 2021 to January 2025, and the presentation of ASL interpreters in this manner does not alter, obstruct, or otherwise impact the President's or speaker's image.

Finally, Plaintiffs do not object to excluding the President and Vice President from the injunction order because, as the Court recognized in *NAD I*, enjoining the remaining Defendants will provide Plaintiffs with the relief sought. *See NAD I*, 486 F. Supp. 3d at 59.

## IV.    THE COURT SHOULD NOT REQUIRE SECURITY

Under Federal Rule of Civil Procedure 65(c) courts have discretion "to determine the appropriate amount of an injunction bond . . . including the discretion to require no bond at all." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (cleaned up). Where, as here, Defendants have not identified any "monetary injury from the injunction," it would "defy logic" to require Plaintiffs to post security, particularly where Plaintiffs are two individuals and a non-profit organization. *Id.* Plaintiffs also seek protection of their constitutional rights, which courts have found requires only "a nominal bond of zero dollars under Rule 65(c)." *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025). Accordingly, the Court should not require a bond.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and issue a preliminary injunction requiring Defendants to immediately resume providing qualified ASL interpreters, including CDIs, at all White House press briefings conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary.

Dated: June 18, 2025

/s/ Ian S. Hoffman

Ian S. Hoffman (D.C. Bar No. 983419)
Alex E. Sirio (D.C. Bar No. 1724703)
Samuel D. Kleinman (D.C. Bar No. 1736463)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
ian.hoffman@arnoldporter.com
alex.sirio@arnoldporter.com
sam.kleinman@arnoldporter.com

Caitlyn Lewis Kellerman*
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-7751
caitlyn.kellerman@arnoldporter.com

Brittany Shrader (admitted *pro hac vice*)
Drake W. Darrah (admitted *pro hac vice*)
Alexander Van Hook (admitted *pro hac vice*)
NAD Law and Advocacy Center
86 30 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791
brittany.shrader@nad.org

*pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

25