APPEAL,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25−cv−01683−AHA</u>

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF et al v. TRUMP et al | Date Filed: 05/28/2025 |
| Assigned to: Judge Amir H. Ali | Jury Demand: None |
| Cause: 29:0794 Job Discrimination (Handicap) | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION OF THE DEAF** | represented by | **Caitlyn R. Lewis** |

ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019
212−836−7751
Email: Caitlyn.Kellerman@arnoldporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Alexander E. Sirio**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202−942−6087
Email: Alex.Sirio@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Alexander Sklaroff Van Hook**
NATIONAL ASSOCIATION OF THE
DEAF
Law and Advocacy Center
8630 Fenton Street
Suite 202
Silver Spring, MD 20910
484−312−2001
Email: alexander.vanhook@nad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brittany Shrader**
NATIONAL ASSOCIATION OF THE
DEAF
Law and Advocacy Center
8630 Fenton Street
Suite 202
Silver Spring, MD 20910

1

301–639–1970
Email: brittany.shrader@nad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Drake Darrah**
8630 Fenton Street
Ste 202
Silver Spring, MD 20910
240–748–1711
Email: drake.darrah@nad.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Katerberg**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942–5000
Fax: (202) 942–5999
Email: robert.katerberg@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Samuel Kleinman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202–942–5821
Email: Sam.Kleinman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202–942–6406
Fax: 202–942–5999
Email: ian.hoffman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **DERRICK FORD** | represented by | **Alexander E. Sirio**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Alexander Sklaroff Van Hook**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Brittany Shrader**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Drake Darrah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Katerberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MATTHEW BONN**                    represented by    **Caitlyn R. Lewis**
*TERMINATED: 07/28/2025*                               (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *PRO HAC VICE*
                                                        *ATTORNEY TO BE NOTICED*

**Alexander E. Sirio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Sklaroff Van Hook**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brittany Shrader**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Drake Darrah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Katerberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**DONALD J. TRUMP**
*in his official capacity as President of the United States*

represented by **Elizabeth Themins Hedges**
DOJ–Civ
950 Pennsylvania Ave NW
Washington, DC 20530
771–209–1978
Email: elizabeth.t.hedges@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
DOJ
FEDERAL PROGRAMS BRANCH –
Civil Division
1100 L Street, N.W.
Washington, DC 20005
202–353–5980
Email: christian.r.dibblee@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
U.S. DEPARTMENT OF JUSTICE
Office of the Assistant Attorney General,
Civil Division
950 Pennsylvania Ave NW
Rm. 3632
Washington, DC 20530
202–514–4052
Email: tyler.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**EXECUTIVE OFFICE OF THE PRESIDENT**

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WHITE HOUSE OFFICE**                represented by  **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE VICE PRESIDENT**    represented by  **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN WILES**                        represented by  **Elizabeth Themins Hedges**
*in her official capacity as White House*                (See above for address)
*Chief of Staff*                                         *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KAROLINE LEAVITT**                   represented by  **Elizabeth Themins Hedges**
*in her official capacity as Press*                     (See above for address)

*Secretary to the President of the United States*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2025 | 1 | COMPLAINT against EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, THE WHITE HOUSE OFFICE, DONALD J. TRUMP, SUSAN WILES ( Filing fee $ 405 receipt number ADCDC–11719783) filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Exhibit – A ASL Policy, # 2 Exhibit – B January 31, 2025 Letter, # 3 Exhibit – C April 12, 2025 Letter, # 4 Civil Cover Sheet, # 5 Summons – Pam Bondi, # 6 Summons – Civil Process Clerk, # 7 Summons – Executive Office of the President, # 8 Summons – Karoline Leavitt, # 9 Summons – Office of the Vice President, # 10 Summons – President Donald J. Trump, # 11 Summons – Susan Wiles, # 12 Summons – The White House Office)(Hoffman, Ian) (Entered: 05/28/2025) |
| 05/28/2025 | 2 | MOTION for Preliminary Injunction *and Request for an Expedited Hearing* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Derrick Ford, # 3 Declaration of Matthew Bonn, # 4 Declaration of Dr. Judy Shepard–Kegl and Dr. Amy June Rowley, # 5 Declaration of Kelby N. Brick, # 6 Exhibit – A – January 31, 2025 Letter, # 7 Exhibit – B – ASL Policy, # 8 Exhibit – C – April 12, 2025 Letter)(Hoffman, Ian). Added MOTION to Expedite on 5/29/2025 (znmw). (Entered: 05/28/2025) |
| 05/28/2025 | 3 | NOTICE OF RELATED CASE by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. Case related to Case No. 20–cv–2107. (Hoffman, Ian) (Entered: 05/28/2025) |
| 05/29/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL ASSOCIATION OF THE DEAF (Hoffman, Ian) (Entered: 05/29/2025) |
| 05/29/2025 | | Case Assigned to Chief Judge James E. Boasberg. (znmw) (Entered: 05/29/2025) |
| 05/29/2025 | 5 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 05/29/2025) |
| 06/02/2025 | 6 | NOTICE of Appearance by Elizabeth Themins Hedges on behalf of All Defendants (Hedges, Elizabeth) (Entered: 06/02/2025) |
| 06/02/2025 | 7 | RESPONSE re 3 Notice of Related Case *Objection to Designation as Related Case* filed by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Hedges, Elizabeth) (Entered: 06/02/2025) |

| 06/02/2025 | | MINUTE ORDER: The Court ORDERS that: 1) Defendants shall file their Opposition to Plaintiffs' 2 Motion for a Preliminary Injunction by June 11, 2025; 2) Plaintiffs shall file their Reply by June 18, 2025; and 3) The parties shall appear for a hearing on the Motion via Zoom on June 26, 2025, at 2:00 p.m. So ORDERED by Chief Judge James E. Boasberg on June 2, 2025. (lcjeb3) (Entered: 06/02/2025) |
|---|---|---|
| 06/02/2025 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall file any response to Defendants' 7 Response by June 5, 2025. So ORDERED by Chief Judge Boasberg on June 2, 2025. (lcjeb3) (Entered: 06/02/2025) |
| 06/03/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brittany Shrader, Filing fee $ 100, receipt number ADCDC–11732900. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Attachment 1 replaced on 6/4/2025) (znmw). (Entered: 06/03/2025) |
| 06/04/2025 | | NOTICE OF ERROR regarding 8 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brittany Shrader, Filing fee $ 100, receipt number ADCDC–11732900. Fee Status: Fee Paid.. The following error(s) need correction: Declaration must have an original, ink signature. Please refile using the event Declaration. (znmw) (Entered: 06/04/2025) |
| 06/04/2025 | 9 | DECLARATION *(CORRECTED ATTACHMENT 1)* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF re 8 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Brittany Shrader, Filing fee $ 100, receipt number ADCDC–11732900. Fee Status: Fee Paid.. (Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Drake W. Darrah, Filing fee $ 100, receipt number ADCDC–11735675. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 11 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Drake W. Darrah, *Filing fee $ 100, receipt number ADCDC–11735675. Fee Status: Fee Paid.* Fee Status: No Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Alexander S. Van Hook, Fee Status: No Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: The Court ORDERS that the 8 Motion for Leave to Appear Pro Hac Vice of Brittany Shrader is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER: The Court ORDERS that the <u>11</u> Motion for Leave to Appear Pro Hac Vice of Drake W. Darrah is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** <u>Click for instructions</u>. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: The Court ORDERS that the <u>12</u> Motion for Leave to Appear Pro Hac Vice of Alexander S. Van Hook is GRANTED. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** <u>Click for instructions</u>. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | <u>13</u> | NOTICE of Appearance by Alexander E. Sirio on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Sirio, Alexander) (Entered: 06/04/2025) |
| 06/05/2025 | <u>14</u> | REPLY re <u>3</u> Notice of Related Case *Plaintiffs' Response to Defendants' Objection to Notice of Relatedness under LCvR 40.5* filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # <u>1</u> Exhibit A)(Hoffman, Ian) Modified event title on 6/6/2025 (znmw). (Entered: 06/05/2025) |
| 06/06/2025 | | MINUTE ORDER: Although it is quite a close question, the Court ultimately believes that this case does not fall within our related–case rule. The relief sought is considerably broader here; there has been a break in administrations; and, given the Court's limited involvement in the prior case, the judicial economy to be gained is slight. The Court, accordingly, ORDERS that the Calendar Committee shall randomly reassign this matter. So ORDERED by Chief Judge James E. Boasberg on June 6, 2025. (lcjeb3) (Entered: 06/06/2025) |
| 06/06/2025 | | Case randomly reassigned to Judge Amir H. Ali pursuant to the Minute Order dated 6/6/2025. Chief Judge James E. Boasberg is no longer assigned to the case. (ztnr) (Entered: 06/06/2025) |
| 06/06/2025 | <u>15</u> | NOTICE of Appearance by Alexander Sklaroff Van Hook on behalf of All Plaintiffs (Van Hook, Alexander) (Entered: 06/06/2025) |
| 06/09/2025 | <u>16</u> | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 06/09/2025) |
| 06/09/2025 | <u>17</u> | NOTICE of Appearance by Drake Darrah on behalf of All Plaintiffs (Darrah, Drake) (Entered: 06/09/2025) |
| 06/11/2025 | <u>18</u> | Memorandum in opposition to re <u>2</u> MOTION for Preliminary Injunction *and Request for an Expedited Hearing* MOTION to Expedite *Memorandum in Opposition* filed by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Attachments: # <u>1</u> Exhibit Proposed Order)(Hedges, Elizabeth) (Entered: 06/11/2025) |
| 06/17/2025 | | MINUTE ORDER. The Court will hold a motion hearing on Plaintiffs' <u>2</u> motion for preliminary injunction on June 25, 2025, at 10:00 am in Courtroom 19. The motion hearing scheduled for June 26, 2025, is vacated. Signed by Judge Amir H. Ali on 6/17/2025. (lcaha1) (Entered: 06/17/2025) |
| 06/17/2025 | <u>19</u> | NOTICE of Appearance by Brittany Shrader on behalf of All Plaintiffs (Shrader, Brittany) (Entered: 06/17/2025) |

| 06/18/2025 | 20 | REPLY to opposition to motion re 2 Motion for Preliminary Injunction,,, Motion to Expedite,, filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Hoffman, Ian) (Entered: 06/18/2025) |
|---|---|---|
| 06/20/2025 | | MINUTE ORDER. The Court will hold a motion hearing on Plaintiffs' 2 motion for preliminary injunction on July 2, 2025, at 10:30 am in Courtroom 19. The motion hearing scheduled for June 25, 2025, is vacated. Signed by Judge Amir H. Ali on 6/20/2025. (lcaha1) (Entered: 06/20/2025) |
| 06/23/2025 | 21 | NOTICE of Appearance by Samuel Kleinman on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Kleinman, Samuel) (Entered: 06/23/2025) |
| 07/01/2025 | 22 | NOTICE of Appearance by Robert J. Katerberg on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Katerberg, Robert) (Entered: 07/01/2025) |
| 07/01/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Caitlyn Lewis Kellerman, Filing fee $ 100, receipt number ADCDC–11790649. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Sirio, Alexander) (Entered: 07/01/2025) |
| 07/02/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 22 NOTICE of Appearance by Robert J. Katerberg on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Katerberg, Robert).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 7/9/2025. (zapb) Modified on 7/3/2025 (zhcn). (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 23 motion for leave to appear pro hac vice. Attorney Caitlyn Lewis Kellerman is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Amir H. Ali on 7/2/2025. (lcaha1) (Entered: 07/02/2025) |
| 07/02/2025 | 24 | NOTICE of Appearance by Caitlyn R. Lewis on behalf of MATTHEW BONN, NATIONAL ASSOCIATION OF THE DEAF (Lewis, Caitlyn) (Entered: 07/02/2025) |
| 07/02/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 7/2/2025 re 2 Motion for Preliminary Injunction. Oral arguments heard. The Court takes the motion under advisement. Written ruling forthcoming via Chambers. (Court Reporter: Sonja Reeves) (ASL Interpreters: Joseph Lucas and Sarah Blattbert) (Certified Deaf Interpreters: Nancylynn Ward, and Neisha Washington–Shepherd) (zalh) (Entered: 07/02/2025) |
| 07/06/2025 | 25 | |

| | | |
|---|---|---|
| | | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on July 2, 2025; Page Numbers: 1−79. Date of Issuance: July 6, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354−3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/27/2025. Redacted Transcript Deadline set for 8/6/2025. Release of Transcript Restriction set for 10/4/2025.(Reeves, Sonja) (Entered: 07/06/2025) |
| 07/15/2025 | 26 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 7/15/2025. (lcaha1) (Entered: 07/15/2025) |
| 07/22/2025 | 27 | Joint MOTION to Vacate *Answer Deadline and Set JSR Deadline* by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Becker, Tyler) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. The parties' 27 joint motion to vacate answer deadline and set deadline for joint status report is granted. The July 28, 2025, deadline to file an answer is vacated. The parties shall file a joint status report within ten days of the Court's ruling on Plaintiffs' 2 motion for a preliminary injunction. Signed by Judge Amir H. Ali on 7/22/2025. (lcaha1) Modified on 7/28/2025. (zalh) (Entered: 07/22/2025) |
| 07/25/2025 | 28 | NOTICE *[PLAINTIFF MATTHEW BONN'S NOTICE OF VOLUNTARY DISMISSAL OF HIS CLAIMS AGAINST DEFENDANTS]* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Hoffman, Ian) (Entered: 07/25/2025) |
| 11/04/2025 | 29 | MEMORANDUM OPINION AND ORDER. Plaintiffs' 2 motion for a preliminary injunction is granted in part and denied in part. See document for details. The Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary shall file a status report by November 7, 2025, that apprises the court of their compliance with this order. Signed by Judge Amir H. Ali on 11/4/2025. (lcaha1) (Entered: 11/04/2025) |
| 11/05/2025 | 30 | NOTICE of Appearance by Christian Dibblee on behalf of All Defendants (Dibblee, Christian) (Entered: 11/05/2025) |
| 11/07/2025 | 31 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT re 29 Memorandum Opinion by WHITE HOUSE OFFICE, KAROLINE LEAVITT, SUSAN WILES, EXECUTIVE OFFICE OF THE PRESIDENT. Fee Status: No Fee Paid. |

| | | |
|---|---|---|
| | | Parties have been notified. (Dibblee, Christian) Modified event title and link on 11/10/2025 (znmw). (Entered: 11/07/2025) |
| 11/07/2025 | 32 | NOTICE *of Efforts To Comply With Preliminary Injunction* by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, WHITE HOUSE OFFICE, SUSAN WILES (Dibblee, Christian) (Entered: 11/07/2025) |
| 11/07/2025 | | MINUTE ORDER. The court is in receipt of Defendants' 32 notice. Plaintiffs shall file a response by November 10, 2025. Signed by Judge Amir H. Ali on 11/7/2025. (lcaha1) (Entered: 11/07/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, *et al*.,<br><br>       Plaintiffs,<br><br>              v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>       Defendants. | Case No. 25-cv-1683 (AHA) |

## NOTICE OF APPEAL

Defendants respectfully provide notice that they hereby appeal to the United States Court of Appeals for the D.C. Circuit the preliminary injunction entered against them in this Court's November 4, 2025, Memorandum Opinion and Order, ECF No. 29.


Dated: November 7, 2025                    Respectfully submitted,

                                   BRETT A. SHUMATE
                                   Assistant Attorney General
                                   Civil Division

                                   YAAKOV M. ROTH
                                   Principal Deputy Assistant Attorney General
                                   Civil Division

                                   ERIC J. HAMILTON
                                   Deputy Assistant Attorney General
                                   Civil Division, Federal Programs Branch

                                   TYLER J. BECKER
                                   ELIZABETH HEDGES
                                   Counsel to the Assistant Attorney General
                                   Civil Division

                                   DIANE KELLEHER
                                   Branch Director
                                   Civil Division, Federal Programs Branch

_/s/ Christian Dibblee_
CHRISTIAN DIBBLEE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

_Counsel for Defendants_

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF THE
DEAF, *et al.*,

      *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

      *Defendants*.

Civil Action No. 25-01683 (AHA)

<u>**Memorandum Opinion and Order**</u>

Congress has dictated that people cannot, on account of their disability, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" in "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The National Association of the Deaf ("NAD"), an organization dedicated to protecting the rights of Americans who are deaf, and Derrick Ford, a deaf individual, sue to end the exclusion of deaf Americans from the White House's direct engagement with the public during press briefings. They sue the President, as well as the relevant senior staff and executive offices, who concede the prohibition on excluding people with disabilities from government programming applies to White House press briefings and do not contest that American Sign Language ("ASL") interpretation is a feasible accommodation. The defendants say they can nonetheless hold press briefings without ASL, regardless of whether that excludes deaf Americans, because this particular prohibition is unenforceable. Alternatively, they ask the court to find that English captioning and transcripts are good enough to accommodate deaf Americans who rely on ASL, even though unrebutted evidence shows they are not.

The court concludes the plaintiffs are likely to succeed on their Rehabilitation Act claim. In doing so, the court agrees with courts that have concluded the Rehabilitation Act's prohibition

of discrimination in government programming is enforceable under the statute itself, *see Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 53–57 (D.D.C. 2020) (Boasberg, C.J.), and, alternatively, with courts that have concluded the prohibition is enforceable through a court's "inherent equitable power to enjoin the Government," *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 22 (D.D.C. 2024) (McFadden, J.). White House press briefings engage the American people on important issues affecting their daily lives—in recent months, war, the economy, and healthcare, and, in recent years, a global pandemic. The exclusion of deaf Americans from that programming, in addition to likely violating the Rehabilitation Act, is clear and present harm that the court cannot meaningfully remedy after the fact. Because the record shows exclusion is a reality for Ford, NAD members, and many other deaf Americans, and that providing ASL interpretation is readily feasible, the court finds the plaintiffs are entitled to preliminary relief.

The court is also mindful that preliminary relief is just that—an interim measure that, here, partially restores a recent status quo until the case is resolved. The court limits its relief at this stage to the provision of simultaneous and publicly accessible ASL interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary, finding that to be the least relief that is both necessary and supported by the record. The plaintiffs ask for more, including that ASL interpretation be required at press briefings and events conducted by the Vice President, First Lady, and Second Lady; that the feed with ASL interpretation be provided to networks; that interpretation be provided for all videos streamed on or uploaded to the White House's website and social media pages; and that the interpreter feed occupy a certain width of the screen. ECF No. 2-1 at 1–2. But, the plaintiffs have not, at this stage, submitted evidence to support that broader relief.

2

I.      **Background**

Ford and many deaf NAD members use ASL as their primary language and have limited proficiency in English. ECF No. 2-2 ¶¶ 2–3; ECF No. 2-5 ¶¶ 3–5. According to unrebutted record evidence, ASL and English "are two completely distinct languages." ECF No. 2-4 ¶ 27. ASL has its own vocabulary, grammar, and syntax. *Id.* ¶¶ 27–29. And English fluency "is not widespread" in the deaf community. *Id.* ¶ 32. Accordingly, many deaf Americans have very limited ability to read, write, or otherwise communicate in English. *Id.* ¶¶ 31–39; ECF No. 2-5 ¶ 3.

Because many people who use ASL cannot communicate in English, providing them with English captions or transcripts does not make speech accessible to them. ECF No. 2-4 ¶¶ 31, 39. For them to receive the information, it needs to be to be provided in the language they use, ASL. This has become significantly easier with advances in technology. Today, via remote interpretation, ASL interpreters can provide live interpretation without needing to be in the same room as the speaker, and a video feed of the interpreter can be inserted into the video of the speaker through picture-in-picture technology. *Id.* ¶¶ 17, 40–41. This can be done "without difficulty or significant logistical or financial burden." *Id.* ¶ 17.

Before 2021, the White House did not provide ASL interpretation during press briefings. The importance of providing ASL interpretation came to the fore during the COVID-19 pandemic, as White House briefings on emerging updates and safety protocols became a daily norm. In 2020, several individuals, along with NAD, sued to require ASL interpretation for COVID-19 press briefings, resulting in a preliminary injunction that required ASL interpretation during those briefings. *See Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107, 2020 WL 5757463, at *1 (D.D.C. Sept. 23, 2020). That case settled after the White House adopted a much broader policy of providing ASL interpretation during press briefings "conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary, for which the White House Press

Office or the White House Office of the Press Secretary provide public notice." ECF No. 2-7 at 2; *see* ECF No. 14-1. The White House stopped providing ASL interpretation during press briefings beginning in January 2025. *See* ECF No. 2-2 ¶ 5; ECF No. 2-5 ¶ 7.

The plaintiffs bring this action, asserting that the failure to provide ASL interpretation during press briefings and other events violates their rights under the Rehabilitation Act, as well as the First and Fifth Amendments to the U.S. Constitution. *See* ECF No. 1 ¶¶ 62–98. The plaintiffs move for a preliminary injunction requiring the defendants to provide ASL interpretation by qualified interpreters at press briefings, press conferences, and related events "conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary." ECF No. 2-1 at 1. The parties had the opportunity to brief the issues and submit evidence, and the court held a preliminary injunction hearing.

## II.    Discussion

"A preliminary injunction is an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). A plaintiff must establish four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The court finds the plaintiffs have satisfied their burden for preliminary relief, but tailors the proposed relief to the least necessary based on the record before the court at this preliminary stage—namely, to providing a simultaneous and publicly accessible feed with visible ASL interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary captured by White House communication channels.

### A.  The Plaintiffs Are Likely To Succeed On Their Rehabilitation Act Claim

Congress passed the Rehabilitation Act "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" through, among other things, "the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1)(F). As originally enacted in 1973, the statute prohibited the government from discriminating based on a person's disability in two contexts: Section 501 of the act, codified at 29 U.S.C. § 791, prohibited the government from discriminating as an employer. *See* Rehabilitation Act of 1973, Pub. L. No. 93-112, § 501, 87 Stat. 355, 390–91. And section 504, codified at 29 U.S.C. § 794, prohibited federal funding recipients from excluding people with disabilities from, denying them the benefits of, or discriminating against them in "any program or activity receiving Federal financial assistance." *Id.* § 504, 87 Stat. at 394.

Congress later amended the Rehabilitation Act in 1978 to expand its protection in various ways, two of which are most relevant here. *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, 92 Stat. 2955. First, Congress extended section 504's prohibition beyond federal funding recipients, to also prohibit the government from excluding people with disabilities from, denying them the benefits of, or discriminating against them in "any program or activity conducted by any Executive agency," *id.* § 119, 92 Stat. at 2982 (codified at 29 U.S.C. § 794(a))—the prohibition that plaintiffs rely on in this suit.

Second, Congress specified new forms of relief for violations of the act by adding section 505. *Id.* § 120, 92 Stat. at 2982–83 (codified at 29 U.S.C. § 794a); *see Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635 (1984) (observing that the addition of section 505 was "designed to enhance the ability of handicapped individuals to assure compliance with [§ 504]" (alteration in original) (quoting S. Rep. No. 95-890, at 18 (1978))). In section 505's first subsection, Congress

5

expanded the relief available for the act's two original prohibitions by incorporating "remedies, procedures, and rights set forth" in related statutory regimes. 29 U.S.C. § 794a(a). In particular, Congress expanded the remedies for disability discrimination claims against the federal government as an employer to include those available against employers under Title VII, *id.* § 794a(a)(1), and it expanded the remedies for disability discrimination claims against federal funding recipients to include those available against federal funding recipients under Title VI, *id.* § 794a(a)(2). Then, in section 505's second subsection, Congress specified that attorney's fees are available for all types of claims brought under the Rehabilitation Act. *See* 29 U.S.C. § 794a(b) (providing that attorney's fees are available in "any action or proceeding to enforce or charge a violation").

The defendants concede that the Rehabilitation Act's prohibition on excluding people with disabilities from participating in, denying them the benefits of, or discriminating against them in Executive agency programming applies to their offices. *See* ECF No. 18 at 4 (recognizing that "the White House Office, the Office of the Vice President, . . . and any committee, board, commission, or similar group established in the Executive Office of the President" are covered by the provision (quoting 3 C.F.R. § 102.103)). And they do not dispute that the text of the prohibition encompasses the type of claim alleged here—namely, failing to make the information communicated in White House press briefings accessible to people who are deaf. The defendants argue instead that the plaintiffs' Rehabilitation Act claim is unlikely to succeed for three reasons: First, because the plaintiffs' suit is claim precluded by a previous case brought and settled by one of the plaintiffs here; second, because the act's prohibition of discrimination in government programming is unenforceable; and third, because, even if the prohibition of discrimination in government

6

programming and activities is enforceable, the court should deem the provision of English captions or transcripts a sufficient accommodation. The court addresses each argument in turn.

1.  *The Plaintiffs' Rehabilitation Act Claim Is Not Claim Precluded Or Barred By The Referenced Settlement Agreement*

The defendants first argue that the plaintiffs are unlikely to succeed on their Rehabilitation Act claim because it is precluded by a case brought and settled by five deaf individuals and NAD five years ago, *National Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (D.D.C. 2020). *See* ECF No. 18 at 12–18. This argument is not persuasive.

The plaintiffs' Rehabilitation Act claim is not barred by claim preclusion. Claim preclusion applies "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)). The defendants' argument fails at the first step. The plaintiffs' claim here cannot be said to be the same as in the prior suit—or, as courts have put it, to "share the same nucleus of facts" as that case— because they are challenging their exclusion from, and denial of the benefits of, press briefings that had not even occurred at the time of the prior suit. *Id.* at 261 (quoting *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004)). It is well established that "[c]laim preclusion generally does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 414 (2020) (quotation marks and citation omitted); *see also Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) ("Federal law is clear that post-judgment *events* give rise to new claims, so that claim preclusion is no bar."). According to the unrebutted evidence in the record, the defendants have conducted White House press briefings without ASL interpretation since January 2025. *See* ECF No. 2-2 ¶ 5;

ECF No. 2-5 ¶ 7. The plaintiffs claim that doing so has violated and continues to violate their rights; these violations were not challenged—and, indeed, could not yet have been challenged—in the suit five years ago.

If the defendants' preclusion argument did not fail at the first step, it would fail at the second: They have not shown, at least at this stage, that the suit is brought by the same parties or their privies. Although NAD is a common plaintiff to both suits, it is undisputed Ford is not. ECF No. 18 at 15. The defendants assert that Ford is nonetheless precluded from suing because he is a member of NAD and, in the defendants' view, NAD adequately represented Ford's interests either because he might have been a NAD member during the suit or because he is deaf. *See id.* at 15–16. But this argument is not supported by law. *See Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 82 (D.D.C. 2020) (recognizing that a plaintiff's "mere membership in or affiliation" with an association that litigated a prior case "does not foreclose" them from bringing claims); *see also Cal. Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) ("Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization.").

Nor does the settlement agreement in the prior suit bar this action. The agreement, by its terms, does not relinquish "claims based on any acts or omissions that may occur after the date of execution" of the agreement. ECF No. 14-1 at 4. The defendants' decision to hold briefings without ASL interpretation since January 2025 clearly occurred after the agreement's execution. And, as noted, Ford was not a party to the earlier action or a party to the settlement agreement, and therefore it is hard to see how it could possibly bar his legal claims.

The defendants' arguments that the claims here arise from the same nucleus as the earlier suit, so as to be barred by the suit or its settlement agreement, is hard to square with their prior

8

representations in this case. After this case was initially assigned to the judge in the prior case as related, the defendants argued—successfully—that it should be reassigned because the two cases "do not 'relat[e] to the same subject matter.'" ECF No. 7 at 3 (alteration in original) (quoting LCvR 40.5(a)(4)). Their argument also has an incoherence to it. The suit that the defendants rely upon as preclusive of this one, which challenged the failure to provide ASL during COVID-19 press briefings, was settled after the government voluntarily provided ASL interpretation across a far broader array of press briefings, in a manner "consistent with the relief" the plaintiffs sought in that case. ECF 14-1 at 3. Under the defendants' theory, they could have ceased providing any ASL interpretation in press briefings the very next day, and the plaintiffs (and even non-plaintiffs like Ford) would be barred from suing again.

The defendants' preclusion arguments are not convincing, and do not impact the plaintiffs' likelihood of success in this case.

### 2. Section 504(a)'s Prohibition On Excluding Or Discriminating Against People Because Of Their Disability In Government Programming Is Enforceable

In *Lane v. Pena*, 518 U.S. 187 (1996), the Supreme Court considered whether a plaintiff asserting that the government has discriminated in programming in violation of § 504(a) may obtain monetary damages and held that damages were not available because the Rehabilitation Act does not unequivocally waive the federal government's sovereign immunity against monetary damages awards. *Id*. at 200. Although the plaintiff in *Lane* had obtained injunctive relief, there, the government "did not dispute the propriety" of such relief under the Rehabilitation Act. *Id*. at 190. The government now argues that the Rehabilitation Act provides no private cause of action to seek injunctive relief when it excludes or discriminates against people with disabilities in its programming or activities. ECF No. 18 at 18–20. That is not a sound reading of the statute's text, history, or structure. *See Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 53–57 (D.D.C. 2020)

9

(explaining that the statute's text, history, and structure support the conclusion that Congress provided a private cause of action for such claims). And, even if it were a sound interpretation, it would not get the defendants very far: As another judge of this court has recognized, in the event the statute itself does not provide a private cause of action, the prohibition would be enforceable under the court's "inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis*, 749 F. Supp. 3d at 22.

It is well established that not all statutory violations give rise to a private cause of action. As the Supreme Court has put it, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). So, the "determinative" question for courts is one of statutory intent—whether the statute "displays an intent to create not just a private right but also a private remedy." *Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)). Courts begin this inquiry with the "text and structure" of the statute. *Id.* at 288.

The Rehabilitation Act's text and structure create a private cause of action. In the text of section 504(a), Congress adopted the very language that the Supreme Court and Congress have recognized as prototypical to demonstrate statutory intent to have a private cause of action. The text, in relevant part, says: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The Supreme Court has held, and consistently reaffirmed, that this formulation—"no person . . . shall be subjected to discrimination"—creates a private cause of

action. *See, e.g.*, *Cannon*, 441 U.S. at 689–90; *Sandoval*, 532 U.S. at 288. In *Cannon*, the Supreme Court considered section 901(a) of Title IX—which provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681—and held that this language created a private cause of action. *Cannon*, 441 U.S. at 689. The court explained that the phrasing used was "patterned after Title VI of the Civil Rights Act of 1964" and that this "critical language in Title VI had already been construed as creating a private remedy." *Cannon*, 441 U.S. at 694, 696. The court reiterated the same reasoning in *Sandoval*, explaining that this "critical" phrasing led the court to conclude that "Congress had intended Title IX, like Title VI, to provide a private cause of action." 532 U.S. at 280, 288. The Supreme Court further recognized that Congress has "ratified *Cannon*'s holding," which "cannot be read except as a validation" of the court's conclusion that this formulation creates a private cause of action. *Id*. at 280 (quoting *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 72 (1992)). Congress's use of nearly identical phrasing in section 504(a) demonstrates the same statutory intent.

That is also clear from the text's history. The parallel language in section 901 of Title IX (the language in *Cannon*) and section 504(a) of the Rehabilitation Act (the language here) was not by accident, but by design. Like section 901 of Title IX, Section 504 of the Rehabilitation Act was specifically modeled after section 601 of Title VI. *Gottfried v. FCC*, 655 F.2d 297, 312 (D.C. Cir. 1981) (recognizing "Section 504 of the Rehabilitation Act was expressly modeled on Section 601 of Title VI of the Civil Rights Act of 1964") (citing S. Rep. No. 93-1297, 93d Cong., 2d Sess., reprinted at (1974) U.S. Code Cong. & Ad. News 6373, 6390 ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act

11

of 1964")). So, when Congress drafted section 504(a) it chose the same "critical language" that "had already been construed as creating a private remedy." *Cannon*, 441 U.S. at 696; *see also Sandoval*, 532 U.S. at 288 (recognizing Congress creates a private cause of action when it enacts "the verbatim statutory text that courts had previously interpreted to create a private right of action"). Indeed, by the time Congress added the clause prohibiting discrimination in government programming to section 504(a) in 1978, circuits to consider the issue had unanimously interpreted section 504(a) to allow suits for injunctive relief under a private cause of action. *See Davis v. Se. Cmty. Coll.*, 574 F.2d 1158 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979); *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977); *United Handicapped Fed'n v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296 (2d Cir. 1977).

The statute's structure supports this understanding, too. As described, when Congress amended the Rehabilitation Act to include the clause prohibiting discrimination in government programming, it also added section 505, entitled "Remedies and attorney fees." 29 U.S.C. § 794a; *see also* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, § 505, 92 Stat. 2955, 2982–83. There, Congress expanded relief available for claims against the federal government as an employer and federal funding recipients to include remedies available in analogous civil rights schemes. *See* 29 U.S.C. § 794a(a). In addition to expanding relief for those particular prohibitions, Congress specified that reasonable attorney's fees would be available in "any action or proceeding to enforce or charge a violation of a provision of this subchapter." *Id*. § 794a(b). Congress's expansion of the remedies available for certain actions under the statute, and broader directive that attorney's fees be available for "any action or proceeding" under the statute, confirms Congress understood there to be causes of action to bring those claims into federal court in the first place. The court accordingly concludes,

consistent with Chief Judge Boasberg's analysis of the statute in *National Ass'n of the Deaf*, that the text, history, and structure of the Rehabilitation Act create a private right of action. 486 F. Supp. 3d at 53–57.

The defendants argue there is no private cause of action when it comes to the clause of the sentence in section 504(a) prohibiting *the government* from excluding or discriminating against people with disabilities in programming and activities, contending there is a cause of action only for the clause of that sentence prohibiting discrimination by *federal funding recipients*. ECF No. 18 at 18–19. That is so, they say, because when Congress added section 505, it stated that claims for discrimination in federal employment and by federal funding recipients would have available the "remedies, procedures, and rights" of the analogous statutory schemes in Title VII and Title VI, respectively, and did not mention claims for discrimination in government programming. 29 U.S.C. § 794a(a). According to the defendants, the court can infer from this that Congress did not intend any private cause of action for claims of executive agency discrimination. ECF No. 18 at 18–19. Instead, Congress intended that such discrimination claims be brought under the Administrative Procedure Act, based on regulations agencies promulgate. *See id.* at 21 (citing 29 U.S.C. § 794(a) (directing agencies to "promulgate such regulations as may be necessary to carry out" the act's prohibition)).[1]

This court does not find the defendants' interpretation persuasive. To begin with, they do not meaningfully respond to the text of section 504(a). They do not dispute the Supreme Court has held that virtually identical phrasing creates a private cause of action. *Cannon*, 441 U.S. at 689; *Sandoval*, 532 U.S. at 288. And they do not meaningfully respond to the fact that, as in *Cannon*,

---

[1]    The defendants then argue that any such APA claim would be barred here because, although the Rehabilitation Act's prohibition on discrimination by Executive agencies encompasses the defendants, the APA's definition of agencies does not. ECF No. 18 at 21.

Congress specifically modeled the language of section 504(a) on "critical language in Title VI" that "had already been construed as creating a private remedy." 441 U.S. at 696. Indeed, the defendants do not even cite *Cannon*. The defendants may wish to overlook binding precedent, but this court cannot. *See Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2230 n.1 (2025) (observing that courts "remain[] bound by *Cannon*'s 'holding'" despite shifts in the approach to inferring causes of action (quoting *Sandoval*, 532 U.S. at 282)).

The defendants appear to argue that the text of section 504(a) does not matter because of structure—namely Congress's decision to connect some, but not all, Rehabilitation Act violations to the remedies available under other, analogous remedial schemes. But that is not an apt inference for two reasons. First, that Congress *expanded* the remedies available for discrimination claims against the federal government as an employer and against federal funding recipients to include those available under analogous statutory regimes does not imply an intent to *restrict* section 504(a)'s private cause of action as it relates to the government's discrimination in programming. There is an obvious reason why Congress would not include claims against the government for discrimination in programming in those provisions: the statutory schemes section 505 incorporated from Title VII and Title VI are schemes that address discrimination by employers and by federal funding recipients, respectively; they do not apply to discrimination in government programming. As the government once put it, it "would have been odd for Congress to have provided that Title VI remedies applied in section 504 cases involving discrimination by executive agencies because Title VI [unlike § 504] does not prohibit discrimination in programs or activities conducted by executive agencies." Brief for Respondents at 16, n.8, *Lane v. Pena*, 518 U.S. 187 (1996) (No. 95-365). Second, the defendants' argument is premised on an incomplete description of section 505. It overlooks that, in addition to expanding remedies for certain violations of the statute, Congress

specified that attorney's fees would be available in "any action or proceeding to enforce or charge a violation of a provision of this subchapter." 29 U.S.C. § 794a(b). The defendants do not dispute that a suit for exclusion or discrimination in government programming under section 504(a) is an "action or proceeding to enforce or charge a violation of a provision of this subchapter."

So, this is not a scheme in which Congress specifically provided the remedy sought here—injunctive relief—for some claims, but not the claim at issue here. In that case, a negative inference might have logic to it. In this case, Congress provided more expansive remedies for some claims by incorporating remedial regimes related to those particular claims and also expanded the relief available for "any" violation of the act's prohibitions by providing attorney's fees. There is no negative inference to draw from that structure.

The defendants' structure argument is even less persuasive when understood in historical context. The implication would be that after Congress, in 1973, adopted language in section 504(a) that was well established to create a private cause of action, it then, in 1978, added the prohibition against discrimination in government programming to *the very same sentence* which created that private cause of action, without intending the established cause of action to apply to this prohibition and only intending the cause of action to apply to a different part of the same sentence that prohibits discrimination by federal funding recipients. If Congress wanted that, it could have easily said so, rather than engaging in a roundabout negative inference from expanded remedial schemes that were attached to other violations. The far more natural reading is that, when Congress added this prohibition to a sentence containing language long understood to create a private cause of action, it intended to, well, provide a private cause of action.

In any event, if the defendants' understanding of the statute were sound, it would not get them far. As Judge McFadden concluded in one of the chief cases the defendants rely on, the

15

Rehabilitation Act's prohibition on disability discrimination by the government in programming would be enforceable even in the absence of a statutory cause of action, under a court's "inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis*, 749 F. Supp. 3d at 22. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state or federal officials "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). While this equitable power "is subject to express and implied statutory limitations," there is no such limitation here. *Id.* at 327; *see also McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (recognizing that courts do not "construe a statute to displace courts' traditional equitable authority absent the clearest command" (citation omitted)).

The defendants argue the Rehabilitation Act displaces the court's equitable power to grant injunctive relief, citing cases that recognize limits on a court's equitable power where Congress has provided a "detailed and exclusive remedial scheme" for violations of the statute. *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002); *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). According to the defendants, that is so here because section 504(a) says agency heads must "promulgate such regulations as may be necessary to carry out the amendments to this section." 29 U.S.C. § 794(a). The defendants argue this language displaces the court's equitable power and limits victims of discrimination by the government to administrative remedies created by agencies followed by actions under the Administrative Procedure Act. ECF No. 18 at 21.

But a statutory directive for agencies to promulgate regulations bears no resemblance to detailed and exclusive remedial schemes that the Supreme Court has found to displace the court's equitable power. In *Seminole Tribe*, the relevant statute at issue provided "intricate procedures" that created "a detailed remedial scheme for the enforcement against a State of a statutorily created

16

right." 517 U.S. at 74. The scheme limited judicial forms of relief to a "modest set of sanctions"—such as requiring the government to negotiate or submit proposals to a mediator, who would then notify the Secretary of the Interior if mediation failed—which showed Congress's intent "not only to define, but also to limit significantly, the duty imposed" on the government. *Id*. at 74–75; *see also Verizon*, 535 U.S. at 647 (discussing these key features of *Seminole Tribe*). The Rehabilitation Act, in contrast, sets forth no alternative remedial scheme for claims alleging the government has discriminated in programming and "places no restriction on the relief a court can award." *Verizon*, 535 U.S. at 647. The defendants' notion that a direction to promulgate regulations is a detailed, exclusive remedial scheme finds no support in precedent.[2]

The court accordingly rejects the argument that the Rehabilitation Act's prohibition against excluding or discriminating against people because of their disability in government programming is unenforceable.

3. *The Plaintiffs Are Likely To Succeed In Their Claim That The Defendants' Failure To Provide ASL Interpretation Violates Section 504(a)*

"To prove a violation of section 504, the plaintiffs must show that (1) they are disabled within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under a program or activity, and (4) the program or activity is carried out by a federal executive agency." *Am. Council of the Blind*

---

[2]    The court's conclusion that the APA is not the sole remedy for such violations is reinforced by Congress's decision to define "Executive agency" more broadly in the Rehabilitation Act than in the APA. It would not "make sense to assume—particularly when the text of section 504 indicates otherwise—that Congress intended to direct [plaintiffs suing executive agencies under section 504(a)] to the APA's remedial scheme when section 504's reference to 'any Executive agency' is meant to be more inclusive of entities than is the APA's definition of an agency." *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54–55 (citing 7 Op. O.L.C. 110, 111–15 & n.13 (1983)). The court also agrees with Judge McFadden's conclusion that the availability of APA review would not displace the court's equitable power. *See Mathis*, 789 F. Supp. 3d at 22 (observing that equitable power would remain as a "final avenue" in addition to any APA review under agency regulations).

*v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). The defendants do not dispute that the plaintiffs will likely succeed in proving the first, second, and fourth requirements. *See* ECF No. 18 at 22–27. They instead challenge only that declining ASL interpretation excludes plaintiffs from, denies them the benefit of, or discriminates against them in press briefings. *See id.* at 22.

Section 504 requires the defendants to provide people with disabilities "meaningful access" to their programming and activities. *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir. 2017) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). This inquiry is "necessarily fact-specific." *Paulson*, 525 F.3d at 1267. But the D.C. Circuit has recognized the "general pattern" that "[w]here the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Id.* "By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access." *Id.* Several courts applying these standards have concluded that "deaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance." *Id.* at 1268 (collecting cases).

The defendants argue otherwise here. They assert that the plaintiffs are unlikely to succeed in showing they have been excluded from or denied the benefits of White House press briefings because briefings "generally are accompanied by captioning and followed by written transcripts." ECF No. 18 at 23. But that assertion contradicts the unrebutted evidence in the record. ASL and English are distinct languages with distinct vocabularies, grammars, and syntaxes. ECF No. 2-4 ¶¶ 15, 27–29. The record shows, and the court finds, that Ford and many deaf NAD members use ASL to communicate and have limited to no proficiency in English. ECF No. 2-2 ¶¶ 2–3; ECF No. 2-5 ¶¶ 3–5. Further, deaf individuals with "little to no mastery of English" cannot "reliably

18

understand the intended meaning [of] written English." ECF No. 2-4 ¶ 31. The court accordingly finds that providing written English does not enable Ford, other NAD members, and the larger community of deaf Americans who communicate in ASL, not English, to receive the information conveyed during a press briefing. For the information to be received by deaf individuals who communicate in ASL and not English, there must be ASL interpretation by a qualified interpreter. *See id.* ¶ 15; *see also, e.g.*, ECF No. 2-2 ¶ 5 (explaining that Ford "tried to watch the White House press briefings" after the White House stopped providing ASL interpretation but "could not understand much of what was being said, even with closed captioning").

Aside from simply asserting that it should be good enough to provide deaf Americans with written English in the form of closed captioning or after-the-fact transcripts, the defendants make no effort to rebut the plaintiffs' evidence that many deaf Americans have no proficiency in English. The defendants correctly note that the plaintiffs are entitled only to reasonable accommodations. *See* ECF No. 18 at 22; *Choate*, 469 U.S. at 301. But it is not reasonable—indeed it can hardly be called an accommodation at all—to transcribe press briefings into a language that Ford and many NAD members do not know.

The defendants also invoke the proposition that "accommodations are not reasonable if they would entail either undue financial and administrative burdens or a fundamental alteration in the nature of a program." ECF No. 18 at 22 (cleaned up); *see Paulson*, 525 F.3d at 1266 (observing the government "may assert as an affirmative defense to liability that accommodating the plaintiffs' disabilities would constitute an undue burden"). They do not make any argument or offer any evidence to establish that offering ASL interpretation would impose "undue financial and administrative burdens." ECF No. 18 at 22. To the contrary, when given the opportunity, the defendants declined to argue that providing ASL interpretation would entail any practical burden.

*See* ECF No. 25 at 59–60. The defendants instead suggest that providing ASL interpretation for deaf Americans is a "fundamental alteration in the nature of" their press briefings. *Id.* at 59. According to the defendants, "[r]equiring the President to share his platform with ASL interpreters every time he or his Press Secretary communicates with the nation is a major incursion on his central prerogatives." ECF No. 18 at 27. This argument is puzzling—the defendants do not make clear what "fundamental alteration" or "major incursion" they are referring to, instead offering only coded language about wanting to present their "message and image in a particular way." *Id.* at 3. To the extent the defendants argue that they prefer to act free from association with accessibility for people with disabilities, their gripe is with Congress and the Rehabilitation Act itself. For the purposes of this action, the defendants concede that section 504(a) applies to them, and wanting to have an "image" free from its requirements is not a sound basis for declining to provide reasonable accommodations. Moreover, on this record, ASL interpretation does not require a speaker to "share his platform" with anyone. The evidence shows, and the court finds, that the defendants can readily implement remote ASL interpretation without an interpreter present in the same room as the speaker. ECF No. 2-4 ¶ 40. Indeed, the White House implemented ASL interpretation this way until recently. *See* ECF No. 1 ¶ 39.

On the current record, the plaintiffs are likely to succeed on their Rehabilitation Act claim by showing that the failure to provide ASL interpretation denies them meaningful access to White House press briefings.[3]

---

[3]    The plaintiffs also bring claims under the First Amendment, Fifth Amendment, and for mandamus and non-statutory review. *See* ECF No. 1 ¶¶ 73–98. Because the court concludes the plaintiffs are likely to succeed on their Rehabilitation Act claim, it need not consider whether they are likely to succeed on their other claims.

### B.  The Plaintiffs Have Shown Irreparable Harm

The irreparable harm inquiry is onerous. It requires the plaintiffs to identify injury that is "certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And that injury must also be one that is "beyond remediation." *Id*. As the D.C. Circuit has explained:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* at 297–98 (citation omitted).

The injury here clears this threshold. As explained, the court finds that without ASL interpretation, Ford and other deaf NAD members who communicate in ASL and not English are not able to receive information conveyed at White House press briefings. The record further shows that these press briefings are used by the White House to communicate directly with the public about critical issues that affect the everyday lives of Americans. *See* ECF No. 2-4 ¶ 47. In recent months, White House press briefings have included discussions of natural disasters, federal military and law enforcement deployments in cities around the country, military strikes across multiple continents and questions about whether the United States is at war, the passage of major legislation that impacts Medicare and Medicaid, and an ongoing government shutdown. *See* ECF No. 20 at 20.[4] The plaintiffs' inability to access this information constitutes irreparable harm. *See*

---

[4]    The White House's press briefings often discuss many of these and other important issues impacting Americans around the country. *See, e.g.*, Press Secretary Karoline Leavitt Briefs Members of the Media, Oct. 23, 2025, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-oct-23-2025/; Press Briefing by the White House

ECF No. 2-2 ¶¶ 6, 7; *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 58 (concluding that "absent ASL

interpretation" the plaintiffs would "suffer irreparable harm because they [would] be denied timely

access to . . . critical information, leaving them less able to comply with current orders and advice,

less able to prepare for the future, and more anxious about current conditions and the future"

(cleaned up)).

In response, the defendants merely repeat their argument that "means like closed

captioning" should be good enough for deaf Americans. ECF No. 18 at 9. As explained, however,

that argument contradicts the unrebutted evidence in the record, as well as the court's findings that

ASL and written English are distinct languages and that such means do not allow deaf Americans

who rely on ASL, rather than English, to receive the information communicated. Given the nature

of the programming at issue here—regularly scheduled briefings on critical topics implicating

markets, medicine, militaries, and myriads of other issues—the court finds that denying deaf

Americans access to and the benefit of it presents a clear, present, and imminent harm that cannot

plausibly be addressed through corrective relief at a later date.[5]

### C.  The Balance Of The Equities And The Public Interest Favor The Plaintiffs

The balance of equities and public interest factors merge here because the government is

the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiffs have readily satisfied

---

Press Secretary Karoline Leavitt, Aug. 28, 2025, https://www.whitehouse.gov/videos/press-briefing-by-the-white-house-press-secretary-karoline-leavitt/; Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 28, 2025, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-28-2025/.

[5]    The defendants argue that the plaintiffs' irreparable harm argument is undercut by the time it took them to file suit after the defendants stopped offering ASL interpretation. ECF No. 18 at 10. But according to the record, the plaintiffs used the time before filing suit to engage directly with the White House, asking it multiple times to voluntarily resume providing ASL interpretation. *See* ECF Nos. 2-6, 2-8. The court finds no unjustifiable or prejudicial delay. In any event, the D.C. Circuit has instructed that "a delay in filing is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

these factors. They seek access to public press briefings on topics of national importance by the executive branch, and to not be excluded from that activity because of their disability. On the other side of the ledger, the defendants have not contested that implementing ASL interpretation is readily feasible. The court has found the plaintiffs are likely to succeed in showing that the defendants are violating the Rehabilitation Act, and, as the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

### D.  Scope Of Relief

Having concluded the plaintiffs have shown the factors favor preliminary relief, the court considers the appropriate scope of such relief. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation omitted). The court accordingly crafts interim relief tailored to the particular claim, irreparable harm, and equities on this record.

The plaintiffs ask for an injunction that requires the defendants to provide qualified ASL interpreters at all planned White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary captured by White House communication channels. They also ask that the defendants be required to have the ASL interpreter visible next to the speaker, either in person or by separate video feed, in a size that is at least one-third of the screen width; that the feed with the interpreter

be provided to networks; and that interpretation be provided for all videos streamed on or uploaded to the White House's website and social media pages. ECF No. 2-1 at 1–2.

The court finds that this proposed relief is overbroad in a number of respects. First, the plaintiffs' argument and evidence supporting issuance of a preliminary injunction focus almost exclusively on the importance of, and corresponding harm that would result from exclusion from, the President's and White House Press Secretary's press briefings. The plaintiffs have not introduced evidence that supports extending the court's relief to other press conferences or related events, or to events conducted exclusively by the Vice President, First Lady or Second Lady.[6] Second, while the plaintiffs have shown entitlement to a publicly accessible feed with visible ASL interpretation, they have not provided evidence supporting specific constraints on the minimum screen width of the interpreter feed. Third, the plaintiffs have not provided evidence to show that ASL interpretation must be included in feeds provided to networks or in all videos streamed or uploaded by the White House in order to provide meaningful access.

The defendants do not challenge the feasibility of providing ASL interpretation of press briefings by qualified interpreters—indeed, until earlier this year the defendants provided ASL interpretation for a broader set of events and officials than the preliminary injunction requires, and they have not submitted evidence of any feasibility challenges in doing so. At oral argument, the defendants suggested for the first time that any relief requiring ASL interpretation could be limited to the discussion of particular topics. *See* ECF No. 25 at 58. Aside from floating this possibility orally, the defendants have not provided the court with any meaningful basis to assess the

---

[6]    In crafting the preliminary injunction, the court also finds it unnecessary to enjoin the President himself where "enjoining other parties in the White House can provide" the necessary relief. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59.

24

feasibility of requiring ASL on a topic-by-topic approach, and the court accordingly declines to adopt such an approach at this stage.

## III.    Conclusion

For these reasons, the court grants the plaintiffs' motion for a preliminary injunction, ECF No. 2, in part and denies it in part. The court finds that, considering the plaintiffs' status as an individual and a nonprofit, as well as unrebutted evidence regarding the relatively low burden and expense of providing ASL interpretation, a nominal bond of $1.00 is appropriate. *See Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025).[7]

Consistent with this opinion, the court orders:

- The Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary shall immediately begin providing a simultaneous and publicly accessible feed with visible American Sign Language interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels.

- These defendants shall file a status report by November 7, 2025, that apprises the court of their compliance with this order.

---

[7]    In their briefing, the defendants request that the court stay any preliminary injunction pending appeal. ECF No. 18 at 35. That request is denied as premature. If, after reviewing this opinion and order, the defendants decide to pursue an appeal, they may move for a stay pending appeal and the court will consider it in the ordinary course.

_____

AMIR H. ALI
United States District Judge

Date:   November 4, 2025

26